**Alan PURSELL, Petitioner,**

v.

**Martin HORN, Commissioner, Pennsylvania Department of Corrections; Philip L. Johnson, Superintendent of the State Correctional Institution at Pittsburgh, and Joseph P. Mazurkiewicz, Superintendent of the State Correctional Institution at Rockview, Respondents.**

**Civil Action No. 99–174 E.**

United States District Court,
W.D. Pennsylvania.

Feb. 1, 2002.

---

See also 555 Pa. 233, 724 A.2d 293 and 561 Pa. 214, 749 A.2d 911.

Matthew Lawry, James Anderson, Staurt Lev, Defender Association of Philadelphia, Capital Habeas Unit, Philadelphia, PA, for petitioner.

Kenneth A. Zak, Office of the District Attorney, Erie, PA, for respondents.

### *MEMORANDUM OPINION AND ORDER*

D. BROOKS SMITH, Chief Judge.

## TABLE OF CONTENTS

I. FACTS AND PROCEDURAL HISTORY ................................... 284

II. EXHAUSTION ..................................................... 288

III. PROCEDURAL DEFAULT ........................................... 290

 A. The Procedural Bars in Question ...................................... 292

 B. When The Alleged Default Occurred .................................. 292

 C. Was the Waiver Rule Firmly Established Between 1982 and 1994? .......... 293

 D. Was the One Year Limitations Period Firmly Established in 1986? .......... 295

 E. Conclusion to Procedural Default ...................................... 296

IV. STANDARD OF REVIEW ............................................ 297

V. PURSELL'S GUILT–PHASE CLAIMS .................................. 299

 A. Trial Court's Refusal to Order Change of Venue .......................... 299

 (1) Factual Background ............................................. 299

 (2) Legal Analysis ................................................ 300

 (a) Refusal to Presume Prejudice ................................. 302

(b) Refusal to Find Actual Prejudice ................................303

(3) Ineffective Assistance Claim .......................................305

(4) Conclusion ...........................................................306

B. Trial Court's Denial of Challenges For Cause ...........................306

(1) Ineffective Assistance Claim .......................................306

(a) Legal Background ..............................................307

(b) Challenges to Shank, Noble, Fink, and Gunther ....................308

(c) Challenges to Ott and Yaple .....................................310

(d) Was Counsel Deficient In Failing to Raise Claims Concerning
 Ott and Yaple? ..............................................318

(2) Sixth Amendment Right to Impartial Jury ...........................321

(3) Due Process Claim ................................................322

(4) Trial Court's Grant of Commonwealth's Challenge for Cause ............322

(5) Conclusion .........................................................322

C. Prosecution's Failure to Disclose Evidence of Other Suspect .....·.......323

(1) Factual Background ................................................323

(2) Request for Evidentiary Hearing ....................................325

(3) Brady Claim .......................................................326

(4) Ineffective Assistance Claim .......................................329

(5) Conclusion .........................................................329

D. Prosecutorial Misconduct ..............................................329

(1) Claims Relating To Testimony of Officer Mark Krahe .................330

(a) Pursell's Invocation of Right to Counsel ..........................331

(b) Testimony About Pursell's Prior Criminal Record and Counsel's
 Withdrawal of Motion for Mistrial ..............................335

(c) Krahe's Testimony About Conley's Accusation of Rape ..............340

(d) Krahe's Testimony That Pursell Was "Nervous" ...................342

(2) The Testimony of the Erie County District Attorney ..................342

(3) The Use of Prior Consistent Statements .............................343

(a) Factual Background .............................................343

(b) Prosecutorial Misconduct Claim .................................344

 (c) Ineffective Assistance Claim ................................... 346

 (d) Conclusion ................................................. 346

 (4) Prosecutor's Remarks About Pursell's Appearance .................... 347

 (a) Factual Background .......................................... 347

 (b) Admission of Evidence in Case in Chief ........................... 348

 (c) Prosecutor's Closing Remarks ................................. 348

 (d) Conclusion ................................................. 350

 (5) Prosecutor's Reference to Personal Knowledge ....................... 350

 (6) Prosecutor's Reference to Time of Death ........................... 351

 (7) Cumulative Effect of Errors ..................................... 352

 (a) What Errors Should Be Considered? ............................ 352

 (b) Legal Analysis of Cumulative Claim ............................ 353

 (c) Conclusion ................................................. 354

E. Ineffective Assistance of Counsel ..................................... 354

 (1) Counsel's Failure to Request a Jury Instruction on Good Character ..... 354

 (2) Counsel's Failure to Rehabilitate Dorothy Pursell ...................... 355

 (3) Counsel's Failure to Object to Impeachment by Omission ............... 357

 (4) Counsel's Failure to Challenge Contention That Nearest Rock Was Two Hundred Feet From Victim ................................... 358

 (5) Counsel's Failure to Impeach Diane Walters ......................... 359

 (6) Counsel's Failure to Rebut Claim of Premeditation ..................... 362

 (7) Claim Based on Counsel's Cumulative Errors ........................ 363

F. Challenge to Jury Instructions ........................................ 363

 (1) Jury Instruction on Malice ....................................... 364

 (2) Mandatory Presumption of Malice and Intent to Kill ................... 366

 (3) Ineffective Assistance Claim ...................................... 368

 (4) Conclusion .................................................... 368

G. Pursell Represented Himself On His PCRA Appeal ....................... 368

 (1) Background .................................................... 369

 (2) Claim is Barred By Teague ....................................... 370

(3) Merits of the Claim ............................................372

(4) Conclusion ....................................................373

H. Challenge to Conduct of All Prior Counsel ...............................373

I. Claim for Cumulative Trial Error .....................................373

(1) Analyzing Claims for Cumulative Error ...........................374

(2) The Errors ....................................................376

(3) Merits of the Claim ...........................................376

(4) Conclusion ....................................................377

J. Conclusion to Guilt–Phase Analysis ...................................377

**VI. PURSELL'S SENTENCING–PHASE CLAIMS** ...........................378

A. Counsel's Failure to Investigate and Introduce Mitigating Evidence .........378

(1) Factual Background ............................................378

(a) Pursell's Early Years .........................................378

(b) Physical and Sexual Abuse .....................................379

(c) Drug and Alcohol Abuse .......................................379

(d) Psychological Impairments .....................................380

(e) Kind, Loving, and Peaceful Person .............................381

(2) Expansion of the Record .......................................381

(3) Legal Analysis ................................................382

(a) Counsel Was Deficient ........................................382

(b) Counsel's Conduct Prejudiced Pursell...........................385

(4) Conclusion ....................................................387

B. The Trial Court's Instruction on the Meaning of Torture ..................387

(1) Factual Background ............................................387

(2) Clearly Established Federal Law ................................388

(3) Unconstitutionality of the Instruction .........................390

(a) Especially Heinous, Atrocious, or Cruel Manifesting Exceptional
 Depravity ...................................................390

(b) Intention to Inflict Pain or Suffering.........................393

(c) Meaning of Torture Was a Moving Target........................394

(4) Is Relief Required Under AEDPA? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395

 (a) The Pennsylvania Supreme Court's Decision . . . . . . . . . . . . . . . . . . . . . . 395

 (b) Unreasonable Application Prong . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 397

(5) Harmless Error Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

(6) Conclusion to Torture Challenge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

VII. **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 399

On January 26, 1982, a jury empaneled by the Court of Common Pleas of Erie County, Pennsylvania convicted petitioner, Alan Pursell, of first degree murder in the death of thirteen year-old Christopher Brine and, in a separate proceeding, sentenced him to death. At issue today is Pursell's federal habeas corpus petition filed pursuant to 28 U.S.C. § 2254 (1994 & Supp.2001). Dkt. nos. 9 & 26. In this petition, Pursell claims that his trial and sentencing hearing were infected with constitutional error, and he requests either a new trial or, at a minimum, a new sentencing hearing. For the following reasons, I will grant this petition to the extent that it seeks a new sentencing hearing and deny it in all other respects.

## I. FACTS AND PROCEDURAL HISTORY

On July 23, 1981 at approximately 6:30 p.m., thirteen year-old Christopher Brine left his home in Wesleyville, Pennsylvania, riding his bronze Columbia bicycle. (Tr. 1/19/82, at 101–04).[1] Less than twenty-four hours later, he was found dead along a wooded area in Lawrence Park Township. *Id.* at 57–61. He was naked, his face was drenched with blood, and a twenty-five foot long tree-limb lay across his throat. *Id.* at 74–75; 125–26; 134; *Commonwealth v. Pursell*, 508 Pa. 212, 495

A.2d 183, 186 (1985) (*Pursell–1*). An autopsy revealed that Brine had sustained fifteen blows to the head with a rock, and had suffered a broken nose, internal hemorrhaging in the neck, and swollen eyes. *Pursell–1*, 495 A.2d at 186; *see also* (Tr. 1/20/82, at 172–77, 179). The ultimate cause of death, however, was asphyxiation as Brine's windpipe was crushed when he was strangled with the tree-limb. (Tr. 1/20/82, at 180).

Within days of the murder, the police began to piece together evidence that linked Alan Pursell to the crime. By the time that Pursell was tried for Brine's murder in January of 1982, the Commonwealth's case against him rested on four evidentiary pillars.

First, a pair of glasses was found at the murder scene. *Id.* at 133. An optometrist, Dr. Moody Perry, examined these glasses and determined that they were the same prescription and frame that he sold to Pursell a few months before the murder. (Tr. 1/20/82, at 218–20). According to Dr. Perry, the prescription was so rare that his office records revealed that he had written it only once in six years. *Id.* at 214 & 220. On the afternoon of July 24, 1981, hours after the murder took place, Pursell returned to Dr. Perry's office and ordered a new pair of glasses, explaining

---

**1.** Throughout this Memorandum Opinion, I will cite to the trial transcript in this case as "(Tr. 1/——/82, at ——)." The trial transcript spans nearly two thousand pages and can be found at dkt. nos. 15–18.

that his pair had been stolen. *Id.* at 226–28, 239, 254–55.

Second, a number of witnesses confirmed that Pursell lost his glasses on the very night that Brine was killed. On the night of the murder, Pursell was living with his mother in her trailer in Wesleyville, Pennsylvania. (Tr. 1/21/82, at 68–69). Almon Hall saw Pursell at approximately 9:00 or 9:30 p.m. on the night of the murder at Mrs. Pursell's trailer. *Id.* at 69–70. According to Hall, Pursell was not wearing any glasses, *id.* at 70–71, and he looked nervous. *Id.* at 73. Hall overheard Mrs. Pursell ask her son about his glasses, and Pursell said that he lost them in a fight. *Id.* at 71, 73. An hour later, at approximately 10:30 p.m., Pursell had a brief conversation with two boys who lived next to his mother's trailer, James Lynch and Thomas Jagta. Both boys noticed that Pursell was not wearing his glasses. *Id.* at 8, 26. When Lynch asked Pursell about his glasses, Pursell also told him that he lost them in a fight. *Id.* Pursell mentioned as well that he hit someone in the head with a brick during this fight. *Id.* 8–9, 26.

Third, Pursell made an incriminating statement to his friend, Diane Walters. On July 27, 1981, he and Walters were watching the television news when, out of the blue, Pursell asked if a person could be traced through his glasses. *Id.* at 57–58. At the time, only the police and the murderer himself could have known that a pair of glasses was found at the scene of the crime because the local news media had made no such report. (Tr. 1/20/82, at 269–71, 275); (Tr. 1/21/82, at 85–86).

Finally, a search of Pursell's trailer turned up a pair of brown shoes that contained several small drops of blood. Although Pursell and Brine had the same blood type, an analysis of the isoenzymes in the blood stains showed that they were inconsistent with Pursell's blood, but consistent with the blood chemistry of 5.5% of the population, including Brine. (Tr. 1/22/82, at 162, 171–72, 184–85).

Based on this and other evidence, Pursell was tried for the murder of Christopher Brine. At trial, he contested nearly all of the facts introduced against him.

First, he attacked the Commonwealth's theory that he lost his glasses while murdering Brine, introducing evidence to show that he lost them days before Brine's death. Two witnesses testified that they saw Pursell at the optometrist's office without his glasses on the afternoon of July 23, 1981, hours before the alleged murder took place. (Tr. 1/25/82, at 8–11, 163).[2] Pursell introduced testimony to show that his conversation with Lynch and Jagata took place on July 22, not July 23, (Tr. 1/22/82, at 230, 232), proving, according to Pursell, that he lost his glasses long before Brine's death. Finally, both Pursell and his mother testified that Pursell had lost his glasses days before the murder. (Tr. 1/25/82, at 20–24, 85–87).

Second, Pursell tried to refute the inference that Brine's blood was on his shoes. Kathy Sheehan, who had been living with Pursell shortly before the murder, testified that Pursell received those shoes from the Red Cross in April 1981. (Tr. 1/22/82, at 266–67). According to the trial testimony,

---

**2.** Pursell also introduced evidence suggesting that he could not have been at the optometrist's on July 24, 1981. Teddy Wilson, a friend of Pursell's, testified that on July 24th he and Pursell went to the hospital where Wilson was scheduled to get a cast removed. (Tr. 1/22/82, at 237–41). After leaving the hospital, the two men went fishing. *Id.* Wilson's testimony was corroborated by Dr. James Rochelle, who testified that he treated Wilson in the hospital on the afternoon of the 24th and that he saw Pursell at the time. *Id.* at 257–60.

the shoes contained blood spots on them when they came from the Red Cross. *Id.* at 268. Nevertheless, Pursell did not like the shoes, kept them at his mother's house, and wore them on only one occasion. *Id.* at 269–70, 279; *see also* (Tr. 1/25/82, at 20–21, 81–82).

Finally, Pursell offered an alibi for his whereabouts during the time of the murder. Pursell's mother testified that she was with her son throughout the night of July 23 and into the morning of July 24. Although Mrs. Pursell had a date on the night of July 23 with Almon Hall, she and Hall returned to the trailer around 9:30 or 10:00 p.m. where they found Pursell eating cereal. The three chatted until Hall left at approximately 11:00 p.m. (Tr. 1/25/82, at 31–35). Mrs. Pursell and her son then talked until 12:15 p.m. when she went to bed. Mrs. Pursell, who is a light sleeper, was up several times during the night and each time she saw her son asleep on the couch. *Id.* at 37–38.

The jury rejected Pursell's account, convicted him of first degree murder, and sentenced him to death. (Tr. 1/26/82, at 100, 151–53). On appeal, Pursell challenged his conviction and death sentence on numerous grounds. Dkt. no. 18, at 1978. In a five to two decision, the Pennsylvania Supreme Court rejected Pursell's challenge and affirmed his conviction and death sentence. *Pursell–1*, 495 A.2d at

198.[3] Pursell's conviction became final on December 23, 1985.[4]

Pursell subsequently filed various pleadings with the Court of Common Pleas and the Pennsylvania Supreme Court, seeking relief under the Pennsylvania Post Conviction Relief Act (PCRA), 42 Pa. Cons.Stat. Ann. §§ 9541 *et seq.* Pursell's court-appointed counsel filed a PCRA petition ("counseled PCRA petition") that raised only three claims for relief. *Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 300 (1999) (*Pursell–2* ). In response, Pursell filed a motion requesting the appointment of new counsel and seeking leave to supplement the counseled PCRA petition. The trial court denied both motions and later, without opinion, denied the counseled PCRA petition on March 23, 1993. *Id.* Acting *pro se*, Pursell appealed the trial court's decision to the Pennsylvania Supreme Court. In that appeal, he raised the three claims put in his counseled PCRA petition and twenty-seven other claims. *Id.* Because the trial court had never issued an opinion in the matter, the Pennsylvania Supreme Court remanded the case so that the trial court could explain its March 23, 1993 order. This remand occurred on January 15, 1997. *Id.*

Once again, Pursell sought to amend his PCRA petition in front of the trial court and, once again, he was denied the opportunity.[5] On April 25, 1997, the trial court

---

3. Throughout this Memorandum Opinion, the Pennsylvania Supreme Court's opinion on Pursell's direct appeal will be referred to as *"Pursell–1."*

4. The Pennsylvania Supreme Court denied Pursell's petition for rehearing in *Pursell–1* on September 24, 1985. *Pursell–1*, 495 A.2d at 183. Under Rule 13 of the Rules of the United States Supreme Court, Pursell had ninety days to file his petition for certiorari after "the date of the denial of the petition for rehearing ..." Accordingly, Pursell had until December 23, 1985 to file his petition for

certiorari. Because he did not file such a petition, his conviction became final on that date for purposes of this federal habeas petition.

5. The original trial judge in this case was Judge Jess S. Jiulante of the Erie County Court of Common Pleas. Judge Jiulante presided over Pursell's trial and issued the March 23, 1993 order denying Pursell's PCRA petition. After this March 1993 order, however, Judge Jiulante took senior status. Accordingly, Pursell's case was assigned to Judge Er-

issued an opinion addressing the merits of only the three claims raised in the counseled PCRA petition. *Id.* at 301. Concerning the additional issues raised by Pursell, the trial court stated that to review those issues "would exceed the Supreme Court's mandate." Dkt. no. 19, at 2505–06 n. 3. Nevertheless, it also held that "it would appear that those claims are also barred by the PCRA's waiver provision." *Id.*

After the trial court issued its opinion, the Pennsylvania Supreme Court again took up Pursell's *pro se* appeal. Relying on the original briefs filed in 1994, *id.* at 2257–2488, the Supreme Court issued an opinion denying both Pursell's counseled and *pro se* petitions for relief. *Pursell–2,* 724 A.2d at 315.[6] First, the court held that most of Pursell's claims were waived because they were not raised at trial or on direct appeal. *Id.* at 302 n. 6, 303, 306. Second, although recognizing that Pursell could overcome his waiver by asserting an ineffective assistance of counsel claim, the court rejected Pursell's allegation that his counsel was ineffective for failing to raise certain claims in the PCRA petition. *Id.* at 304–313. Finally, the court reviewed the three claims raised in the counseled PCRA petition and denied relief on these claims on the merits. *Id.* at 314–315. The court issued its opinion in *Pursell–2* on January 19, 1999. On April 5, 1999, it denied Pursell's request for reargument.

On May 12, 1999, Pennsylvania Governor Thomas Ridge signed a warrant for Pursell's execution. Within days, Pursell's lawyers entered their appearance on his behalf in federal court and filed a motion for stay of execution. Dkt. no. 1. On May 24, 1999, I granted the stay, dkt. no. 5, and subsequently entered an order setting a schedule for Pursell to file a petition for habeas corpus pursuant to 28 U.S.C. § 2254. Dkt. no. 6. Pursell filed this petition, along with a memorandum of law, on September 15, 1999. Dkt. no. 9.

At the same time that he was seeking habeas relief in federal court, however, Pursell was still pursuing his remedies in the state courts. In fact, on June 4, 1999, he filed yet another PCRA petition ("second PCRA petition") with the Court of Common Pleas of Erie County.[7] *Commonwealth v. Pursell,* 561 Pa. 214, 749 A.2d 911, 912–13 (2000) (*Pursell–3*).[8] Almost immediately, the trial court denied Pursell's request for relief. *Id.* at 913. Pursell appealed the trial court's decision to the Pennsylvania Supreme Court which affirmed on procedural grounds. In particular, the court explained that Pursell's petition was barred by the 1995 amendments to the PCRA. *See* 42 Pa. Cons.Stat. Ann. § 9545(b). Under these amendments, "[a]ny petition . . ., including a second or subsequent petition, shall be filed

---

nest J. DiSantis, Jr. for all subsequent proceedings.

**6.** Throughout this Memorandum Opinion, the Pennsylvania Supreme Court's opinion in which it denied Pursell's first PCRA petition will be referred to as *"Pursell–2."*

**7.** After I learned that Pursell had filed a second PCRA petition in state court, I stayed all proceedings on his federal petition until the state court resolved the issues raised by Pursell. Dkt. no. 22. Even the Commonwealth conceded that staying the case was an appro-

priate way to proceed. Dkt. no. 23, at 77–80. To the extent that the Commonwealth argues that this case should have been dismissed without prejudice under *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) and *Christy v. Horn,* 115 F.3d 201 (3d Cir.1997), I deem that objection waived.

**8.** Throughout this Memorandum Opinion, the Pennsylvania Supreme Court's opinion on Pursell's second PCRA petition, and its third opinion in the Pursell case, will be referred to as *"Pursell–3."*

within one year of the date that judgment becomes final ..." *Id.* § 9545(b)(1). Because Pursell's conviction became final in 1985, and he did not file the petition in question until 1999, the court held that his petition was time barred. *Pursell–3,* 749 A.2d at 914. It issued this opinion in *Pursell–3* in April 2000.

After the conclusion of these state court proceedings, I ordered the parties to file new memoranda addressing all of the legal and factual issues in this case. At that time, Pursell raised eighteen claims for relief, including numerous sub-claims, and sought a new trial or, at a minimum, a new sentencing hearing. Dkt. no. 26. The Commonwealth addressed the merits of these claims, but vigorously maintained that the entire petition should be dismissed because it contained claims that were unexhausted in the Pennsylvania state courts. Additionally, the Commonwealth argued that a number of Pursell's claims were procedurally defaulted and, thus, unreviewable in federal court. Dkt. no. 28. It is to these procedural issues that I turn first.

## II. EXHAUSTION

■ The federal habeas corpus statute, 28 U.S.C. § 2254, permits a federal court to entertain an application for habeas corpus relief from a state prisoner "only on the ground that he or she is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Although the writ of habeas corpus has been described as the "highest safeguard of liberty," *Smith v. Bennett,* 365 U.S. 708, 712, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961), there are strict procedural limits on when and how it can be entertained by a federal court. One such limitation is known as the exhaustion requirement. As a general rule, a federal court cannot grant a writ of habeas corpus unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b). This exhaustion requirement "ensures that state courts have the first opportunity to review federal constitutional challenges to state convictions and preserves the role of the state courts in protecting federally guaranteed rights." *Evans v. Court of Common Pleas, Delaware County, Pa.,* 959 F.2d 1227, 1230 (3d Cir.1992).

■ To satisfy the exhaustion requirement, a claim need not be actually decided by the state courts. Instead, a claim is exhausted if it was "fairly presented" to the state courts. *Id.* at 1231 (quoting *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). This merely requires that the federal claim is the "substantial equivalent" of the claim brought in state court. *Id.* As the Third Circuit has repeatedly explained, in deciding whether a claim was fairly presented, a district court should look to "the substance of the claim presented to the state courts, rather than its technical designation." *Id.* Even if the state court refuses to hear the claim presented because it is time-barred or waived, the claim is still exhausted as long as the state court is given the opportunity to address it. *Bond v. Fulcomer,* 864 F.2d 306, 309 (3d Cir.1989) (holding that presentation of an untimely petition to the state's highest court satisfied the exhaustion requirement).

■ There is no doubt that Pursell has satisfied the exhaustion requirement in this case. Seventeen of his eighteen claims were presented, in almost verbatim fashion, to the state courts either on direct appeal, *see Pursell–1,* 495 A.2d at 183, or during one of his two petitions for postconviction relief. *See Pursell–2,* 724 A.2d at 293; *Pursell–3,* 749 A.2d at 911. Although the Pennsylvania courts held that most of Pursell's claims were waived or

time-barred, these claims were exhausted simply because they were presented to the courts for review. *Bond,* 864 F.2d at 309. The exhaustion doctrine requires nothing more.

Only one of Pursell's claims merits any discussion on the exhaustion issue. He asks this court to vacate his death sentence because the Pennsylvania Supreme Court conducted what he calls an "arbitrary proportionality review" that violated his rights under the United States Constitution. Dkt. no. 26, Claim 14, at 206. At the time of his conviction, the Pennsylvania Supreme Court was statutorily required to conduct a proportionality review in all death penalty cases. *See* 42 Pa. Cons.Stat.Ann. § 9711(h)(3)(iii) (1985). Under this review, the Supreme Court had to vacate any death sentence if it was "excessive or disproportionate to the penalty imposed in similar cases ..." *Id.* In *Pursell–1,* the Pennsylvania Supreme Court performed this proportionality review and concluded that Pursell's sentence was not excessive or disproportionate in relation to the sentences of others convicted of first-degree murder. *Pursell–1,* 495 A.2d at 197–98. Today, Pursell challenges the Pennsylvania Supreme Court's proportionality review, calling it arbitrary and unconstitutional. Dkt. no. 26, at 206–220.

■ While Pursell did not explicitly raise this issue in state court, the state court nevertheless decided it in two ways. First, to affirm Pursell's conviction on direct review, the Pennsylvania Supreme Court had to necessarily decide the question presented by Pursell in this case. *Pursell–1,* 495 A.2d at 197–98. Indeed the same statute that required the court to perform a proportionality review also stated that a death sentence could not be affirmed if it was "arbitrary." 42 Pa. Cons.Stat.Ann. § 9711(h)(3)(i). The Supreme Court clearly determined that the proportionality review in Pursell's case was not "arbitrary," as Pursell now claims, or it could not have affirmed his sentence. Second, in a recent decision, the Pennsylvania Supreme Court explained that it implicitly resolves all constitutional issues concerning the application of proportionality review when it performs that review on direct appeal. In *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 708 (1998), the court confronted a challenge to its proportionality review that is identical to the one in the present case. It rejected the constitutional challenge with no discussion, stating only that the issue was "previously litigated" when it "fulfilled its statutory obligation to review [defendant's] sentence for proportionality and ruled against him." *Id.* The exhaustion doctrine simply does not require a litigant to present an issue that the state court has already decided.

■ Even if the exhaustion doctrine did require such an odd result, I would excuse Pursell's failure to exhaust this claim because exhaustion would be futile. The Third Circuit has explained that " '[f]utility' exists where ... 'a state's highest court has ruled unfavorably on a claim involving facts and issues materially identical to those undergirding a federal habeas petition and there is no plausible reason to believe that a replay will persuade the court to reverse its field.' " *Lines v. Larkins,* 208 F.3d 153, 162 (3d Cir.2000) (quoting *Allen v. Attorney General of Maine,* 80 F.3d 569, 573 (1st Cir.1996)); *see also Lynce v. Mathis,* 519 U.S. 433, 436 n. 4, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997) (holding that "exhaustion would have been futile" because the Florida Supreme Court previously rejected the same claim in other cases and counsel for the state had "not suggested any reason why the Florida courts would have decided petitioner's case differently.").

Just such a situation is present in Pursell's case. Repeatedly over the past few years, the Pennsylvania Supreme Court has rejected identical constitutional challenges to its proportionality review. In *Commonwealth v. Gribble*, 550 Pa. 62, 703 A.2d 426, 441 (1997), the court held that there was nothing "arbitrary or capricious" in the Pennsylvania scheme. *Id.* A year later, in *Albrecht*, it again rejected a constitutional challenge to its proportionality review. *Albrecht*, 720 A.2d at 708. Finally, in early 1999, it rejected the same constitutional challenge, holding that it found "nothing in Appellant's argument which persuades us that our reasoning in *Gribble* was incorrect." *Commonwealth v. Porter*, 556 Pa. 301, 728 A.2d 890, 901 (1999). To force Pursell to raise a constitutional challenge identical to one that has been repeatedly rejected by the Pennsylvania Supreme Court would require him to perform a "futile act[ ]." *Allen*, 80 F.3d at 573. The exhaustion doctrine does not require such meaningless gestures. "After all, it is the legal issues that are to be exhausted, not the petitioner." *Story v. Kindt*, 26 F.3d 402, 406 n. 8 (3d Cir.1994) (citations omitted).[9]

## III. PROCEDURAL DEFAULT

The Commonwealth's second procedural attack is based on the doctrine of procedural default. It is well-established that a state court decision resting on an independent and adequate state proce-

dural rule is barred from review in the federal courts. *Wainwright v. Sykes*, 433 U.S. 72, 81, 86–87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Known as procedural default, this doctrine is "grounded in concerns of comity and federalism," *Coleman v. Thompson*, 501 U.S. 722, 730, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), and it bars federal habeas review whenever the petitioner has failed to comply with the state's procedural rules, whether this failure occurred at trial, on appeal, or during post-conviction review. *Edwards v. Carpenter*, 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000). Only in the rare instance where the petitioner can demonstrate "cause" for not following the state procedural rule and "prejudice" resulting from application of the procedural bar will a federal habeas court review the merits of the petitioner's claim. *Sykes*, 433 U.S. at 87, 97 S.Ct. 2497.

Before a state procedural rule can act as a bar to relief in federal court, however, it must be both "independent" of federal law and "adequate." *Coleman*, 501 U.S. at 729, 111 S.Ct. 2546; *Szuchon v. Lehman*, 273 F.3d 299, 325 (3d Cir.2001); *Jermyn v. Horn*, 266 F.3d 257, 278 (3d Cir.2001). The Pennsylvania Supreme Court's procedural rules were independent and, thus, I turn to whether those rules were "adequate." A state procedural rule is "adequate" only if it is "firmly established and regularly followed" at the time

9. There is an additional reason that Pursell's efforts to raise this claim in state court would be futile. If state procedural rules bar a petitioner from seeking further relief in state courts, "the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.'" *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir.1999) (citing 28 U.S.C. § 2254(b)(1)(B)(i)); *see also Gray v. Netherland*, 518 U.S. 152, 161–62, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) ("Because [the exhaustion] 'requirement ... refers only

to remedies still available at the time of the federal petition,' it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law.'" (citations omitted)); *Coleman v. Thompson*, 501 U.S. 722, 732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In the present case, there can be little doubt that the Pennsylvania courts would hold Pursell's claim barred under the PCRA's one-year statute of limitations. *See Pursell–3*, 749 A.2d at 913.

that the alleged procedural default occurred. *Ford v. Georgia*, 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348–51, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984)); *see also Edwards*, 529 U.S. at 455, 120 S.Ct. 1587 (Breyer, J., concurring). The United States Supreme Court explained this requirement in *Ford v. Georgia*. In that case, the Georgia Supreme Court applied a state procedural rule adopted in 1987 in the case of *State v. Sparks*, 355 S.E.2d 658, 659 (Ga.1987) to bar defendant's claim, even though defendant's alleged default took place in 1984, three years before the *Sparks* rule was even in effect. The United States Supreme Court rejected the Georgia Court's attempt to bar petitioner's federal claim.

The Supreme Court of Georgia's application of its decision in *Sparks* to the case before us does not even remotely satisfy the requirement of *James* that an adequate and independent state procedural bar to the entertainment of constitutional claims must have been 'firmly established and regularly followed' by the time as of which it is to be applied.... *Sparks* was decided more than two years after petitioner in this case filed his motion on the prosecution's use of peremptory challenges and long after petitioner's trial was over.

*Ford*, 498 U.S. at 424, 111 S.Ct. 850. As the Court further explained, to apply the *Sparks* rule "retroactively to bar consideration of [petitioner's] claim ... would therefore apply a rule unannounced at the time of petitioner's trial and consequently inadequate to serve as an independent state ground within the meaning of *James*." *Id.*

Cases in the Third Circuit have also held that a state procedural rule is not adequate to bar federal habeas relief unless it was firmly established at the time the alleged default occurred. *Doctor v. Walters*, 96 F.3d 675, 686 (3d Cir.1996); *Reynolds v. Ellingsworth*, 843 F.2d 712, 722 (3d Cir.1988); *Szuchon*, 273 F.3d at 325–26. In *Doctor v. Walters*, for instance, the Third Circuit reviewed the petition of Gary Lee Doctor. Doctor escaped from state custody in June 1986. In August of that same year, the state trial court entered a guilty verdict against Doctor without ever informing him or his attorney. In 1992, Doctor was rearrested and sentenced. Soon after his sentencing, Doctor filed an appeal to the Pennsylvania Superior Court, but the Court quashed the appeal in 1993, relying on a procedural rule that required dismissal of all claims brought by a recaptured fugitive. *Doctor*, 96 F.3d at 684. According to the Superior Court, it had no discretion to hear Doctor's appeal.

In reviewing Doctor's petition for habeas corpus, the Third Circuit held that the state's procedural rule was not adequate to bar habeas relief. First, the Court explained that a state procedural rule only bars federal review if it is "firmly established and regularly applied." *Id.* at 684 (quoting *Ford*, 498 U.S. at 423–24, 111 S.Ct. 850). Second, the Court said that the relevant time period for deciding whether the procedural rule was firmly established was not "1993 when the Superior Court relied on it, but rather ... the date [that] the waiver ... allegedly occurred when Doctor escaped in 1986." *Id.* at 686. After a detailed review of the Pennsylvania case law in existence in 1986, the Third Circuit concluded that "it was not 'firmly established' that Pennsylvania courts lacked the discretion to hear an appeal first filed after custody had been restored." *Id.* at 686. Accordingly, "the state courts in this case did not rely on an 'adequate' procedural rule to deny petitioner review of his appeal on the merits."

*Id.*[10]

■■■■ As the Third Circuit's analysis in *Doctor* demonstrates, a federal district court analyzing whether a state procedural rule bars federal habeas relief must undergo a multi-part inquiry. First, it must define the state procedural rule that was allegedly violated. Second, it must identify when, precisely, the alleged default occurred. Finally, it must review the state court decisions prior to the time of the alleged default to determine whether the procedural rule in question was firmly established and consistently applied at that time. *Bronshtein v. Horn,* Civil Action No. 99–2186, 2001 WL 767593, *5 (E.D.Pa. July 5, 2001). In applying this analysis to the present case, I conclude that Pursell's claims are not procedurally defaulted.

### A. The Procedural Bars in Question

There are two alleged procedural bars at issue in the present case. First, in *Pursell–2,* the Pennsylvania Supreme Court refused to address some of the claims raised in Pursell's *pro se* PCRA petition, holding that these claims were waived because they were not raised at trial or on direct appeal. *Pursell–2,* 724 A.2d at 302 n. 6, 303, 306. Under this rule,

claims that were not properly raised at trial or on direct appeal were waived. *Id.* The second procedural bar relied on by the Pennsylvania Supreme Court was a statute of limitations. In *Pursell–3,* the Court held that Pursell's second PCRA petition was barred by the PCRA's one-year statute of limitations. *Pursell–3,* 749 A.2d at 913. Under 42 Pa. Cons.Stat.Ann. § 9545(b), any PCRA petition must be filed "within one year of the date that judgment becomes final." *Id.* Pursell's conviction and death sentence became final in 1985, but his second "PCRA petition was filed in 1999, more than one year from the date that his judgment of sentence became final ..." *Pursell–3,* 749 A.2d at 913. Accordingly, the Court held that Pursell's second PCRA petition was time-barred.

### B. When The Alleged Default Occurred

While determining the procedural bars at issue is simple, deciding when the alleged procedural defaults occurred is much harder. First, in *Pursell–2,* the Supreme Court did not clearly state when the alleged waivers occurred. Nonetheless, a close reading of the Court's opinion in *Pursell–2* provides only one possible time-

---

**10.** Other Circuits also hold that a state procedural rule is inadequate to bar federal habeas relief unless it was firmly established at the time the alleged default occurred. *Johnson v. Muncy,* 830 F.2d 508, 510–14 (4th Cir. 1987) (adequacy of state court ruling that claims were waived because they had not been raised on direct appeal must be assessed as of the time of the direct appeal, not at the time that the state court holds that the claims are waived); *Reed v. Scott,* 70 F.3d 844, 846–47 (5th Cir.1995) (same); *Warner v. United States,* 975 F.2d 1207, 1213–14 (6th Cir.1992) (same); *Liegakos v. Cooke,* 106 F.3d 1381, 1384–85 (7th Cir.1997) (same); *Calderon v. United States District Court,* 96 F.3d 1126, 1129 (9th Cir.1996) (time limitations on filing state post-conviction petitions were not adequate because they were not clear at

the time that the petitioner missed the filing deadline); *Walker v. Attorney General of Oklahoma,* 167 F.3d 1339, 1344–45 (10th Cir. 1999) ("the proper time for determining whether a procedural rule was firmly established and regularly applied is 'the time of [the] purported procedural default.'") (citations omitted); *Spencer v. Kemp,* 781 F.2d 1458, 1467–70 (11th Cir.1986) (*en banc*) (adequacy of state court rule that claims were waived because they were not raised prior to trial must be assessed as of the time of the pretrial proceedings not at the time that the state court holds the claims to be waived); *see also* Louis M. Natali, *New Bars in Pennsylvania Capital Post–Conviction Law and Their Implications for Federal Habeas Corpus Review,* 73 Temp.L.Rev. 69, 74–85 (2000) (discussing cases).

period during which these alleged defaults could have taken place. At the earliest, Pursell waived certain issues when he failed to raise them at trial in 1982 or on direct appeal in 1985. *Pursell–2*, 724 A.2d at 306. At the latest, he waived other issues when he failed to raise them in his PCRA filings with the Pennsylvania Supreme Court in 1994. *Id.* Accordingly, my inquiry must focus on the state of Pennsylvania waiver law in death penalty cases between 1982 and 1994.

Pursell's second alleged procedural lapse is easier to place in time. In fact, in *Pursell–3*, the Pennsylvania Supreme Court identified precisely when the alleged procedural default occurred in that case.

> Direct review of [Pursell's] conviction expired in 1985 when [Pursell] failed to seek review in the United States Supreme Court of our decision affirming [his] conviction and death sentence. [Pursell's] present PCRA petition was filed in 1999, more than one year from the date that his judgment of sentence became final and therefore not in compliance with the general one-year time limitation of 42 Pa.C.S. § 9545(b)(1).

*Pursell–3*, 749 A.2d at 913. By pinpointing the expiration of Pursell's conviction in 1985, and holding that he had only one year from that date to file his petition, the Supreme Court clearly points to 1986 as the year when Pursell's procedural default occurred. Accordingly, my inquiry must focus on the state of the PCRA one-year limitations period in 1986.

The only remaining question is whether the procedural rules used to bar Pursell's claims in *Pursell–2* and *Pursell–3* were

"firmly established and regularly followed," *James*, 466 U.S. at 348–51, 104 S.Ct. 1830, at the time when the alleged defaults occurred.

### C. Was the Waiver Rule Firmly Established Between 1982 and 1994?

The waiver rule applied in *Pursell–2* was not "firmly established and regularly followed," *James*, 466 U.S. at 348–51, 104 S.Ct. 1830, until 1998, many years after the alleged default in this case occurred. This waiver rule has its root in the language of the PCRA. 42 Pa. Cons.Stat.Ann. § 9544(b) (stating that an issue is waived "if the petitioner failed to raise it and if it could have been raised before the trial, at the trial, on appeal, in a habeas corpus proceeding or other proceeding actually conducted"). Nonetheless, between 1978 and 1998, the Pennsylvania Supreme Court simply did not adhere to this provision in capital cases. In *Commonwealth v. McKenna*, 476 Pa. 428, 383 A.2d 174 (1978), for instance, the Court stated that it had a "duty to transcend procedural rules" in death penalty cases because procedural rules "cannot be exalted to a position so lofty as to require this Court to bind itself to the real issue—the propriety of allowing the state to conduct an illegal execution of a citizen." *Id.* at 181. The doctrine set forth in *McKenna* became known as the "relaxed waiver rule." Under this rule, the Pennsylvania Supreme Court reviewed the merits of all claims raised in capital cases, whether on direct appeal or in post-conviction proceedings, regardless of any alleged waiver by the defendant.[11] By 1997, the relaxed waiver

---

**11.** There are literally dozens of Pennsylvania Supreme Court cases between 1978 and 1998 that apply the "relaxed waiver rule" in capital cases. *Commonwealth v. Spotz*, 552 Pa. 499, 716 A.2d 580, 591 (1998) (reviewing waived claim on the merits because of "our practice to relax waiver rules in capital cases."); *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444, 455 (1998) ("This Court generally applies a relaxed waiver rule in capital cases because of the permanent and irrevocable nature of the death penalty."); *Commonwealth v. Mor-*

rule was so well established that even the Third Circuit concluded that the Pennsylvania Supreme Court had a "practice of reaching the merits of claims in PCRA petitions in capital cases regardless of the failure of the petition to meet the appropriate procedural criteria." *Banks v. Horn*, 126 F.3d 206, 214 (3d Cir.1997).

The relaxed waiver rule was firmly in place when Pursell's trial was conducted in 1982 and when his conviction was affirmed in 1985. *See supra* n. 11. In 1991, when he filed his first PCRA petition with the Court of Common Pleas, the relaxed waiver rule was firmly entrenched in Pennsylvania jurisprudence. *Id.* In 1993, when Pursell filed the appeal of the denial of his first PCRA petition, dkt. no. 19, at 2257–2488, the relaxed waiver rule remained fixed in Pennsylvania law. *See supra* n. 11. Finally, in 1997, when Pursell sought to amend his PCRA petition to add new claims, the relaxed waiver rule was "generally applie[d] . . . because of the permanent and irrevocable nature of the death penalty." *Brown*, 711 A.2d at 455; *see also supra* n. 11.

In 1998, while Pursell's first PCRA petition was pending before the Pennsylvania Supreme Court, however, the rules changed. In *Commonwealth v. Albrecht*, the Pennsylvania Supreme Court was urged, once again, to apply its relaxed waiver rule to issues raised for the first time in petitioner's PCRA petition. *Albrecht*, 720 A.2d at 700. The Court refused. "While it has been our 'practice' to decline to apply ordinary waiver principles in capital cases, we will no longer do so in PCRA appeals." *Id.* (internal citations omitted). Recognizing that the "negligible benefits" from applying the relaxed waiver doctrine to PCRA appeals was "outweighed by the need for finality and efficient use of [its] resources," the Supreme Court abandoned the relaxed waiver rule on PCRA appeals. *Id.* The *Albrecht* decision was handed down on November 23, 1998, *id.* at 693, and used to bar certain of Pursell's claims in January of 1999, *Pursell–2*, 724 A.2d at 293.[12]

There can be no doubt that the rule set forth in *Albrecht* was not "firmly established and regularly followed" at the time

---

*ris*, 546 Pa. 296, 684 A.2d 1037, 1042 n. 11 (1996) ("While we agree that some of the issues presented . . . could be deemed waived pursuant to the PCRA, we will nevertheless address all of Appellant's claims . . . because it is this Court's practice to address all issues arising in a death penalty case irrespective of a finding of waiver."); *Commonwealth v. Walker*, 540 Pa. 80, 656 A.2d 90, 98–99 (1995) ("At the outset we note that appellant's appellate counsel failed to develop this claim at the post-trial evidentiary hearing, thus the issue is waived. However, since this Court has developed a relaxed waiver standard regarding waiver rules in capital cases, we will address the underlying claim."); *Commonwealth v. DeHart*, 539 Pa. 5, 650 A.2d 38, 48 (1994) (same); *Commonwealth v. Abu-Jamal*, 521 Pa. 188, 555 A.2d 846, 854 (1989) (same); *Commonwealth v. Yarris*, 519 Pa. 571, 549 A.2d 513, 521 (1988) (same); *Commonwealth v. Baker*, 511 Pa. 1, 511 A.2d 777, 790 n. 10 (1986) (same); *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700, 707 n. 4 (1984) (same); *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 955 n. 19 (1982). For a more complete list of the Pennsylvania Supreme Court cases concerning the doctrine of relaxed waiver see Natali, *New Bars in Pennsylvania*, 73 Temp. L.Rev. at 86 n. 127.

**12.** While the *Albrecht* decision bars the applicability of the "relaxed waiver" rule to PCRA petitions, the doctrine still applies in capital cases on direct appeal. *See Commonwealth v. Rivera*, 565 Pa. 289, 773 A.2d 131, 139 n. 7 (2001) ("Technically, this claim is waived because counsel failed to make a timely objection to the jury instruction. See Pa.Crim.P. 1119(b). However, because this is a capital case on direct appeal, we will nonetheless review the merits of this claim pursuant to the relaxed waiver rule."); *Szuchon*, 273 F.3d at 325–26 (interpreting Pennsylvania law on this issue).

that Pursell allegedly waived the claims at issue in *Pursell–2*. Indeed, between 1978 and 1998, the Pennsylvania Supreme Court had a regular practice of forgiving waivers in capital cases, whenever they occurred, and reviewing the merits of a petition. To apply the *Albrecht* rule "retroactively to bar consideration of [Pursell's] claim[s] ... would therefore apply a rule unannounced at the time of petitioner's trial and consequently inadequate to serve as an independent state ground ..." *Ford*, 498 U.S. at 424, 111 S.Ct. 850.

### D. Was the One Year Limitations Period Firmly Established in 1986?

I reach the same conclusion with the limitations period used to bar Pursell's claims in *Pursell–3*. In 1995, the Pennsylvania legislature amended the PCRA to add a one-year statute of limitations for all petitions filed under the Act. 42 Pa. Cons. Stat.Ann. § 9545(b). As one commentator has stated, these 1995 amendments to the PCRA "were not written on a blank slate." Natali, *New Bars in Pennsylvania*, 73 Temp. L.Rev. at 101. Instead, they were written against the backdrop of the well-established relaxed waiver doctrine. *Id.* Accordingly, even when the statute of limitations was added to the PCRA in 1995, many believed that the Pennsylvania Supreme Court simply would not follow it in capital cases. *Id.*

The Third Circuit took this view. In *Banks v. Horn*, the Court held that the relaxed waiver rule applied to a petition by a capital defendant filed outside the statute of limitations. *Banks*, 126 F.3d at 214. While the Commonwealth argued that Banks' claim was barred by the clear language of the 1995 PCRA amendment, the Third Circuit rejected this argument.

While it is true that the text of the 1995 PCRA amendments supports these contentions, it is not clear that these amendments are dispositive. The Commonwealth does not refer us to a Pennsylvania Supreme Court case applying the PCRA as amended in 1995 to support its view.... [T]he Pennsylvania Supreme Court seems to exercise strong control of procedures in death penalty cases.

In the circumstances, we are not confident that the Pennsylvania Supreme Court, even in the face of the 1995 amendments to the PCRA, will abandon its practice of reaching the merits of claims in PCRA petitions in capital cases regardless of the failure of the petition to meet the appropriate procedural requirements.

*Id.* As of 1997, whether the Pennsylvania Supreme Court would follow the limitations period in the PCRA was simply unclear. *Id.; see also Peterkin v. Horn*, 30 F.Supp.2d 513, 519–20 (E.D.Pa.1998) ("it is virtually impossible for this Court to definitively predict" if the PCRA statutory time limits will be applied to capital cases); *Crawley v. Horn*, 7 F.Supp.2d 587, 588 (E.D.Pa.1998) (PCRA statutory time bar may be overcome by capital case relaxed waiver rule); *Jermyn*, 266 F.3d at 278–79.

In late 1998, however, the Pennsylvania Supreme Court ruled for the first time that it would follow the PCRA limitations period in capital cases. In *Commonwealth v. Peterkin*, 554 Pa. 547, 722 A.2d 638 (1998), the Court dismissed a capital defendant's second PCRA petition as untimely under the PCRA's statute of limitations. *Id.* at 642. Because *Peterkin* failed to file his petition by 1988, a year after his conviction became final, he was barred under the PCRA. *Id.* at 641. Nonetheless, the Court's decision in *Peterkin* did not address whether the relaxed waiver rule applied. *See Banks v. Horn*, 271 F.3d 527, 532 (3d Cir.2001). Indeed, as the Third Circuit has explained, "the Pennsylvania

Supreme Court did not clarify that the state PCRA statute was jurisdictional and not waivable until 1999 in *Commonwealth v. Banks*, 556 Pa. 1, 726 A.2d 374 (1999)." *Fahy v. Horn*, 240 F.3d 239, 245 (3d Cir. 2001). In *Banks*, the Pennsylvania Supreme Court addressed for the first time the relationship between the relaxed waiver doctrine and the PCRA time-limitations, holding that "the issue here is one of jurisdiction and not waiver." *Banks*, 726 A.2d at 376. Accordingly, it was not until March 2, 1999, the date that the *Banks* decision was handed down, that Pursell was put on notice that he had to comply with the PCRA's one-year limitations period. *Banks*, 726 A.2d at 374.

Once again, the rule applied by the Supreme Court to bar Pursell's claims was not "firmly established and regularly followed" at the time of Pursell's alleged default. According to the Court in *Pursell–3*, Pursell was required to file his PCRA petition by 1986, within one year of the date his conviction became final. *Pursell–3*, 749 A.2d at 913. However, that limitations period did not exist at the time that Pursell was supposed to comply with it. Once again, the law changed midstream and these changes were applied retroactively to bar merits review of a number of Pursell's claims. Such a retroactive application of a procedural rule is simply inadequate to bar relief in federal court. *Ford*, 498 U.S. at 424, 111 S.Ct. 850.

The fact that Pursell did not file his second PCRA petition until June 1999, three months after the decision in *Banks*, does not alter my conclusion in this case. On at least two occasions before the *Banks* decision, Pursell tried to amend his first PCRA petition by adding new claims. *Pursell–2*, 724 A.2d at 300–301. Both attempts were rejected by the trial court. To make matters worse, Pursell was barred under Pennsylvania law from filing a second petition in which he could raise these new claims until his first petition was resolved. *Whitney v. Horn*, 170 F.Supp.2d 492, 499 (E.D.Pa.2000); *Commonwealth v. Lark*, 560 Pa. 487, 746 A.2d 585, 588 (2000). Had the trial court permitted Pursell to amend his first petition, it might have obviated the need for a second one. Nonetheless, the trial court's refusal left Pursell with a classic Hobson's choice: he was free to raise any claims he wanted, at any time, *Fahy*, 240 F.3d at 245; *Banks*, 271 F.3d at 530; *Bronshtein*, 2001 WL 767593, at *8–10, but he could only raise them in a second petition, and only after his first petition was resolved. *Whitney*, 170 F.Supp.2d at 499. Accordingly, Alan Pursell had to wait, and while he waited, the law in Pennsylvania changed, and his window for asserting new claims quickly closed.[13] Under such unique circumstances, I conclude that Pennsylvania's one-year statute of limitations does not act as an adequate bar to Pursell's federal claims. *See Whitney*, 170 F.Supp.2d at 498–99.

**E. Conclusion to Procedural Default**

For more than a decade, one clear legal rule governed capital cases in Pennsylvania: the Pennsylvania Supreme Court addressed the merits of any post-conviction petition, regardless of its procedural failings. Then, after nearly fifteen years, this rule changed, and this change was

---

13. Even after Pursell learned that the PCRA one-year bar applied to him, he filed his second PCRA petition as soon as he could legally do so. In March 1999, the Pennsylvania Supreme Court decided *Banks*. One month later, that same Court dismissed Pursell's first PCRA petition. *Pursell–2*, 724 A.2d at 293. And on June 4, 1999, less than sixty days after the decision in *Pursell–2*, Pursell filed his second petition, *Pursell–3*, 749 A.2d at 912–13, no doubt raising many of the claims that he was prevented from raising earlier.

applied retroactively to bar a number of the claims brought by Pursell in the present case. For the foregoing reasons, I conclude that the procedural rules applied by the Pennsylvania Supreme Court in *Pursell–2* and *Pursell–3* were not firmly established at the time of Pursell's alleged defaults and, thus, cannot act as an adequate bar to federal review.

## IV. STANDARD OF REVIEW

 With the procedural issues put to rest, only one preliminary matter remains: the standard of review in cases brought under 28 U.S.C. § 2254. Pursell filed his petition for habeas corpus relief after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132 § 104, 110 Stat. 1214, so that statute applies to his case. *See Lindh v. Murphy,* 521 U.S. 320, 326–27, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Of particular importance in this case is § 2254(d) which creates a deferential standard of review for federal habeas corpus petitions. This section provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1). The United States Supreme Court interpreted this standard for the first time in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Subsequently, in *Hameen v. State of Delaware,* 212 F.3d 226, 235 (3d Cir.2000), the Third Circuit set forth how a district court should proceed when reviewing a habeas petition under § 2254(d)(1).

 First, the court must decide exactly what is clearly established law determined by the Supreme Court in the case at hand. *Williams,* 529 U.S. at 390, 120 S.Ct. 1495; *see also Hameen,* 212 F.3d at 235. The Supreme Court provided some guidance on this issue in its *Williams* decision. The phrase "clearly established Federal law" "refers to the holdings, as opposed to the dicta," of Supreme Court opinions at the time that the state court conviction became final. *Williams,* 529 U.S. at 390, 120 S.Ct. 1495 ("[t]he threshold question under AEDPA is whether Williams seeks to apply a rule of law that was clearly established at the time his state-court conviction became final."). Nonetheless, even Supreme Court decisions rendered after the petitioner's conviction became final can be considered "clearly established Federal law" if those decisions would have been considered "old rules" under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *See Moore v. Morton,* 255 F.3d 95, 104–05 (3d Cir.2001) (quoting *Williams,* 529 U.S. at 412, 120 S.Ct. 1495).[14]

 Once the court decides what the clearly established law was at the relevant time, it must then determine whether the state court's decision was "contrary to" or "an unreasonable application of" that law. 28 U.S.C. § 2254(d)(1). These two clauses have independent meaning. *Williams,* 529 U.S. at 405, 407, 120 S.Ct. 1495. Under the "contrary to" clause, a federal habeas court may grant the writ in only two in-

---

**14.** A rule of law is "old" under *Teague* if it is dictated or "compelled" by the precedent existing at the time the petitioner's state court conviction became final. *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).

stances: 1) if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or 2) if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Id.* at 412–13, 120 S.Ct. 1495. "[A] run-of-the mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Id.* at 406, 120 S.Ct. 1495.

■ Under the "unreasonable application" clause, a federal habeas court may grant the writ even if the state court identifies the correct legal principle, as long as the court unreasonably applies that principle to the facts of the case. *Williams,* 529 U.S. at 413, 120 S.Ct. 1495. The Third Circuit explained how a district court should apply this prong of § 2254(d)(1) in *Hameen:*

> The "unreasonable application" inquiry requires the habeas court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." Thus, under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

*Hameen,* 212 F.3d at 235 (quoting *Williams,* 529 U.S. at 418–411, 120 S.Ct. 1495).[15]

■ While the *Williams* decision concerned only those instances when § 2254(d)(1) obviously applies, the clear language of that section suggests that it does not apply to all cases. The introductory sentence of § 2254(d)(1) explicitly limits its deferential review to only those claims that were "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d)(1). "It follows that when, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA and explained in *Williams* do not apply." *Appel v. Horn,* 250 F.3d 203, 210 (3d Cir.2001). In such cases, the court should exercise "pre-AEDPA independent judgment" on those claims. *Hameen,* 212 F.3d at 248; *see also Appel,* 250 F.3d at 210.

■ Prior to the passage of AEDPA, pure questions of law and mixed-questions law and fact were reviewed *de novo* by district courts. *Appel,* 250 F.3d at 210; *Williams,* 529 U.S. at 400–402, 120 S.Ct. 1495 (O'Connor, J., concurring) (noting that before AEDPA, federal courts exercised independent judgment when deciding both questions of constitutional law and mixed constitutional questions, i.e., application of law to fact). Nonetheless, the state court's factual findings are still presumed correct, and the petitioner has the burden of rebutting this presumption by clear and

---

**15.** The *Williams* Court noted two instances when the "unreasonable application" prong may apply: 1) when "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case"; or 2) when "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams,* 529 U.S. at 407–409, 120 S.Ct. 1495; *see also Hameen,* 212 F.3d at 253 (McKee, J., concurring). It was only the first instance that was present in *Williams. Williams,* 529 U.S. at 409, 120 S.Ct. 1495.

convincing evidence. *Appel,* 250 F.3d at 210 (citing 28 U.S.C. § 2254(e)(1)).

With these legal standards in mind, I now turn to the merits of Pursell's petition.

## V. PURSELL'S GUILT-PHASE CLAIMS

Pursell raises numerous claims for relief from his conviction for first-degree murder. As so often occurs when a third party retrospectively examines a trial record, many aspects of Pursell's trial give me pause. Had I presided over his case, I might have ruled differently than the trial court did on certain objections; and had I represented Pursell, I might have raised certain objections that went unraised, explored certain avenues that went unexplored, and asked certain questions that went unasked. But I did not participate in this case, and cannot on a petition for habeas relief impose my personal predilections on a trial that occurred nearly twenty years ago. Errors were committed during the guilt-phase of Pursell's trial, but proof of error, standing alone, is not sufficient to merit relief on a petition for habeas corpus. Instead, Pursell must show that these errors, either separately or cumulatively, rose to the level of a constitutional violation. In the present case, he has failed to make such a showing, and I will deny his request for habeas relief.

## A. Trial Court's Refusal to Order Change of Venue

Pursell first claims that he was denied his right to an impartial jury when the trial court denied his repeated requests for a change of venue due to highly prejudicial pretrial publicity.[16] The Pennsylvania Supreme Court denied this claim

in *Pursell-1,* 495 A.2d at 187–89, giving two reasons. First, it held that any prejudice against Pursell created by the media coverage in July 1981 had "dissipate[d]" by the time Pursell was tried in January 1982. *Id.* at 188. Second, it carefully reviewed the 900 pages of jury voir dire and concluded that neither the veniremen nor the sixteen individuals actually chosen for the jury were affected by the pretrial publicity. *Id.* at 188–89. Because this decision was neither "contrary to" nor "an unreasonable application of" "clearly established Federal law," 28 U.S.C. § 2254(d)(1), I will deny Pursell's claim for relief.

### (1) Factual Background

Before delving into the merits of Pursell's claim, I will briefly outline the extent of the pretrial publicity at issue in this case.[17] There was regular media coverage of Brine's murder for a number of days in late July 1981. Dkt. no. 10, Ex. 10; dkt. no. 26, at 84–89. From these early reports, four kinds of stories emerged that were potentially prejudicial to Pursell.

First, a number of newspaper articles raised speculation that Brine had been sexually assaulted by the murderer. Dkt. no. 10, Ex. 10 (Erie Times–News, 7/25/81; Erie Times–News, 7/26/81; Erie Daily Times, 7/27/81). In fact, one investigator said that "[t]his appears to be a fiendish sex crime killing." *Id.* (Erie Times–News, 7/26/81). Nevertheless, after Pursell was arrested, the police stated that "[a]lthough there has been much speculation of a sex-based crime . . . ., [r]ight now we don't know that it was a sex crime." *Id.* (Erie Morning News, 7/29/81). Ultimately, Pursell was not charged with any kind of

---

**16.** This is Claim 4 in Pursell's Memorandum of Law Following the Completion of State Court Proceedings ("Memorandum of Law"). Dkt. no. 26, Claim 4, at 81.

**17.** While most television reports were not included in the record, I have assumed for the purpose of this petition that Pursell's rendition of these news broadcasts is correct.

sexual assault, and the newspapers reported this fact, indicating that the only charge against him was murder. *Id.* (Erie Daily Times, 8/11/81).

Second, newspaper articles and television broadcasts showed Pursell handcuffed on a number of different occasions. For example, an August 11, 1981 front-page article in the Local section of the Erie Daily Times showed a picture of Pursell in handcuffs. *Id.* The caption of the picture noted that the statement "Born To Raise Hell" was tattooed on Pursell's bicep. *Id.* Television broadcasts showed Pursell in handcuffs a number of times as well. Dkt. no. 26, at 87.

Third, some stories inferred that Pursell might be guilty of the Brine killing. On July 30, 1981, WJET–TV ran a report during its 6:00 p.m. newscast in which several residents of the Wesleyville/Lawrence Park area made accusations of guilt against Pursell. *Id.* During one television broadcast, Pursell's neighbors called him "weird" and a "wild man." Dkt. no. 18, at 1882. One person even accused him of brandishing a gun in the neighborhood. *Id.* Additionally, on August 14, 1981, the Erie Daily Times ran an article on the front page of its Local section entitled, "How does it feel to be the mother of murderer?" Dkt. no. 10, Ex. 10 (Erie Daily Times, 8/14/81). Despite its unfortunate title, the text of the article focused on Mrs. Pursell's view that her son was innocent. *Id.* Finally, the local media ran a number of stories about how Pursell's glasses were found at the murder scene, *id.* (Erie Daily Times, 7/28/81; Erie Morning News, 7/29/81), suggesting that Pursell was at the scene of the murder.

Finally, and most troubling, newspaper accounts and television broadcasts detailed Pursell's record of prior offenses. A July 28, 1981 article in the Erie Daily Times was entitled "Pursell has record of of-

fenses." *Id.* (Erie Daily Times, 7/28/81). Beginning on the front page, and highlighted by a star, this article detailed Pursell's past criminal record. In addition, the article excerpted a letter to a state court judge that Pursell himself had written while in prison. "I want to try to straighten my life out, I don't want to have to be in jails the rest of my life [because] of the things I do while I'm drinking or on drugs." *Id.* The article also explained that Pursell's record did "not involve violent or sex crimes." *Id.* Around the same time, a television broadcast "also pointed out that [Pursell] had spent 1 ½ years in prison for a stabbing," an incorrect statement. Dkt. no. 18, at 1882.

After this initial flurry of articles appearing around the time of Pursell's arrest, the coverage of the Brine killing slowed down considerably. A few articles appeared in the middle of August, at the time of the preliminary hearing, and some more, mostly factual in nature, ran when Pursell plead not guilty in October 1981, dkt. no. 10, Ex. 10 (Erie Morning News, 10/8/81; Erie Daily Times, 10/8/81), when the court denied Pursell's pretrial motions in November, 1981, *id.* (Erie Daily Times, 11/3/81), and when the prosecution decided to seek the death penalty. *Id.* (Erie Daily Times, 11/7/81). Finally, in January 1982, when the trial commenced, media coverage resumed, but it was strictly factual in nature. Dkt. no. 27, Ex. J.

### (2) Legal Analysis

■■■ The threshold question under AEDPA is whether Pursell seeks to apply a rule of law that was clearly established on December 23, 1985, the date his state court conviction became final. *Williams,* 529 U.S. at 390, 120 S.Ct. 1495. That question is easily answered because Pursell's change of venue claim is governed by a series of cases, all decided by 1985, in which the Supreme Court held that the

due process clause of the Fourteenth Amendment guarantees a criminal defendant the right to "a trial by an impartial jury free from outside influences." *Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *see also Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). As these cases hold, when prejudicial pretrial publicity wholly undermines the impartiality of the jury, the trial court should take steps to assure a fair trial, usually by granting a change of venue. *Sheppard,* 384 U.S. at 363, 86 S.Ct. 1507; *Rideau,* 373 U.S. at 723, 83 S.Ct. 1417.

 In some cases, adverse pretrial publicity is so extreme that the court will presume prejudice to the defendant. *Irvin,* 366 U.S. at 723, 81 S.Ct. 1639; *Patton,* 467 U.S. at 1031, 104 S.Ct. 2885. "Where media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the defendant without reference to an examination of the attitudes of those who served as the defendant's jurors." *Rock v. Zimmerman,* 959 F.2d 1237, 1252 (3d Cir.1992), *overruled on other grounds Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *see also Sheppard,* 384 U.S. at 333, 86 S.Ct. 1507; *Rideau,* 373 U.S. at 723, 83 S.Ct. 1417. Such cases, however, are "exceedingly rare." *Rock,* 959 F.2d at 1253; *Flamer v. Delaware,* 68 F.3d 736, 754 (3d Cir.1995). In fact, for a court to presume prejudice, "the community and media reac-

tion . . . must have been so hostile and so pervasive as to make it apparent that even the most careful voir dire process would be unable to assure an impartial jury." *Rock,* 959 F.2d at 1252.

 In the absence of facts that demonstrate a presumption of prejudice, a defendant must prove actual prejudice, that is, that those who served on his jury could not reach an impartial verdict based solely on the evidence presented at trial. *Patton,* 467 U.S. at 1035, 104 S.Ct. 2885 (citing *Irvin,* 366 U.S. at 723, 81 S.Ct. 1639); *Rock,* 959 F.2d at 1253.

> It is not required . . . that jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.*

*Irvin,* 366 U.S. at 722–23, 81 S.Ct. 1639 (emphasis added). To determine whether actual prejudice exists, the court should look to the totality of the circumstances, including the voir dire of the jury. *Murphy,* 421 U.S. at 799–801, 95 S.Ct. 2031.

Having set forth the clearly established federal law, the next question is whether the Pennsylvania Supreme Court's decision in *Pursell–1* was either "contrary to" or "an unreasonable application of" that

law. Pursell admits that the Court's decision was not "contrary to" "clearly established Federal law." Dkt. no. 26, at 94. This is a wise concession. In rejecting Pursell's claim, the Pennsylvania Court relied on *Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287 (1978), a case that properly recognized *Irvin, Rideau, Sheppard,* and *Murphy* as setting forth the guiding principles for claims concerning prejudicial pretrial publicity. In the present case, this is sufficient to pass muster under § 2254(d)(1)'s "contrary to" standard. *Williams,* 529 U.S. at 406, 120 S.Ct. 1495. Therefore, the only issue before me is whether the Pennsylvania Supreme Court's decision was an "unreasonable application of" this clearly established law.

### (a) Refusal to Presume Prejudice

In refusing to presume prejudice, the Pennsylvania Supreme Court relied on a "six month 'cooling off period'" between the time when the alleged prejudicial coverage was released and Pursell's trial. *Pursell–1,* 495 A.2d at 188. Acknowledging that some of the coverage "may establish prejudice," *id.,* the Court nonetheless held that the "'cooling off period' was sufficient to dissipate the prejudice, if any, engendered by the July, 1981, publicity." *Id.* Pursell claims that the Pennsylvania Court's reliance on this "cooling-off period" was an "unreasonable application" of Supreme Court precedent. For two reasons, I disagree.

First, the United States Supreme Court has explained that, even when pretrial publicity is extensive and severe, a lapse in time between the publicity and the trial can dissipate any prejudice that may have resulted. In *Murphy,* for instance, the Court held that extensive media coverage of the defendant's prior crimes did not amount to prejudice, particularly since the publicity had stopped seven months before jury selection. *Murphy,* 421 U.S. at 802,

95 S.Ct. 2031. In *Patton,* the Court found no prejudice when the extensive and prejudicial media coverage occurred four years before the trial itself. During that time, "the community sentiment had softened." *Patton,* 467 U.S. at 1034, 104 S.Ct. 2885. "That time soothes and erases is a perfectly natural phenomenon, familiar to all," the *Patton* Court explained.

> The relevant question is not whether the community remembered the case, but whether the jurors at Yount's trial had such fixed opinions that they could not judge impartially the guilt of the defendant. It is not unusual that one's recollection of the fact that a notorious crime was committed lingers long after the feelings of revulsion that create prejudice have long passed.... *[I]t is clear that the passage of time ... can be a highly relevant fact. In the circumstances of this case, we hold that it clearly rebuts any presumption of partiality or prejudice that existed at the time of the initial trial.*

*Id.* at 1035, 104 S.Ct. 2885 (emphasis added) (internal citations omitted); *see also Flamer,* 68 F.3d at 755 (refusing to presume prejudice when there was a lapse of eight months between the publication of the last newspaper story on which the defendant relied and the start of jury selection); *see also Jacobs v. Horn,* 129 F.Supp.2d 390, 411 (M.D.Pa.2001) (refusing to presume prejudice when, among other things, the articles in question ran seven months before the trial). Thus, the Pennsylvania Supreme Court's reliance on a "cooling off period" was perfectly appropriate under federal law.

Second, there is ample support for the Pennsylvania Supreme Court's conclusion that the "cooling off period" had an effect in the present case. For one, as the Pennsylvania Court correctly noted, the media coverage in Pursell's case was "not exten-

sive, sustained, or pervasive." *Pursell–1,* 495 A.2d at 189. Instead, it involved but a few stories, most of which ran nearly six months before trial. *Id.* at 188. Second, when questioned during voir dire, most jurors only vaguely recalled these media reports, and none of them had a fixed opinion of Pursell's guilt. *Pursell–1,* 495 A.2d at 188–89. In Pursell's case, "the passage of time" was a "highly relevant fact," *Patton,* 467 U.S. at 1035, 104 S.Ct. 2885, and the Pennsylvania Supreme Court was absolutely correct to rely on it.

Even without the passage of time, however, the publicity in Pursell's case was still far from the kind of "trial atmosphere . . . utterly corrupted by press coverage," *Murphy,* 421 U.S. at 799, 95 S.Ct. 2031, that the United States Supreme Court has required before attaching a presumption of prejudice. In *Sheppard,* for instance, prejudicial publicity about the murder of Marilyn Sheppard ran all the way through trial and spanned five volumes in the Supreme Court's record. *Sheppard,* 384 U.S. at 333, 86 S.Ct. 1507.

> Much of the material printed or broadcast during the trial was never heard from the witness stand, such as the charges that Sheppard had purposely impeded the murder investigation and must be guilty since he had hired a prominent criminal lawyer; that Sheppard was a perjurer; that he had sexual relations with numerous women; that his slain wife had characterized him as a 'Jekyll Hyde'; that he was 'a bare-faced liar' because of his testimony as to police treatment; and finally, that a woman

convict claimed Sheppard to be the father of her illegitimate child.

*Id.* at 356–57, 86 S.Ct. 1507. Even though some of the jurors admitted that they heard or read these prejudicial news reports, *id.* at 348, 357, 86 S.Ct. 1507, the trial court did not sequester the jurors, and it never directly instructed them to avoid media coverage. *Id.* at 352–53, 86 S.Ct. 1507. Under such circumstances, the Court held that due process was violated by the trial court's failure to "protect Sheppard from the inherently prejudicial publicity which saturated the community and to control the disruptive influences in the courtroom." *Id.* at 363, 86 S.Ct. 1507. *Sheppard* was a case where prejudice was presumed.

In contrast, the pretrial coverage in Pursell's case was tame, to say the least. It was of limited scope and duration, and it left only a slight impression on the veniremen, and almost no lasting impression on the jurors actually seated.[18] Pursell has failed to show that his is one of those "exceedingly rare" cases, *Rock,* 959 F.2d at 1252, where "the community and media reaction . . . [was] so hostile and so pervasive as to make it apparent that even the most careful voir dire process would be unable to assure an impartial jury." *Id.* at 1252. Accordingly, the Pennsylvania Supreme Court's refusal to presume prejudice was not an unreasonable application of clearly established federal law.

**(b) Refusal to Find Actual Prejudice**

In addition to refusing to presume prejudice, the Pennsylvania Supreme Court

---

**18.** In fact, the publicity in this case was not even as extreme as the coverage in *Murphy,* a case where the Supreme Court found the publicity insufficient to create a presumption of prejudice. *Murphy,* 421 U.S. at 799, 95 S.Ct. 2031. In *Murphy,* there had been "extensive" pretrial coverage, highlighting the defendant's prior criminal record, including his prior charges for murder and robbery. *Id.* at 796, 95 S.Ct. 2031. The jury voir dire showed that every juror had some knowledge of the defendant's past crimes. *Id.* at 799, 95 S.Ct. 2031. Nevertheless, the *Murphy* Court held that these facts, without more, would not create a presumption of prejudice. *Id.*

also did not find any actual prejudice at work in Pursell's case. In making this judgment, the Pennsylvania Court canvassed the 900 pages of jury voir dire. The Court explained that 66 of the 101 potential jurors were actually questioned about their knowledge of the case, the other 35 having been excused due to their views on the death penalty. *Pursell–1*, 495 A.2d at 188. Of these 66 prospective jurors, 58 of them had heard about the case in some way. Nonetheless, of those 58, 57 said that they had no fixed opinion about Pursell's guilt, stated that they would be able to reach a verdict based solely on the evidence presented at trial, and claimed that the information they learned outside the courtroom would not affect their decision. *Id.* In addition, the Pennsylvania Supreme Court noted that of these 66 prospective jurors, only 2 actually knew that the defendant had a prior criminal record. *Id.* "Considering the almost unanimous lack of knowledge of [Pursell's] prior criminal conduct by the veniremen," the Court concluded, "it is obvious that the community was not saturated with the knowledge of [Pursell's] prior offenses." *Id.* at 189.

A review of the jury voir dire confirms the Pennsylvania Supreme Court's conclusion that the jury was capable of impartially determining Pursell's fate.[19] None of the jurors had a fixed opinion concerning Pursell's guilt; none of them had any specific knowledge about Pursell's prior crimes; and each of them said that he or she could render a verdict based solely on the evidence presented at trial. Indeed, in the entire voir dire transcript there are only two colloquies on which Pursell could create a colorable claim of partiality. First, Douglas Czerwinski stated that he heard someone on the news say that Pursell was a "neighborhood troublemaker." (Tr. 1/15/82, at 134, 138). Nonetheless, he expressed no opinion on Pursell's guilt, and said that he could decide the case based solely on the evidence presented at trial. *Id.* at 135–36. He was accepted by the defendant without challenge. *Id.* at 138. Second, Donald Schruers stated that he had seen all that had been reported about the case and would have a hard time disregarding that information. (Tr. 1/14/82, at 89–91). Yet, he too said that he had no fixed opinion about Pursell's guilt, and that he could judge the case on the evidence brought at trial. *Id.* at 90–91, 94. Again, the defense accepted him without objection. *Id.* at 94.

Pursell's jury had even fewer indicia of partiality than did the juries in many cases where the Supreme Court has held that actual prejudice did not exist. In *Murphy*, "20 of the 78 persons questioned were excused because they indicated an opinion as to petitioner's guilt," *Murphy*, 421 U.S. at 794, 95 S.Ct. 2031, yet that jury was deemed to be without actual prejudice. Likewise in *Patton*, where 77% of prospective jurors admitted that they would carry an opinion about defendant's guilt into the jury box, and where 8 of 14 jurors seated, admitted that they, at some time, had formed an opinion as to defendant's guilt, the Court held that such evidence was insufficient to amount to actual prejudice. *Patton*, 467 U.S. at 1029–30, 1035, 104 S.Ct. 2885. Needless to say, if the *Mur-*

---

**19.** The voir dire of the jurors actually chosen to sit on the case can be found at the following locations: John Agnelo (Tr. 1/13/82, at 6); John Goodill, *id.* at 93; Carl Steenberge (Tr. 1/14/82, at 39); Donald Schruers, *id.* at 82; Marion Murray, *id.* at 95; Leola Gnacinski (Tr. 1/15/82, at 28); Elvira Clougherty, *id.* at 89; Douglas Czerwinski, *id.* at 128; Carl Benden, *id.* at 153; Bernadine Sharrer (Tr. 1/18/82, at 126); Michael Rabe, *id.* at 198; William Haas, *id.* at 275; Pauline Rakowski, *id.* at 293; Jimmy Necker, *id.* at 330; Louis Dovichow, *id.* at 339; and Bonita Drayer, *id.* at 361; *see also* (Tr. 1/26/92, at 100–01).

*phy* and *Patton* voir dires were insufficient to show actual prejudice then the Pursell jury easily passes constitutional muster. The Pennsylvania Supreme Court's decision to deny Pursell's due process claim was correct, and hardly an unreasonable application of clearly established federal law.

### (3) Ineffective Assistance Claim

Pursell's final argument concerning pretrial publicity is that his counsel was ineffective for failing to ensure that the record before the Pennsylvania Supreme Court contained all of the relevant newspaper articles and television broadcasts. In one respect, Pursell is correct: the record before the Pennsylvania Supreme Court on his claim for pretrial publicity was incomplete. As that Court noted, "[t]he characterization of continued and pervasive prejudicial pretrial publicity ... appears nowhere in the record presented to us for review.... Such factual allegations, *de hors* the record, cannot be considered by a reviewing court and the practice of asserting facts in an appellate brief, which allegations do not appear in the record has recently been condemned by us ..." *Pursell–1,* 495 A.2d at 188 n. 3. In his petition, Pursell has remedied this problem by including all of the articles that were not given to the Pennsylvania Supreme Court. I have independently reviewed these articles and have measured the Pennsylvania Supreme Court's decision against this complete record. Because I conclude that Pursell was not entitled to relief on his due process claim, even under a review of the complete record, I will deny his claim for ineffective assistance of counsel.

 In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court explained that there are two components to demonstrating a violation of the right to effective assistance of counsel. First, the defendant must show that counsel's performance was deficient. This requires showing that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052; *see also Williams,* 529 U.S. at 390–91, 120 S.Ct. 1495.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. As the Third Circuit has explained, "[i]t is only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." *United States v. Kauffman,* 109 F.3d 186, 190 (3d Cir.1997).

 Second, the defendant must show that he was prejudiced by the deficient performance. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104

S.Ct. 2052; *see also Williams,* 529 U.S. at 391, 120 S.Ct. 1495.

 In the present case, Pursell cannot prove that he suffered any prejudice from his counsel's failure to ensure that the record before the Pennsylvania Supreme Court was complete. As my analysis above demonstrates, even if the Pennsylvania Supreme Court had been provided with all of the pretrial publicity in this case, its conclusion would have been the same. Accordingly, Pursell has failed to prove a "reasonable probability that, but for counsel's errors, the result of the proceedings would have been different." *Id.* at 694, 104 S.Ct. 2052. His ineffectiveness claim is denied.

### (4) Conclusion

 I will deny Pursell's claims for relief concerning the trial court's failure to grant a change of venue. Because I do not believe that Pursell has made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), on his due process and ineffective assistance of counsel claims, I will also deny him a certificate of appealability on those claims.[20]

### B. Trial Court's Denial of Challenges For Cause

Pursell's second guilt-phase claim is also directed at the composition of his jury and the conduct of his lawyers. During the jury voir dire, Pursell's lawyer moved to strike some potential jurors for cause and, in a number of instances, the trial court denied these challenges. Pursell claims that these rulings, and his lawyer's failure to challenge them on appeal, violated his

Sixth Amendment rights to effective assistance of counsel and an impartial jury, and his Fourteenth Amendment right to due process.[21] Because the Pennsylvania Supreme Court did not address the merits of these claims, I review them *de novo.* For the following reasons, I will deny Pursell's claims for relief.

### (1) Ineffective Assistance Claim

 Pursell first claims that his appellate counsel was ineffective when he failed to raise on appeal the trial court's refusal to strike six potential jurors: Harold Shank; William Noble; Patricia Gunther; Jerome Ott; Wellie Yaple; and Ruth Fink. The Sixth Amendment's right to effective assistance of counsel, as set forth in *Strickland,* also extends to appellate counsel. *Evitts v. Lucey,* 469 U.S. 387, 396–97, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). Accordingly, to succeed on his claim that his appellate counsel was ineffective, Pursell must prove both prongs of the *Strickland* test. *United States v. Mannino,* 212 F.3d 835, 840 (3d Cir.2000). First, he must show that his appellate counsel's "representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. That is, he must show that counsel unreasonably failed to raise on appeal the trial court's denial of his challenges for cause. Second, he must prove that he was prejudiced by his counsel's failure. This requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors," *id.* at 694, 104 S.Ct. 2052, he "would have prevailed on appeal." *Smith v. Robbins,* 528 U.S. 259, 285–86, 120 S.Ct. 746, 145

---

**20.** In order to make a "substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2), Pursell must prove "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v.*

*McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see also Szuchon,* 273 F.3d at 312.

**21.** This is Claim 5 in Pursell's Memorandum of Law. Dkt. no. 26, Claim 5, at 96.

L.Ed.2d 756 (2000); *see also Mannino*, 212 F.3d at 844.

Obviously, I cannot resolve Pursell's *Strickland* claim until I first examine the merits of the claim that his lawyer failed to raise on appeal. *Mannino*, 212 F.3d at 840. If the trial court was wrong when it denied any of Pursell's six challenges for cause, and if this error was reversible under Pennsylvania law, then Pursell's counsel should have raised this claim on appeal. But if Pursell's underlying claim lacks merit, then he "cannot successfully argue that counsel's failure to raise the claim on direct appeal denied [him][his] constitutional right of representation." *Id.* Success or failure on the *Strickland* claim, in other words, is linked with success or failure on Pursell's underlying challenge for cause claim.

### (a) Legal Background

At the time of Pursell's direct appeal, Pennsylvania law was relatively straightforward on when a trial court should strike a juror for cause.

> The test for determining whether a prospective juror should be disqualified is whether he or she is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor, *Commonwealth v. Bighum*, 452 Pa. 554, 307 A.2d 255 (1973). It must be determined whether any biases or prejudices can be put aside on proper instruction of the court, *Commonwealth v. Drew*, 500 Pa. 585, 459 A.2d 318 (1983). A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice by his or her conduct and answers to questions, *Commonwealth v. Colon*,

> 223 Pa.Super. 202, 299 A.2d 326 (1972). The decision on whether to disqualify is within the sound discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion, *Commonwealth v. Black*, 474 Pa. 47, 376 A.2d 627 (1977).

*Commonwealth v. Colson*, 507 Pa. 440, 490 A.2d 811, 818 (1985), *abrogated on other grounds, Commonwealth v. Burke*, 566 Pa. 402, 781 A.2d 1136 (2001).

▮ As this standard indicates, jurors need not be free from bias. Indeed, "it would be unrealistic to expect jurors to be free from all prejudices, a failing common to all human beings." *Commonwealth v. Johnson*, 452 Pa. 130, 305 A.2d 5, 8 (1973). Rather, Pennsylvania law only requires that jurors seek "to put aside those prejudices in the performance of their duty, the determination of guilt or innocence." *Id.* As the Pennsylvania Supreme Court has explained repeatedly: "We therefore do not expect a tabula rasa but merely a mind sufficiently conscious of its sworn responsibility and willing to attempt to reach a decision solely on the facts presented, assiduously avoiding the influence of irrelevant factors." *Id.; see also Commonwealth v. England*, 474 Pa. 1, 375 A.2d 1292, 1296 (1977); *see also Colson*, 490 A.2d at 818; *Commonwealth v. Drew*, 500 Pa. 585, 459 A.2d 318, 320 (1983).

▮ In the first instance, it is the trial judge who must decide whether a potential juror has satisfied this standard. His ruling is a finding of fact, entitled to great deference, and it will not be disturbed on appeal unless it amounts to a "palpable abuse of discretion." *Colson*, 490 A.2d at 818.

> The method of filling a jury box is addressed to the trial judge, and much weight must be given his judgment in passing on its legality. The reason is

manifest; the juror appears before him, he sees him and hears what is said; and is able to form his opinion as much from the proposed juror's conduct as from the words which he utters, printed in the record. Hesitation, doubt, and nervousness indicating an unsettled frame of mind, with other matters, within the judge's view and hearing, but which it is impossible to place in the record must be considered. As it is not possible to bring these matters to our attention, the trial judge's view should be given great weight in determining the matters before him. Nothing short of a palpable abuse of discretion justifies reversal in passing on a challenge for cause.

*Commonwealth v. Gelfi*, 282 Pa. 434, 128 A. 77, 79 (1925); *Commonwealth ex rel. Fletcher v. Cavell*, 395 Pa. 134, 149 A.2d 434 (1959); *Commonwealth v. Bighum*, 452 Pa. 554, 307 A.2d 255, 259 (1973). To show that his underlying claim is meritorious, therefore, Pursell must do more than just prove that the trial court was wrong in denying a challenge for cause. He must also show that the trial court's ruling was a "palpable abuse of discretion."

 What complicates matters for Pursell is that AEDPA adds an additional layer of protection for the trial court's rulings in the present case. The United States Supreme Court has held that a trial judge's determination that a potential juror is qualified to sit on a jury is a finding of fact. *Patton*, 467 U.S. at 1038, 104 S.Ct. 2885; *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Under AEDPA, such factual determinations are "presumed to be correct," 28 U.S.C. § 2254(e)(1), and a petitioner, like Pursell, bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* While the parties do not raise § 2254(e)(1), the clear language of the statute seems to apply to

this case. In fact, the statute itself applies to any "determination of a factual issue made by a State court ..." *Id.* And at least one federal circuit court has applied § 2254(e)(1)'s presumption to a factual situation similar to the one presented by Pursell's challenge. *Collins v. Dormire*, 240 F.3d 724, 727 (8th Cir.2001) (applying presumption of correctness to trial court factual findings concerning underlying claim that counsel failed to raise on appeal).

With this legal background in mind, I now turn to the merits of Pursell's challenge for cause claim.

### (b) Challenges to Shank, Noble, Fink, and Gunther

Of the six potential jurors challenged by Pursell, four of them—Harold Shank, William Noble, Ruth Fink, and Patricia Gunther—were clearly qualified to serve as jurors under Pennsylvania law. Shank, Noble, Fink, and Gunther each came into the courtroom with a built-in bias, but each acknowledged that he or she could put this bias aside and judge the case against Pursell solely on the evidence introduced at trial. Pennsylvania law requires no more. *Colson*, 490 A.2d at 818; *Drew*, 459 A.2d at 320; *Johnson*, 305 A.2d at 8. A brief review of the testimony of each juror confirms the soundness of the trial court's rulings.

Harold Shank had read newspaper articles about the crime, and suggested that these articles tended to hint at the guilt of the defendant. (Tr. 1/13/82 at 80, 84–85). Nevertheless, his comments were more directed at what the newspapers thought than at what he thought. *Id.* at 80, 85. And, when asked directly, he said that he did not have a fixed opinion about the guilt or innocence of Pursell. *Id.* at 80–81. Shank also said that he lost his daughter in a tragic accident "so naturally I would display favor to the parents." *Id.* at 81;

*see also id.* at 84. Nonetheless, he said that he would be able to put that fact aside and decide the case based solely on the evidence presented at trial, without any bias based on the death of his child. *Id.* at 81–82, 84. Pursell challenged Shank for cause and the trial court correctly denied the challenge. *Id.* at 85.

William Noble had heard about the case from the news media and, when he entered the courtroom, he was "leaning one way": "[g]uilty." *Id.* at 112, 115. Nonetheless, he believed that he could set aside all he had seen and judge the case solely on the evidence presented in the courtroom. *Id.* at 112–13. In fact, on questioning from defense counsel, Noble said that his opinion was not "fixed" and that he could put it out of his mind if selected for the jury, *id.* at 115–16, even though he was not "positive" that he could forget it. *Id.* at 116. After Pursell's lawyer moved to strike for cause, the court conducted its own questioning:

> THE COURT: It's like an opinion, once it's there—would you explain that once again? You have an opinion and now you can't get it out of your mind?
>
> MR. NOBLE: Well, I can't get it out of my mind, but I would be willing to listen to all evidence and base an opinion on that but I have already—I am not going to say that I haven't read nothing.
>
> THE COURT: But are you willing to dismiss from your mind any prejudice that you might have or any leaning one way if you were chosen while you were listening to the evidence and testimony from both sides?
>
> MR. NOBLE: I could do that.

*Id.* at 116. The court then correctly denied the challenge for cause. *Id.* at 117.

Ruth Fink said that she had a "tendency" to believe police officers more than other witnesses. (Tr. 1/19/82, at 66–67, 69). Based on this testimony, defense counsel moved for cause, and this motion was denied. *Id.* at 70. Nonetheless, the trial court allowed further questioning. During this questioning, Fink said that she would follow the court's instructions on the credibility of witnesses, *id.* at 70, and that she would apply these instructions to both police and other witnesses. *Id.* at 70–71. Finally, in response to questioning by defense counsel, she said "[t]he more you question me the least I would be inclined to say that [it] is my tendency to believe someone just because of their occupation." *Id.* at 72–73. At that point, defense counsel struck Fink with a peremptory challenge. *Id.* at 73. While the soundness of the trial judge's initial ruling is debatable, his judgment about Fink's impartiality was borne out by further questioning. Even defense counsel seemed to acknowledge as much because he did not renew his challenge for cause.

Finally, Patricia Gunther had no fixed opinion about Pursell's guilt, (Tr. 1/14/82, at 17–18), and acknowledged that she could put aside what little she remembered and judge the case solely on the evidence presented in court. *Id.* at 18–19. Nevertheless, when informed that the victim was a thirteen year-old boy, Gunther said that she would hope to be impartial because she had a daughter that age. *Id.* at 18. At the end of her voir dire, defense counsel pursued this line of inquiry.

> Q. Would you still be able to act impartially in light of the fact that the victim is thirteen years old?
>
> A. Now honestly, the only thing I can say is that I would hope I would.
>
> Q. Is the answer "I don't know"?
>
> A. Okay, I don't know.
>
> Q. You are not sure.
>
> [DISTRICT ATTORNEY]: I think the answer was she would attempt and she would hope she would.

MRS. GUNTHER: Yeah, I would hope that I would be impartial. I can't—

Q. (By [Defense Attorney]) At this time you can't say; is that correct?

A. Yeah, I can't say a definite yes I will act impartial, you know.

*Id.* at 22–23.

The trial judge was not troubled by this colloquy and neither am I. For one, it is unclear whether Gunther had an actual bias at all. She acknowledged, quite honestly, that she hoped her child's age would not influence her thinking, but she never said that it would. Second, it was only after repeated questioning that she finally said "I can't say a definite yes I will act impartial." *Id.* at 23. In *Murphy*, 421 U.S. at 801–02, 95 S.Ct. 2031, the United States Supreme Court confronted a juror who indicated that he could be impartial, but after numerous leading questions made a statement that undermined his impartiality. In upholding the trial court's refusal to strike for cause, the Supreme Court, in an opinion by Justice Marshall, stated that "we cannot attach great significance to this statement . . . in light of the leading nature of counsel's questions and the juror's other testimony . . ." *Id.* I concur with the *Murphy* Court's assessment and find no problem with the trial court's refusal to exclude Gunther for cause.

 Obviously, the trial court's rulings on Shank, Noble, Fink, and Gunther were correct if AEDPA's presumption of correctness applies to the present case. 28 U.S.C. § 2254(e)(1). None of the voir dire testimony shows the kind of clear and convincing evidence needed to overcome AEDPA's hurdle. Yet, even if the presumption does not apply, the trial judge's rulings were still correct. All four witnesses testified that they could set aside any pre-existing biases, and judge the case on the evidence presented at trial. Penn-

sylvania law expects no more. *Colson*, 490 A.2d at 818. Pursell's claim concerning Shank, Noble, Gunther, and Fink is without merit, and his counsel was not ineffective for failing to raise it on appeal. *Mannino*, 212 F.3d at 840.

### (c) Challenges to Ott and Yaple

That leaves two potential jurors, Jerome Ott and Wellie Yaple. The most troubling part about Ott's voir dire is his testimony about police witnesses.

Q. Now, would you naturally tend to believe a police witness more than another witness just because he is a police officer?

A. That's a tough question. I always believe police officers.

Q. Pardon me.

A. I've always believed police officers.

Q. Well, because he is a police officer?

A. He is still human.

Q. Okay, in other words, would you believe him just because he is a police officer more than you would believe anybody else who is a witness because he isn't a police officer?

A. I don't think so.

(Tr. 1/14/82, at 126). After the court completed its questioning of Ott, defense counsel asked a few questions on the issue of police testimony.

Q. . . . . I think you said it was a tough question in your mind whether you would tend to believe a police officer more than other witnesses; is that correct?

A. Well, like I say, I was always brought up to law and order and that the police officer was always—he was authority—and so I at least have a tendency to believe him more than I would an ordinary person.

Q. Is that still the case?

A. Depends on the police officer now, I believe.

Q. Okay, I am talking about just because he is a police officer. You might not know these police officers at all. In fact, I think that probably will be the case because you have been read a list of witnesses. So, let me just ask that again. If you would see a police officer that appeared who you don't know at all, all you know is that he is a police officer—

A. I think I could disregard the fact that he is a police officer pretty easily.

Q. Could you disregard the fact and view him as just another person?

A. That's another touchy question.

*Id.* at 130. At this time, there was a brief interruption, during which an exchange between counsel and the court took place. Defense counsel was then asked to pose his question again.

[DEFENSE COUNSEL]: I thought I just asked specifically would it still be a tough question for him whether he could disregard or whether he could view a police officer just because he is a police officer and doesn't know him at all.

A. I think I could disregard it, yes.

Q. (By [Defense Counsel]) Would you disregard the fact that—

A. To me that's a tough question.

Q. Why is that so?

A. Well, like I said, I was always brought up to law and order. We always respected law and order more than they do nowadays.

Q. I am not talking with respect now. Do you tend to—

A. Respect is law, and once you get into that, you believe it a little more than if you run into an ordinary person, right?

Q. So, are you saying that you would tend to believe a police officer because of his authority?

A. I try not to.

Q. Well, will you disregard—will you tend to believe a police officer just because he is a police officer because of his authority more than another witness?

A. Like I say, I try not to, but I wouldn't guarantee that I could or couldn't.

Q. You might give more credence than you would another person; is that correct?

A. I might, yes.

Q. Just because he is a police officer?

A. I am afraid so.

Q. You are afraid so?

A. I am afraid so, yes.

THE COURT: The question was—I will ask you again: Would—in this particular case if you are chosen as a juror, would you just believe a police witness more than another witness just because of the fact that he was a police officer?

A. I have a tendency to do that? I would say I believe I would.

*Id.* at 130–32. At that point, the defense moved to exclude Ott for cause, and the trial court denied that motion. "I refuse the cause," the trial judge explained. "I think he's answered it many different ways, and I think he is being honest about it, so I am refusing the request." *Id.* at 132. Defense counsel then exercised a peremptory challenge. *Id.*

■ Was the trial court's decision correct? And would Pursell's claim have been meritorious on appeal? Again, AEDPA itself answers these questions by bestowing a presumption of correctness on all factual determinations made by a state court. 28 U.S.C. § 2254(e)(1). In the present case, there is simply not the kind of clear and convincing evidence of bias that

is needed to rebut § 2254(e)(1)'s presumption. Four times Ott was asked about his view of police witnesses and four times he said that he could disregard any tendency he had to believe police officers more than others. (Tr. 1/14/82, at 126) (stating that he didn't think he would believe a police officer more than another witness); *id.* at 130 ("I think I could disregard the fact that he is a police officer pretty easily."); *id.* at 131 ("I think I could disregard it, yes."); *id.* (stating that "I try not to" tend to believe a police officer more than others). Then, after repeated questioning from defense counsel, Ott began to hedge. *Id.* ("Like I say, I try not [to believe police officers more], but I wouldn't guarantee that I would or couldn't."); *id.* (acknowledging that he "might" give more credence to a police officer than to another witness). Finally, when questioned by the court, he stated that "I would say I believe I would" believe a police officer more than another witness. *Id.* at 132. At best for Pursell, the testimony is mixed. Clear statements about Ott's impartiality became muddier and muddier as he was questioned more and more, but they never ripened into clear statements of bias. Indeed, even Ott's final statement was really no more than another unclear statement about his ability to set aside his bias. *Id.* While this conflicting testimony may somewhat shake the trial court's conclusion that Ott could be impartial, it is not clear and convincing evidence of bias. Accordingly, under § 2254(e)(1)'s presumption of correctness, the trial court's decision to empanel Ott was correct and Pursell's lawyer would have had no basis to appeal this claim.

■ Even if § 2254(e)(1) does not apply, I would reach the same conclusion. To succeed on appeal, Pursell had to show more than just a "wrong call" by the trial judge. He had to prove that the judge's ruling was a "palpable abuse of discretion."

*Colson,* 490 A.2d at 818. Unfortunately for Pursell, this was one of those cases where the deferential standard of review was bound to have some bite. Ott's testimony was mixed, and, if placed on a scale, his statements of impartiality outnumbered his statements of potential bias. In just such a case, the Pennsylvania Supreme Court would likely defer to the trial judge because only he saw the witness, heard his words, and scrutinized his demeanor. *See, e.g., Gelfi,* 128 A. at 79. In light of the great deference given to trial judges in empaneling a jury, *id.* at 79 (requiring a "palpable" abuse of discretion); *Webster's Ninth New Collegiate Dictionary* 849 (1988) (defining "palpable" as "easily perceptible"), I do not believe that Pursell would have prevailed on appeal.

Granted, a number of cases at the time might have bolstered Pursell's claim on appeal. First, in *Commonwealth v. McBee,* 267 Pa.Super. 49, 405 A.2d 1297, 1300 (1979) the defendant was on trial for robbery and murder, and the juror, Joseph Steinmetz, had a niece who had been shot and killed a few years earlier. *Id.* at 1298–99. When told about the case, Steinmetz said "my niece was killed approximately two years ago, Your Honor. She was shot. I don't think I could give a fair verdict." *Id.* at 1298. During voir dire, Steinmetz said four times that he didn't think he could set aside the death of his niece and judge the case impartially. *Id.* at 1298–99. Nevertheless, he did say that he would try to the best of his ability to not let his niece's death interfere with his decision in the case. *Id.* at 1299. And he indicated that he would follow the court's instructions to the best of his ability. *Id.* at 1300. The trial court denied the defendant's challenge for cause and the Superior Court reversed. *Id.*

A fair reading of Mr. Steinmetz's voir dire reveals that he had a sincere, sub-

stantial and persistent doubt concerning his ability to give a fair verdict, despite his equally sincere assertion that he would try to the best of his ability to follow the court's instructions and, implicitly, not to allow his niece's death by shooting to influence his judgment. We conclude, therefore, that the lower court abused its discretion in refusing to excuse Mr. Steinmetz for cause.

*Id.* at 1300.

Second, there was *Commonwealth v. Johnson*, 299 Pa.Super. 172, 445 A.2d 509 (1982), a case where the defendant was on trial for robbery, simple assault, and possession of an instrument of crime, and a juror, Herbert Rubin, had a daughter who had been the victim of a robbery during which the robbers had raped her. *Id.* at 512. Upon learning about the allegations against the defendant, Rubin showed considerable distress. "I didn't expect myself to break down, practically," he indicated during voir dire. *Id.* Rubin repeatedly acknowledged how strongly the attack on his daughter affected him, and how difficult it might be for him to be fair. *Id.* at 512–13. Nonetheless, after a number of questions from the court, Rubin said that he could try to be fair. *Id.* at 513. The trial court denied a challenge for cause and the Superior Court reversed. *Id.* at 513–14.

Mr. Rubin vividly demonstrated during voir dire that he would be likely not to be an impartial juror. He not only visibly manifested emotional distress but specifically expressed substantial doubts about his ability to be impartial at least five times....

Mr. Rubin's eventual assurance to the court that he would "[b]e fair" did not dispel the force of these admissions. This is particularly so in view of the court's questions, which Mr. Rubin may well have understood as suggesting that

his proper response, and the response desired by the court, was to say, despite his doubts, that he would be an impartial juror.

*Id.* at 514 (internal citations omitted).

Yet even these cases do not show that Pursell would have succeeded on appeal. For one, unlike Ott, the jurors in *McBee* and *Johnson*, more clearly and persistently expressed doubts about their ability to be impartial. While Ott consistently said that he could set aside his bias up until the last few questions, the jurors in *McBee* and *Johnson* said just the opposite: they repeatedly told the court that they could not set aside their biases, until the very end when they acknowledged that they could. Second, the jurors in *McBee* and *Johnson* had real emotional attachments to their biases, stemming from their close family ties to individuals who had been victimized by similar crimes, and making it unlikely that such biases could be readily cast aside. Such an emotional attachment was not present in Ott's case. Finally, both cases were handed down by the Pennsylvania Superior Court, and Pursell's appeal was directly to the Pennsylvania Supreme Court. *Pursell–1*, 495 A.2d at 186. While the Supreme Court might consider the Superior Court's decisions, it was not bound by them.

Pursell cites the Pennsylvania Supreme Court's opinion in *Commonwealth v. Ingber*, 516 Pa. 2, 531 A.2d 1101, 1104 (1987) to show that his challenge against Ott was meritorious. In that case, the Court held that the trial court improperly failed to excuse a juror for cause when the juror said that she would give greater weight to the testimony of a police officer merely because the witness was in fact a police officer. *Id.* But *Ingber* was not decided until more than three and a half years after Pursell filed his appeal and more than two years after the Supreme

Court rendered its decision in *Pursell–1*. *Compare id.* at 1101 (case decided on October 6, 1987) *with* dkt. no. 18, at 1985 (Pursell's appeal filed on February 8, 1984) *and Pursell–1*, 495 A.2d at 183 (Pursell's appeal decided on June 26, 1985). "A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. Pursell's counsel did not have the benefit of the Pennsylvania Supreme Court's case in *Ingber* at the time he filed his appeal.

If anything, Pursell's citation to *Ingber* cuts the other way, suggesting that there was not much merit to his claim concerning Ott's bias. In reaching its holding in *Ingber*, the Pennsylvania Supreme Court reversed the prior holdings of the Court of Common Pleas and the Pennsylvania Superior Court. A few weeks before Pursell filed his appeal, an *en banc* panel of the Bucks County Court of Common Pleas upheld the trial court's denial of the challenge for cause at issue in *Ingber*. *Ingber*, 531 A.2d at 1103 n. 3. Further, while Pursell's case was pending on appeal, a panel of the Pennsylvania Superior Court affirmed the decision of the Court of Common Pleas. *Commonwealth v. Ingber*, 343 Pa.Super. 610, 494 A.2d 480 (1985). In other words, the lower court decisions in *Ingber* on the same issue posed by Ott's testimony were not favorable to Pursell, until long after his appeal was decided.

In short, whether Pursell would have succeeded on appeal in his challenge to Ott's qualifications is a close question. Clearly, the claim had arguable merit, as the voir dire and the *McBee* and *Johnson* cases seem to indicate. Nonetheless, even if the presumption of correctness does not apply, I ultimately conclude that the trial court's decision to deny the challenge for cause was not a palpable abuse of discretion. Pursell's counsel, therefore, was not ineffective for failing to raise a claim that would have lost on appeal.

The same can be said for Pursell's challenge to juror Wellie Yaple. Like Ott, Yaple said that he had a tendency to believe police witnesses more than others.

Q. Would you naturally tend to believe a witness who is a police officer more than other witnesses just because someone is a police officer?

A. Yes.

BY THE COURT: Rephrase that, please.

Q. Mr. Yaple, during the trial police officers are expected to be called. I suppose—do you understand that a police officer as a witness should be given no more credibility than anyone else?

A. I feel in most cases a police officer is neutral and if he says something, it's more or less not giving one or other an advantage.

Q. So, you came into court today with an opinion in your mind that a police officer would be a more believable witness than a person who wasn't?

A. No, not really, no.

Q. Perhaps I'm asking the wrong question then. Would you please state again how you would approach a police officer as a witness?

A. I would more or less believe what he had to say. It's kind of a hard question to answer.

Q. I suppose—let me ask you bluntly, would you tend to believe a police officer more than another witness?

A. Not really. I guess not.

Q. You guess not. Are you sure?

A. I've always believed a policeman would be right in a lot of—it's just my understanding. That is just the way I feel. I don't think a police officer would

lie under oath as much maybe as another person could. (Tr. 1/18/82, at 16–17). After defense counsel finished questioning Yaple, the prosecution asked a few questions as well.

Q. Mr. Yaple, if you were selected as a juror in this case, at the end of the case his Honor will give you certain instructions to guide you in jury deliberations. One of those instructions would be that as a juror, you are to determine the credibility of the witnesses and that for each witness who takes the stand, you are to observe their demeanor, look at the way they testify under oath, listen to their words, and make your judgments as you would in your own business or your everyday life. Do you feel you would be able to do that for all of the witnesses who would take the stand in this case?

A. Yes.

Q. Would you be able to apply that standard for police officers and lay witnesses if you were so instructed?

A. Yes.

*Id.* at 18–19. Defense counsel then moved to strike Yaple for cause, and the trial judge denied the request, stating "I don't think there is enough for cause here at this time because of the way the questions were answered . . . " *Id.* at 19.

Was the trial court wrong in denying the challenge for cause? And would Pursell's claim have prevailed on appeal? Again, AEDPA's presumption of correctness seems to answer these questions. 28 U.S.C. § § 2254(e)(1). Like Ott, Yaple's testimony was inconsistent. Twice he said that he would not believe the testimony of a police officer more than another witness. (Tr. 1/18/82, at 16) (answering "[n]o, not really. No" to whether he came into court with an opinion that a police officer was more believable than another witness); *id.* at 17 (answering "not really. I guess not"

to question whether he would believe police officer more than another witness). Further, he said that he could apply the court's instructions on witness credibility to police witnesses as well as other witnesses. *Id.* at 19. Nonetheless, four times he gave answers that indicated his bias in favor of police witnesses and suggested an inability to put that bias aside at trial. *Id.* at 16 (answering "yes" to whether he would tend to believe police witnesses more than others); *id.* at 16 ("I feel in most cases that a police officer is neutral"); *id.* at 17 ("I would more or less believe what he had to say"); *id.* at 17 ("I always believed a policeman would be right. . . . I don't think that a police officer would lie under oath as much as maybe another person could."). While the trial court was arguably wrong, he was also arguably right. In other words, Yaple's testimony is so inconsistent that it reasonably supports either conclusion. In the present case, such evidence is not clear and convincing evidence of bias. Accordingly, I presume that the trial judge's ruling was correct. Pursell's challenge to Yaple lacked merit, and his lawyer would have had no grounds to appeal this claim.

Nevertheless, even if the presumption does not apply, I still find that Pursell could not succeed on appeal for one simple reason: the trial court grounded its ruling on "the way the questions were answered," *id.* at 19, not the answers themselves. Yaple's tone of voice, his mannerism, and his demeanor all went into the trial court's decision to deny the challenge. As the Pennsylvania Supreme Court has explained, these are the kinds of judgments that are best made by trial judges and not appellate courts reading a stale and inert trial transcript. *Gelfi*, 128 A. at 79; *Bighum*, 307 A.2d at 259. In light of Yaple's inconsistent testimony, the trial court was certainly entitled to rely on "the way the

questions were answered," (Tr. 1/18/82, at 19), in deciding which answers were credible and which were not. In the present circumstances, I conclude that Pursell's claim would not have succeeded on appeal.

What makes the trial court's decision to qualify Yaple more troubling, however, is the fact that Yaple had more than just a questionable bias for police witnesses. He also had a tendency to believe Erie County District Attorney Michael Veshecco, one of the Commonwealth's witnesses in the case:

Q. .... I will run down a list of names. Please interrupt me if you are acquainted with any of these people, Michael Veshecco?

A. Yes.

Q. You know Michael Veshecco?

A. He handled my divorce.

Q. And when was that?

A. Three years ago. Well, it was the last year before he was the D.A.

Q. Did you know Mr. Veshecco only on a professional basis?

A. He was my attorney up until then.

Q. Did he represent the business?

A. Yes.

Q. Do you feel that because of your relationship on a professional basis with Mr. Veshecco that that would interfere with your ability to sit on this jury in a fair manner?

A. I like Mike and we went through a lot I think together for that time I knew him. He helped me a lot of ways I thought.

Q. There is a possibility that Mr. Veshecco might be called as a witness in this case. Would you tend to believe Mr. Veshecco more than another witness based on your past experience with him?

A. Knowing Mike, I believe in what he says, you know, because of the dealings I had with him. He was fair.

Q. Would you tend to believe him more than another witness who you didn't know?

A. I really don't know. I would have to hear both sides.

*Id.* at 9–10. After defense counsel finished questioning Yaple, the court posed a question concerning whether Yaple would tend to believe Mr. Veshecco.

Q. .... The fact that you know Mr. Veshecco and a few of the other members of the district attorney's staff and that you may know one or two of the witnesses that may be called by the Commonwealth's presentation of the case, do you feel that that in fact would impair your ability to judge this case solely on the evidence produced in the trial?

A. I believe I would probably tend to believe Mr. Veshecco, yes.

*Id.* at 18. Finally, clearly in an effort to rehabilitate Yaple, the prosecution told him about the court's instruction concerning the credibility of witnesses, and asked him whether he "would be able to apply that standard to Mr. Veshecco if you were so instructed." *Id.* at 19. Without hesitation, Yaple answered "Yes." *Id.*

█ The mere fact that Yaple had a past relationship with Veshecco was not enough under Pennsylvania law to obtain a reversal of the trial court's ruling. In many cases prior to the time of Pursell's appeal, the Pennsylvania courts had addressed when a juror's relationship to a case was enough to justify removal for cause. In *Commonwealth v. Colon,* 223 Pa.Super. 202, 299 A.2d 326, 328 (1972), the Supreme Court held that the mere fact that a juror was a law enforcement officer was not enough to disqualify that juror for cause. In *Cavell,* 149 A.2d at 436–38, the Supreme Court held that the son-in-law of a detective who investigated the crime, and the second cousin once removed from the victim were not excludable for cause sim-

ply because of their status. In *Commonwealth v. Stamm*, 286 Pa.Super. 409, 429 A.2d 4, 7 (1981), the Superior Court held that a juror was not excludable when she was related to the police prosecutor in the case and was the aunt of a district attorney who was not trying the case. Finally, in *Commonwealth v. Bright*, 279 Pa.Super. 1, 420 A.2d 714, 716–17 (1980), the Superior Court held that there was no ground to exclude a juror merely because he lived in the same neighborhood as the prosecutor and had known him since he was a child. As these cases demonstrate, exclusion based on status alone is a rare event in Pennsylvania. Yaple's past relationship with Veshecco was not enough, as a matter of law, to exclude him from jury service.

The only significant question presented by Yaple's voir dire, then, is whether he should have been excused due to his tendency to believe Veshecco more than other witnesses. Again, AEDPA's presumption of correctness provides the answer. And, once again, the record shows a trial judge who was both wrong and right, depending on which testimony is emphasized and which is downplayed. In support of the trial judge's ruling was the timing of the answers given by Yaple. Yaple first stated that he would not consider Veshecco differently than other witnesses. (Tr. 1/18/82, at 9–10) ("Q. Would you tend to believe him more than another witness who you didn't know? A. I really don't know. I would have to hear both sides."). Then, under questioning from the court, Yaple seemed to go back on this initial statement. *Id.* at 18. (stating that he "would probably tend to believe Mr. Veshecco."). Finally, Yaple stated unequivocally that he could apply the same credibility standard to Veshecco as to other witnesses. *Id.* at 19. When the trial judge stated that his ruling was based on "the way the questions were answered," *id.* at 19, he might have been balancing Yaple's equivocal statement that he could not be fair, *id.* at 18 ("I *believe* I would *probably tend* to believe") (emphasis added) with his clear statement that he could apply the same credibility instruction to Veshecco that he applied to others. *Id.* at 19. While I find the question a close one, I conclude that the presumption of correctness should apply. There is ample support in the record for the trial court's decision to qualify Yaple, and the evidence to the contrary is not clear and convincing evidence of bias.

For the same reasons, I conclude that the trial court's decision was not a palpable abuse of discretion. Pennsylvania law provides a trial judge with broad discretion in determining juror qualifications and, with regard to Yaple, the trial judge probed the full range of his discretion. But such an exercise of discretion does not necessarily constitute an abuse of discretion. In the present case, the record supports the trial judge's decision. Although statements made by the witness point strongly in the other direction, the trial judge was entitled to credit some statements more than others, particularly when he said that was exactly what he was doing. *Id.* at 19. Even if the presumption of correctness does not apply, I still find that the trial court's ruling on Yaple would not have been reversed on appeal. Once again, Pursell's counsel was not ineffective for failing to raise a losing claim.[22]

This lengthy analysis yields three basic conclusions. First, the trial judge's rulings on Shank, Noble, Fink, and Gunther

---

**22.** One question unanswered by my discussion so far is what relief Pursell would have been entitled to had he prevailed on appeal. In *Commonwealth v. Jones*, 477 Pa. 164, 383 A.2d 874, 876 (1978), the Pennsylvania Supreme Court held that when a trial court forces a defendant to use his peremptory challenges on a person who should have been excused for cause and that defendant exhausts his peremptory challenges prior to the

were correct and presented no grounds for appeal. Second, the court's rulings concerning Ott and Yaple were correct if § 2254(e)(1)'s presumption of correctness applies and, again, presented no grounds for appeal. Finally, if § 2254(e)(1)'s presumption of correctness does not apply, the trial court's rulings on Ott and Yaple were arguably wrong, but not a palpable abuse of discretion. Because there is arguable merit to Pursell's claims concerning Ott and Yaple when analyzed without the presumption of correctness, I will discuss whether Pursell's counsel was deficient in failing to raise those claims on appeal.

### (d) Was Counsel Deficient In Failing to Raise Claims Concerning Ott and Yaple?

■■■ As with decisions made by trial counsel, appellate counsel's decisions are protected by a "strong presumption" that they "fall[ ] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. In the present case, Pursell has come forward with no evidence to undermine the reasonableness of his appellate counsel's decision to forego the challenges to Ott and Yaple on appeal. Accordingly, I conclude that his appellate counsel was not deficient and will deny his claim for ineffective assistance of counsel.

For one, Pursell's lawyer was aware of the trial court's rulings on Ott and Yaple and made a strategic choice not to pursue them.[23] First, he had seen the motion for new trial in which the challenge for cause issue was first raised. In fact, he cited that very document in a supplemental new

---

seating of the jury, the trial court's erroneous ruling is not harmless and the defendant is entitled to a new trial. In the present case, Pursell used a peremptory challenge to strike Ott and Yaple, and then he exhausted his peremptories before the jury was seated. Accordingly, had he been able to show that the trial court abused its discretion, he would have received a new trial.

But what is the source of this new trial requirement? The only case cited by the *Jones* Court in support of its ruling was *United States v. Nell*, 526 F.2d 1223 (5th Cir. 1976), a case relying on federal law. Indeed, in *Ingber*, the Pennsylvania Supreme Court explained that its *Jones* decision was "a matter of settled federal constitutional law." *Ingber*, 531 A.2d at 1105. All of this suggests that the *Jones* Court was holding that the U.S. Constitution required it to grant a new trial.

This is where the problem arises. To the extent that *Jones* is a case based on the U.S. Constitution, it was implicitly overruled by *Ross v. Oklahoma*, 487 U.S. 81, 86, 89–91, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), a case holding that the U.S. Constitution does not require a new trial when a trial court improperly denies a challenge for cause and the defendant exhausts all his peremptory challenges.

Accordingly, if Pursell proves that the trial court abused its discretion when it denied the challenges to Ott or Yaple, the following question arises: is he entitled to a new trial today for a claim that may have been viable back in 1985 (though due only to an incorrect interpretation of Federal law) but which is now clearly foreclosed? More to the point, as a court sitting in habeas, the relief I would grant Pursell would be a release from prison unless the Pennsylvania Supreme Court reinstated his direct appeal within a specified period of time. *Barry v. Brower*, 864 F.2d 294, 300–301 (3d Cir.1988). At this new appeal, Pursell would certainly lose to the extent that he relied on *Jones* in light of *Ross*.

23. The claim at issue was first raised by Pursell's trial counsel in his motion for a new trial. Dkt. no. 18, at 1863. Months later, Pursell removed his trial counsel and obtained the representation of Dennis V. Williams, the same counsel who represented him on appeal. *Id.* at 1912. Soon thereafter, Williams filed a document entitled "Supplemental Reasons for a Motion for New Trial and/or Arrest of Judgement." *Id.* at 1876. In this document, he raised twelve claims for relief, many of which had been previously raised in the original motion for new trial, and others of which were added for the first time. *Id.* In this supplement, Williams did not raise the challenge for cause issue. He then filed a "Brief on Behalf of the Defen-

trial motion that he filed shortly after entering his appearance on Pursell's behalf. Dkt. no. 18, at 1876. Second, he had a copy of the voir dire transcript before filing his appeal. *Id.* at 1879. Third, he had read the voir dire transcript because he raised a claim for change of venue, a claim that obviously turned on the jury voir dire. *Id.* at 1876. Finally, he was told by the Commonwealth that it deemed the challenge for cause claims waived or abandoned, and he neither responded to that statement nor tried to raise those claims again. *Id.* at 1914. Viewing these facts under the presumption that counsel's conduct is strategically sound, *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, I conclude that Pursell's counsel had a firm strategy in place and that strategy did not include the challenge for cause claims.

Second, counsel's strategy was objectively reasonable. The first thing that Pursell's appellate counsel did when he took over the case was narrow the issues for appeal. Dkt. no. 18, at 1876, 1978–79. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues." *Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Sistrunk v. Vaughn,* 96 F.3d 666, 670 (3d Cir.1996) ("the process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.") (internal quotations and citations omitted);

*Mason v. Hanks,* 97 F.3d 887, 893 (7th Cir.1996). What Justice Jackson noted more than fifty years ago is still true today.

> Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one ... [E]xperience on the bench convinces me that multiplying assignments of error will dilute and weaken a good cause and will not save a bad one.

Jackson, *Advocacy Before the Supreme Court,* 25 Temple L.Q. 115, 119 (1951) (quoted in *Jones,* 463 U.S. at 752, 103 S.Ct. 3308). In the present case, the original motion for new trial contained more than fifty claims of error. Dkt. no. 18, at 1867. When Pursell's appellate counsel took over, he chiseled these claims down to twelve, abandoning many, keeping some, and adding others. *Compare id.* at 1880 *with id.* at 1867, *and id.* at 1978–79. In focusing the issues for appeal, counsel acted in an objectively reasonable fashion.

Finally, when the claims actually raised by appellate counsel are compared to the challenge for cause claims, it is clear that counsel's conduct was objectively reasonable.

> When a claim of ineffective assistance of counsel is based on failure to raise viable issues, the district court must examine the trial court record to determine whether appellate counsel failed to pres-

---

dant," in which he addressed only the twelve claims highlighted in his supplement and ignored the remaining issues originally raised in the motion for new trial, including the challenge for cause issue. *Id.* at 1880. The trial court, sitting *en banc,* addressed only the twelve issues raised in the supplement and the brief and denied relief on all twelve. The

court made no mention of the other issues, including the denial of the challenges for cause. *Id.* at 1966. Pursell filed his appeal with the Pennsylvania Supreme Court on February 8, 1984, raising the same twelve issues that he had raised in his supplement. *Id.* at 1978–79. Once again, the challenge for cause issue was not included.

ent *significant and obvious issues* on appeal. Significant issues which could have been raised should then be compared to those which were raised. Generally, *only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.*

*Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1986) (emphasis added); *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994) ("a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.")

Of the seven guilt-phase claims raised on appeal, four of them were stronger than the claims that Pursell's lawyer left behind. First, the change of venue claim was very strong, particularly in light of the pretrial publicity in this case, the nature of that publicity, and the state of Pennsylvania law at the time in question. *See, e.g., Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209 (1973). Second, the claim that a mistrial should have been granted due to Officer Mark Krahe's statements about rape, dkt. no. 18, at 2021, was also a solid one. Krahe's statement ("That boy looked good to you. You took that boy. You raped that boy.' ") (Tr. 1/21/82, at 117–18), injected sexual assault into a case in which no evidence supported such an inference. Due to the fact that the victim was a thirteen year-old boy who was found naked, Krahe's statement had the potential of polluting the minds of the jurors and unduly prejudicing the defendant. Third, the claim that Pursell's lawyer was ineffective for failing to take a mistrial offered him presented arguable grounds for reversal, dkt. no. 18, at 2016, particularly because the trial counsel appeared uninformed about the legal ramifications of the bargain he made. Finally, the claim that Pursell's lawyer was ineffective for

failing to adequately cross examine the Commonwealth's main blood witness was also a good one. *Id.* at 2022. Of the evidence against Pursell, there was only blood, glasses, and a number of admissions. To the extent that Pursell could knock out one of these pillars, he could have gone a long way toward casting doubt on his guilt.

These four claims were also more suited to appellate review. All four presented strictly legal questions that would be reviewed by the Supreme Court *de novo.* In contrast, the challenge for cause claims were intensely factual in nature and rested on a "palpable abuse of discretion" standard of review. It was eminently reasonable for Pursell's appellate counsel to decide to move forward with the four claims described, and leave the challenge for cause claims in his proverbial bag.

Even the remaining three guilt-phase claims raised on appeal had certain attributes that made it reasonable for Pursell's lawyer to raise them while leaving the challenge for cause issue behind. Two of them, dkt. no. 18 at 2013 (ineffectiveness claim based on trial counsel's failure to seek mistrial after the tipstaff died); *id.* at 2020 (claim that trial court erred in denying request for jury instructions), presented clear legal issues that required very little in the way of factual inquiry. Any appellate lawyer knows that appellate courts are aware of their institutional inability to resolve factual issues and, thus, are more amenable to claims of clear legal error. Even the third claim, a claim for insufficient evidence, *id.,* at 2024, had certain attributes that made it better for appeal. For one, it was the kind of claim raised in nearly every case in which a defendant is convicted on circumstantial evidence. Second, such a claim helped appellate counsel undermine the evidence

against his client, thereby making the appellate court more willing to grant relief for legal errors that might have occurred at trial. Although these three claims were slightly weaker than the challenge for cause claims, Pursell's counsel had reasonable grounds for raising them on appeal while leaving the others at home.

Under these circumstances, I conclude that Pursell's lawyer was not unreasonable in failing to raise the challenges to Ott and Yaple, even though those claims had arguable merit. Accordingly, I will deny Pursell's claim for ineffective assistance of counsel, without reaching the issue of prejudice.

### (2) Sixth Amendment Right to Impartial Jury

Pursell next raises another Sixth Amendment claim, but this one focuses not on the conduct of his lawyer, but on the make-up of his jury. In particular, Pursell contends that the trial court's denial of his challenges for cause forced him to exhaust his peremptory challenges before the empaneling of the jury and resulted in a violation of his Sixth Amendment right to an impartial jury.

In *Ross v. Oklahoma*, 487 U.S. 81, 86, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), the United States Supreme Court held that a Sixth Amendment impartial jury claim must focus on the jurors who ultimately sat on the jury in question. In that case, the defendant challenged a potential juror, Darrell Huling, for cause. *Id.* at 83–84, 108 S.Ct. 2273. When the trial court denied this challenge, the defendant exercised a peremptory challenge to remove Huling from the jury. *Id.* at 84, 108 S.Ct. 2273. Even though the trial court erred when it refused to excuse Huling for cause, *id.* at 85, 108 S.Ct. 2273, the Supreme Court rejected defendant's impartial jury claim.

Had Huling sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's failure to remove Huling for cause, the sentence would have to be overturned. But Huling did not sit. Petitioner exercised a peremptory challenge to remove him, and Huling was thereby removed from the jury as effectively as if the trial court had excused him for cause.

*Id.* at 85–86, 108 S.Ct. 2273. The defendant nonetheless claimed that the composition of the jury would have been different had he not been forced to waste a peremptory challenge to remove Huling. Again, the Court rejected this claim:

[W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

*Id.* at 88, 108 S.Ct. 2273.

The Supreme Court's decision in *Ross* easily disposes of Pursell's claim that his Sixth Amendment right to an impartial jury was violated in the present case. None of the six potential jurors at issue actually sat on the jury that decided Pursell's fate. In his Memorandum of Law, Pursell claims that Ruth Fink, one of the jurors that he challenged for cause, sat on the jury, dkt. no. 26, at 107, but this statement is flatly contradicted by the record. *See supra* note 19. After the trial court rejected Pursell's challenge to exclude Fink for cause, Pursell used a peremptory challenge to remove her from the jury. (Tr. 1/18/82, at 73). Therefore, whether

Pursell's Sixth Amendment claim survives depends on whether the jury ultimately chosen was impartial. I have already concluded that it was, *supra* at 304–05, and will not revisit that issue here.

### (3) Due Process Claim

■ Pursell also claims that the trial court's denial of his challenges for cause violated his due process rights under the Fourteenth Amendment by arbitrarily depriving him of the full compliment of the twenty peremptory challenges he was allowed under Pennsylvania law. In *Ross,* the Court explained that "peremptory challenges are a creature of statute and are not required by the Constitution." *Ross,* 487 U.S. at 89, 108 S.Ct. 2273. Accordingly, the *Ross* Court held that, at a minimum, a defendant's due process rights cannot be violated when he receives precisely what state law provides. *Id.* In particular, the Oklahoma state law at issue in *Ross* required that defendants use peremptory challenges to cure a trial court's erroneous refusals to excuse a juror for cause. The *Ross* Court held that the petitioner had received all that he was entitled to under state law and, thus, all the process that he was due. *Id.* at 90–91, 108 S.Ct. 2273.

Once again, *Ross* disposes of Pursell's claim. I have already held that the trial court's denial of the challenges for cause did not violate Pennsylvania law. Because Pursell was given all that Pennsylvania law entitled him to (a ruling on his challenges for cause that was not a palpable abuse of

discretion), his due process claim must fail as well. *Id.* at 90–91, 108 S.Ct. 2273.[24]

### (4) Trial Court's Grant of Commonwealth's Challenge for Cause

■ Finally, Pursell claims that the trial court erred when it granted a Commonwealth challenge for cause to excuse juror Ann Gazda. (Tr. 1/13/82, at 159–81). While Pursell's state law claim is clear enough, it is equally clear that a federal habeas court lacks the power to grant relief simply for violations of state law. *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Additionally, to the extent that Pursell raises an impartial jury or due process claim, such claims are clearly foreclosed by *Ross.* Pursell cites *Gray v. Mississippi,* 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987) and claims that a defendant is entitled to a new trial whenever a trial court erroneously grants a government challenge for cause. But the *Ross* Court specifically limited *Gray* to cases where the trial court erroneously excludes a qualified juror in a capital case under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). *Ross,* 487 U.S. at 87, 108 S.Ct. 2273. No such *Witherspoon* error is at issue in the present case. Thus, I will deny Pursell's claim for relief.

### (5) Conclusion

■ I will deny relief on all of Pursell's claims concerning the trial court's denial of his challenges for cause. Nevertheless, because I believe that Pursell has made a "substantial showing of the denial of a constitutional right," 28 U.S.C.

---

**24.** Even if Pursell can prove a violation of state law, that violation, standing alone, does not constitute a violation of due process. The *Ross* Court held that due process is not violated when state law is not violated, but it left open the opposite question: is due process violated merely because state law is? *Id.* at 91 n. 4, 108 S.Ct. 2273. Just recently, the

Court seemed to suggest that a state law violation, standing alone, would not violate due process absent unique circumstances. *See United States v. Martinez–Salazar,* 528 U.S. 304, 317 n. 4, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) (rejecting idea that the denial of peremptory challenge amounts to a violation of due process without a showing of prejudice).

§ 2253(c)(2), on his claim of ineffective assistance of counsel, I will grant him a certificate of appealability on that claim alone.

### C. Prosecution's Failure to Disclose Evidence of Other Suspect

Pursell next claims that the prosecution violated due process when it failed to disclose evidence that someone else committed the crime in question.[25] In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Because the Pennsylvania Supreme Court did not address the merits of this *Brady* claim, I will review it *de novo*. For the following reasons, I will deny Pursell's claim for relief.

### (1) Factual Background

Shortly after Christopher Brine was found dead on July 24, 1981, a number of suspects were identified. Pursell was one of them. Another was a man who had been soliciting sex from young boys in the area of the murder shortly before the time of the killing. On Saturday, July 25, 1981, the Erie Times–News Weekender ran a front page story that discussed this suspect. Dkt. no. 10, Ex. 10 (Erie Times–News, 7/25/81). The article cited Officer Mark Krahe, the lead investigator on the case, stating that "Krahe and other authorities confirmed that they are investigating reports that a tall, dark-haired man solicited three young Lawrence Park and Wesleyville boys for sex over the past six weeks." *Id.* The article described the suspect as "tall, with a medium build, dark

hair and wearing thick black glasses." *Id.* at 3A. It also explained that one young boy "said the man traveled on a gold 10 speed bicycle." *Id.*

Stories about this unidentified man appeared daily in the aftermath of Brine's murder. On July 26, the Erie Times–News noted that the police had completed a "composite drawing" of the unidentified suspect. "The man was described as white, tall and slender with dark hair. He has been seen riding a 10–speed bicycle, investigators said." *Id.* (Erie Times–News, 7/26/81). On July 27, 1981, the Erie Morning News stated that the police are "investigating reports that an unidentified man had been approaching Lawrence Park and Wesleyville boys for sex over the past six weeks." *Id.* (Erie Morning News, 7/27/81). The article described the suspect "as tall, with dark hair and thick, black-rimmed glasses. In some instances he was reportedly seen riding a 10–speed bicycle along the paths and trails that crisscrossed the Alamo." *Id.* And in an article entitled, "Police checking suspects in Brine slaying," the Erie Daily Times noted that "[s]everal reports have been filled with police regarding a man who has allegedly solicited sex from young boys in the Lawrence Park and Wesleyville areas...." *Id.* (Erie Daily Times, 7/27/81).

What made this unidentified suspect so newsworthy was that, initially at least, the police did not know whether Brine's slaying was coupled with or motivated by sexual assault. Brine's body was found naked, his pants were folded neatly over a branch of a nearby tree, and his shoes were placed next to his right knee in an orderly manner, (Tr. 1/19/82, at 130–31), all of which created the impression that sexual assault may have been involved. Immediately after Brine's body was found, the police began conducting tests to determine

---

**25.** This is Claim 6 in Pursell's Memorandum of Law. Dkt. no. 26, Claim 6, at 109.

whether Brine had been sexually assaulted. Dkt. no. 10, Ex. 10 (Erie Times–News, 7/25/81). One investigator went so far as to say " '[t]his appears to be a fiendish sex crime killing[.]' " *Id.* (Erie Times–News, 7/26/81). Initially at least, evidence that a man had solicited sex from young boys in the area seemed extremely important to the public and the police.

The police also relied on this information to obtain search warrants in the case. In an affidavit of probable cause accompanying a July 27, 1981 request for a warrant to search Pursell's mother's trailer, Trooper Conley tied the reports of a man soliciting sex to Pursell:

> [James] Lynch also reported that Pursell normally rides a brown 10 speed bicycle in the area in question.... *This information corroborates that a man on a bicycle has been seen in the area of the murder recently attempting to solicit young men for sex.* I know that the deceased was found nude at the scene and that his anus was somewhat distended, leading me to believe that *deviate sex may be the possible motive for this brutal murder.*

Dkt. no. 26, at 112 (emphasis added). Further, in a later affidavit, Trooper Conley again tied the reports of a man attempting to solicit sex from area boys to Pursell. *Id.*

Despite Conley's attempt to link Pursell with the unidentified suspect, the police clearly stated that Pursell was *not* the unidentified man.

> Police said the arrest [of Pursell] is *"not connected"* with reports of a man who allegedly solicited sex from young boys in the Lawrence Park and Wesleyville area since late May.
>
> *"That is something entirely different,"* a source said. "If parents think the wooded area is now safe for everybody, then they're wrong."

Police had received reports from several teenagers that they were propositioned by a tall man with dark hair, who had been seen riding a gold bicycle in the area. "As far as we know, *that man either didn't exist or is still around and could return,"* he said.

Dkt. no. 10, Ex. 10 (Erie Daily Times, 7/28/81) (emphasis added). On July 29, 1981, the Erie Morning News quoted Officer Mark Krahe on the same issue. " 'As of this moment we have not linked the defendant to statements received about solicitation,' Krahe said. He added that *a composite sketch from several juveniles doesn't match Pursell."* *Id.* (Erie Morning News, 7/29/81) (emphasis added).

Pursell's trial counsel knew of accounts concerning this unidentified man who had allegedly solicited sex from area boys. He knew that the police had interviewed young boys about the suspect. He knew that the police had drawn a composite sketch of the man. And he knew that the man in question was not Alan Pursell. Indeed, the very newspaper articles in which the information of the unidentified suspect appeared were extensively cited and quoted by Pursell's lawyer when he filed a motion for a change of venue based on prejudicial pretrial publicity. Dkt. no. 15, at 30–35. Additionally, Pursell's lawyer had an opportunity to review these articles and present testimony on them at a pretrial hearing more than two months before trial. *Id.* at 36–37.

While Pursell's lawyer knew much about the unidentified suspect, there were two specific pieces of information that he never saw. First, he never saw the notes that the police had taken from the interviews that they conducted concerning the unidentified suspect. Dkt. no. 51. These notes contained a description of the unidentified suspect. *Id.* Second, Pursell's

lawyer never saw the composite sketch of the unidentified suspect. *Id.* Although Pursell filed a discovery motion in September 1981, asking for "[a]ny evidence favorable to the accused which is material either to guilt or to punishment," dkt. no. 55, Discovery Motion, ¶ 4a, he was never provided with the interview notes or the composite sketch. Pursell alleges that the government's failure to provide these documents violates *Brady,* and he seeks an evidentiary hearing in order to substantiate the allegations in his petition.

**(2) Request for Evidentiary Hearing**

The first question in any case involving a request for an evidentiary hearing is whether AEPDA's new limitations on such hearings applies. 28 U.S.C. § 2254(e)(2) provides as follows:

> If the applicant has *failed to develop the factual basis of a claim in State court proceedings,* the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.* (emphasis added). As the language of the first clause shows, the statute itself only applies to those petitioners who have "failed to develop the factual basis of a claim in State court proceedings." *Id.*

The Supreme Court addressed the meaning of this "failed to develop" language in *Williams v. Taylor,* 529 U.S. 420, 430, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). In that case, the Court explained that "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 432, 120 S.Ct. 1479. "Diligence," the Court continued, "will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437, 120 S.Ct. 1479. Nevertheless, diligence need not always require a request for a hearing in state court. In fact, in *Williams* itself, the Supreme Court allowed two of petitioner's three claims to proceed to a hearing, even though the petitioner had never requested a hearing during his state post-conviction review process. *Id.* at 440–44, 120 S.Ct. 1479.

 In the present case, Pursell showed the kind of diligence needed to avoid the limitations of § 2254(e)(2). First, he requested an evidentiary hearing on his *Brady* claim back in his *pro se* PCRA appeal papers filed in November of 1993. Dkt. no. 19, at 2322–26. Second, he specifically requested an evidentiary hearing on his *Brady* claim in the second PCRA petition that he filed in 1999. *Id.* at 2717–19, 2720. Under *Williams,* Pursell has shown diligence in pursuing an evidentiary hearing on this claim. Thus, § 2254(e)(2)'s limitation simply does not apply.

 This does not mean, however, that Pursell automatically obtains an evidentiary hearing on his claim. Since § 2254(e)(2)'s initial hurdle does not apply, I must analyze Pursell's request for an evidentiary hearing under the standard in place before its passage. *Townsend v.*

*Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) sets forth this standard. In *Townsend,* the Court held that a federal court should hold an evidentiary hearing if a petitioner "alleges facts which, if proved, would entitle him to relief," and "[w]here the facts are in dispute . . . if the habeas applicant did not receive a full and fair evidentiary hearing in a state court. . . ." *Id.* at 312–13, 83 S.Ct. 745. Accordingly, a district court must undertake a two-step process in deciding whether to hold a hearing. First, it must decide whether the petitioner has alleged facts which, if proven, would entitle him to relief. *Id.; Smith v. Freeman,* 892 F.2d 331, 338 (3d Cir. 1989). And, if so, it must decide whether those facts are in dispute such that an evidentiary hearing is necessary to establish their truth. *Smith,* 892 F.2d at 338. For purposes of this claim, I have assumed that Pursell's factual allegations are true, and have read any inferences derived from those facts in the light most favorable to him. Nonetheless, because the facts alleged do not set forth a *Brady* claim, I will deny the claim outright without conducting an evidentiary hearing.

### (3) Brady Claim

 *Brady* establishes the framework for analyzing due process claims when the government has withheld evidence favorable to the defendant and that evidence is material to his guilt or the punishment. *Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). There are three components to a *Brady* claim: 1) the evidence must be favorable to the defendant, either because it is exculpatory or because it is impeaching; 2) the evidence must have been suppressed by the government, either intentionally or inadvertently; and 3) the evidence must have been material to the defense. *See United States v.*

*Perdomo,* 929 F.2d 967, 970 (3d Cir. 1991); *Strickler v. Greene,* 527 U.S. 263, 283, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). I doubt whether the evidence at issue in this case is exculpatory, particularly because there was no evidence—and the Commonwealth did not allege—that Brine's murder was coupled with or motivated by sexual assault. *See, e.g., Moore v. Illinois,* 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972) (no due process violation where prosecution failed to hand over evidence of other suspect). I also doubt whether the government suppressed anything, particularly because the substance of the evidence at issue was openly reported in the newspapers on a number of different occasions. *See, e.g., Wright v. Hopper,* 169 F.3d 695, 702 (11th Cir.1999) (holding that government did not suppress evidence when defendant knew about the existence of the evidence and could obtain it through the exercise of reasonable diligence). Nonetheless, I ultimately deny Pursell's claim for relief because he has failed to prove the third prong of a *Brady* violation—that the withheld documents were material to his defense.

 Evidence is material if there is a reasonable probability that the outcome of the trial would have been different had the evidence been disclosed to the defense. *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). This standard is not satisfied by "[t]he mere possibility that . . . undisclosed information might have helped the defense, or might have affected the outcome of the trial." *Agurs,* 427 U.S. at 109–10, 96 S.Ct. 2392. Instead, to demonstrate a reasonable probability of a different outcome, the defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

*Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *see also Strickler*, 527 U.S. at 289–90, 96, 119 S.Ct. 1936. In the present case, the withheld evidence fails to meet this standard.

The case against Pursell rested on four evidentiary pillars. The first pillar was Pursell's glasses, found at the scene of the crime. (Tr. 1/20/82, at 214–20). The prescription was so rare that Pursell's optometrist testified that he had written it only once in six years. *Id.* at 214–20. The second pillar was a spot of blood, consistent with Brine's, that was found on Pursell's shoe. (Tr. 1/22/82, at 162, 171–72, 184–85). The third and fourth pillars were statements made by Pursell before he was arrested for Brine's murder. On the night of the murder, Pursell told James Lynch and Thomas Jagta that he had been in a fight, during which he had lost his glasses and hit someone in the head with a brick. (Tr. 1/21/82, at 8–9, 26). The statement was consistent with evidence indicating that Pursell's glasses were found at the murder scene and that Brine had been beaten in the head with the rock. Finally, on July 27, 1981, Pursell asked Diane Walters if she thought a person could be traced through his glasses. *Id.* at 57–58. The statement was made before the public learned that Pursell's glasses had been found at the murder scene, suggested that Pursell knew things that only the murderer and the police could have known, and implied Pursell's own feelings about his guilt. (Tr. 1/20/82, at 269–71; 275); (Tr. 1/21/82, at 85–86). To make matters worse, Pursell did not even deny making this statement when asked about it during his direct examination. (Tr. 1/25/82, at 129–30) (stating "I don't recall if I said it or not," and then later suggesting "that I would have said it" only because "I had something in the back of my mind from what I—from what mother said . . .").

The evidence against Pursell was strong. Like a modern-day Nathan Leopold, Pursell accidentally left his calling card at the crime scene for all the world to read.[26] His glasses provided the jury with ample evidence from which it could infer his presence at the murder scene and his complicity in Brine's death. The blood found on his shoe further reinforced his connection to the crime. And his statements to Lynch, Jagta, and Walters seemed to seal his fate, particularly since the testimony regarding these statements came from those who were most likely to support Pursell, his next door neighbors and the wife of his friend. These four pillars established a solid foundation for Pursell's guilt.

In contrast, the withheld evidence was remarkably weak, even in the hands of expert counsel. For one, there were temporal problems with that evidence. The witness notes clearly show that the unidentified suspect was soliciting young boys weeks before the murder of Brine took place, and not on the night of the murder itself. Dkt. no. 51, Witness Notes. Second, there were relevance problems with the evidence, as there was no evidence that Brine was sexually assaulted or molested. Third, if admitted at trial, there was a good chance that the evidence would backfire. Surely, Pursell would have been sailing a course as treacherous as that between Scylla and Charybdis had he injected the idea of sexual assault into the murder trial of a thirteen year-old boy. With weak evidence that someone else had com-

---

26. In the famous Leopold and Loeb case, it was Leopold's horn-rimmed glasses that first led the police to suspect him and Richard Loeb in the slaying of young Bobby Franks.

*See* Scott W. Howe, *Reassessing the Individualization Mandate in Capital Sentencing: Darrow's Defense of Leopold and Loeb,* 79 Iowa L.Rev. 989, 996 (July 1994).

mitted the crime, the jury might have credited the sexual motivation put forward by Pursell and attached it to Pursell himself.[27] Perhaps this explains why Pursell's counsel, armed in substance with the same evidence at issue today, chose not to chart this risky course at trial.

The problem with Pursell's *Brady* claim, then, is that the withheld evidence does little to undermine the evidence actually introduced against him. The hard evidence against Pursell—the glasses and the blood—remains unscarred even after the introduction of this withheld evidence. Further, the testimony of Lynch, Jagta, and Walters is unaffected by the evidence of this unidentified suspect. Granted, the withheld evidence might have given more credence to Pursell's statement that he was not the murderer, and given Pursell someone to point to in order to buttress his theory. Yet, without undermining confidence in the four evidentiary pillars against Pursell, the withheld evidence can hardly be said to place the "whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555. Even if the withheld evidence had been used at trial, the outcome of this case would have been the same: a guilty verdict.

■■■ Pursell disagrees with this conclusion and cites a number of cases in support of his contention that a new trial is warranted. *See, e.g., Bowen v. Maynard,* 799 F.2d 593, 612 (10th Cir.1986). He argues that these cases stand for a general principle: the government's failure to disclose evidence of another suspect is a classic violation of *Brady*. To the extent that Pursell suggests that *Brady* establishes a *per se* rule concerning other suspect evidence, I disagree. There is "no constitutional requirement that the prosecution

make a complete and detailed accounting to the defense of all police investigatory work on a case," *Moore,* 408 U.S. at 795, 92 S.Ct. 2562, even when that investigation uncovers evidence of other suspects. *Id.* The existence of a *Brady* violation turns on a thorough review of the facts of the given case and a determination of whether in the absence of the withheld evidence the defendant received a verdict "worthy of confidence." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555. I have already engaged in a fact-intensive review of the evidence withheld and the evidence introduced at trial and found Pursell's claim to be wanting.

Further, the facts of those cases are so strikingly different from the facts of Pursell's case that they actually support my decision to deny relief. For instance, in *Bowen,* the only evidence against the defendant was the testimony of two witnesses, who claimed that they saw Bowen near the murder scene slightly before the murder. *Bowen,* 799 F.2d at 598. No physical evidence tied Bowen to the crime. *Id.* In fact, at trial Bowen presented the testimony of twelve witnesses who said that Bowen had been 300 miles away at a rodeo around the time of the murder. Despite the weak case against Bowen, the jury convicted him. After trial, *Bowen* discovered that the government had withheld evidence of another suspect in the case. The man was named Leonard Lee Crowe. *Id.* at 599. Crowe matched the description of the shooter, *id.* at 600; he had a motive to kill the victim, *id.* at 601; he had made statements about wanting to kill the victim, *id.;* he usually carried with him the kind of gun and the "unusual" kind of ammunition used in the killing, *id.* at 596–97, 600; he was within driving distance of the murder scene around the time

27. The fact that the unidentified suspect had a bicycle, dark hair, a beard, and dark glasses, all of which Pursell also had, certainly added to this risk.

of the murder, even though he lived much further away, *id.* at 612; and after the murder, Crowe's girlfriend tried to find out if anyone had been asking questions about Crowe or looking for him. *Id.* at 601. Despite this evidence about Crowe's potential role in the crime, the police did not hand over any information about Crowe to Bowen. On a petition for habeas corpus, the Tenth Circuit held that the government had violated *Brady* and ordered a new trial. *Id.* at 614.

The reason that a new trial was ordered in *Bowen* is obvious: the withheld evidence directly undercut the case against Bowen and undermined confidence in the verdict. The same cannot be said in Pursell's case. Hard evidence tied Pursell to the scene of the murder, and none of that evidence was undercut by the withheld evidence. Indeed, the withheld evidence in Pursell's case was anemic and hardly sufficient to cast doubt on the verdict. It pertained to a man who, at best, sought to commit a different crime at a different time. For the reasons outlined above, I will deny Pursell's claim for relief under *Brady*.

### (4) Ineffective Assistance Claim

██ Pursell's final argument is that his trial counsel was ineffective for failing to investigate evidence of another suspect and to present this evidence at trial. Dkt. no. 26, at 117. The Pennsylvania Supreme Court addressed this claim on the merits in *Pursell–2*, *Pursell–2*, 724 A.2d at 306–07, and, therefore, my review is limited to whether the Supreme Court's opinion was "contrary to" or "an unreasonable application of" "clearly established Federal law." 28 U.S.C. § 2254(d)(1). In the present case, this review is simple. To make out an ineffectiveness claim under *Strickland,* Pursell must show that his counsel's conduct prejudiced him. *Strickland,* 466 U.S.

at 687, 694, 104 S.Ct. 2052. Because I have already concluded that the evidence withheld was not material, the failure to investigate this evidence and introduce it at trial did not prejudice Pursell in any way. Accordingly, the Pennsylvania Supreme Court's decision was correct, and I will deny Pursell's claim for ineffective assistance of counsel.

### (5) Conclusion

I will deny Pursell's claim for relief under *Brady,* deny his request for an evidentiary hearing, and deny his claim for ineffective assistance of counsel. Further, because I believe that Pursell has failed to make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), I will deny him a certificate of appealability on those claims.

### D. Prosecutorial Misconduct

Pursell next raises several claims of prosecutorial misconduct and argues that these claims, either independently or cumulatively, mandate a new trial.[28] Spanning nearly thirty pages in his lengthy Memorandum of Law, these allegations are more scattershot than laser-like. Claims for prosecutorial misconduct often focus on a few specific acts and are usually judged under the due process clause of the Fourteenth Amendment. *Donnelly v. De-Christoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Pursell's claims are different. They implicate nearly every stage of the trial, and cite nearly every provision of the Constitution available to a habeas petitioner. At the end of the day, however, this sweeping misconduct claim fails. Whether styled as prosecutorial misconduct or not, I will deny Pursell's claim for relief.

---

**28.** This is Claim 7 in Pursell's Memorandum of Law. Dkt. no. 26, Claim 7, at 119.

### (1) Claims Relating To Testimony of Officer Mark Krahe

Pursell first argues that his rights were violated when the prosecution elicited certain testimony from Officer Mark R. Krahe. To understand these claims, it is important to review the relevant portions of Krahe's trial testimony.

Krahe was a police officer with the Lawrence Park Police Department and lead investigator on the Pursell case. He was one of the officers who interrogated Pursell after his arrest, and he testified at trial about the interrogation. Krahe explained that Pursell was given his *Miranda* warnings and that he waived his right to remain silent. (Tr. 1/21/82, at 103–05). At one point during the interrogation, the police placed a pair of glasses in front of Pursell. *Id.* at 117. Officer Krahe described what followed:

Q. How far from where Alan Pursell was seated were those glasses placed?

A. Well, if I recall right, he was sitting with his hands crossed because I was watching for physical reactions at this point. His hands were crossed in this fashion, more toward across the area of his stomach, and I noted at that time that his breathing increased, that his hands were moving at a faster rate than they had prior, after which Trooper Conley said to him, "I can see how it happened. That boy looked good to you. You took that boy. You raped that boy."

BY [DEFENSE COUNSEL]: Objection, Your Honor.

*Id.* at 117–18. The court overruled the objection, and asked the witness to "[a]nswer the question or state what you were stating." *Id.* at 120. Krahe then continued with his testimony.

A. Trooper Conley said, 'I can see how it happened. That boy looked good to you. You took that boy. You raped

that boy,' at which Mr. Pursell said, 'I'm not a fag. I don't like these questions. I want my attorney.' This was approximately zero-zero thirty-five.

BY THE COURT: At this point I will now stop and I will now tell the jury and caution them that any remarks like this by Trooper Erby Conley must be considered in the light of the circumstances in which it was made because it was questioning and that you must understand that at this time there is no evidence whatsoever of sexual molestation that has been brought out, sexual molesting that has been brought out or anything of that sort, and brought out and put forth by the Commonwealth, and therefore, you are to disregard that particular inference it may give you.

*Id.* at 120–21. After the court provided this instruction, the testimony continued:

Q. Now the questioning ceased at that point; is that correct, sir?

A. Yes. The only question that was asked of him is the name of his attorney.

Q. All right.

BY THE COURT: Well, was it given?

BY THE WITNESS: Yes. He said Gary Skiba. 'He got me out of jail before.'

BY [DEFENSE COUNSEL]: Objection.

*Id.* at 121.

At that point, the court held a lengthy off-the-record conference in chambers. *Id.* at 122. The parties then returned to the courtroom for a brief discussion on the record out of the presence of the jury. *Id.* Pursell's lawyer moved for a mistrial, but then withdrew the motion, indicating that he had struck a deal with the prosecution that would allow the case to proceed. *Id.* at 122–23. The deal was this: Pursell would withdraw his motion for mistrial and

the government would not introduce the testimony of DeFoy, an inmate who was prepared to say that Pursell had admitted to killing Christopher Brine. *Id.* at 123–24. After a lengthy discussion, in which Pursell acknowledged that he would probably take the stand, thereby permitting the introduction of his past crimes anyway, *id.* at 125, the court addressed Pursell directly:

> BY THE COURT: Mr. Pursell, I want you to understand that if a motion for a mistrial had not been withdrawn, I would have had to grant the mistrial. Do you understand that?
>
> BY MR. PURSELL: Yes, I do.
>
> BY THE COURT: I'm saying that in other words, you had the right to a mistrial.
>
> BY MR. PURSELL: Right.
>
> BY THE COURT: Do you fully concur with your counsel, your attorney, for his withdrawal for a motion for a mistrial?
>
> BY MR. PURSELL: Yes, I do.
>
> BY THE COURT: Now, do you agree with your attorney's reasons for withdrawing his motion for mistrial?
>
> BY MR. PURSELL: Can you repeat that?
>
> BY THE COURT: Do you agree with the attorney's reasons that he gave for withdrawing his motion for mistrial?
>
> BY MR. PURSELL: Yes.
>
> BY THE COURT: Now, were you coerced in any way, were you, into withdrawing your motion for a mistrial stating that you are going to take the stand? You were not coerced into saying that you had to take the stand or anything like that in your own defense?
>
> BY MR. PURSELL: No.

*Id.* at 127–28. After the jury returned to the courtroom, the court instructed that "the last statement made by Officer Krahe, the attorney part, which he an-swered, you are to completely disregard." *Id.* at 131.

Pursell now raises four objections to Officer Krahe's testimony.

### (a) Pursell's Invocation of Right to Counsel

First, he argues that reference to his invocation of counsel, *id.* at 121 ("I don't like these questions. I want my attorney."), violated his rights under the Fifth and Fourteenth Amendments, and that his counsel was ineffective for failing to object. The Pennsylvania Supreme Court did not address these claims and, accordingly, my review is *de novo*.

In *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that the government violates due process when it seeks to use a defendant's silence for impeachment purposes, after the defendant has been informed of his rights under *Miranda v. Arizona*, 384 U.S. 436, 467–73, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The defendants in *Doyle* took the stand and gave an exculpatory explanation for their participation in a drug transaction. *Doyle*, 426 U.S. at 612–13, 96 S.Ct. 2240. During cross-examination, the prosecutor asked each defendant, if they were indeed innocent, why they had not told their story to the police at the time of their arrest. *Id.* at 613–14, 96 S.Ct. 2240. On appeal from the defendants' convictions, the Supreme Court held that this cross-examination violated the due process clause of the Fourteenth Amendment. *Id.* at 618, 96 S.Ct. 2240. The Court gave two reasons for its decision. First, a person's decision to remain silent after receiving *Miranda* warnings was, in the Court's words, "insolubly ambiguous." *Id.* at 617, 96 S.Ct. 2240. "Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda*

rights." *Id.* Second, the *Miranda* warnings carried with them the implicit assurance "that silence will carry no penalty." *Id.* at 618, 96 S.Ct. 2240. Thus, it would be fundamentally unfair to induce the defendant to remain silent and then use that very silence against him at trial. *Id.*

In the wake of *Doyle*, a conflict arose about just how far the *Doyle* decision went. A number of courts held that Doyle did not bar the government from referring to a defendant's request for counsel after receiving *Miranda* warnings, as long as that defendant had put forward an insanity defense. *See, e.g., Sulie v. Duckworth*, 689 F.2d 128 (7 th Cir.1982). Others disagreed, holding that *Doyle* barred reference to the defendant's invocation of any of his *Miranda* rights, even when he put forward an insanity defense. *See* e.g., *Greenfield v. Wainwright*, 741 F.2d 329 (11th Cir.1984), *aff'd*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). The Supreme Court resolved this conflict in *Wainwright v. Greenfield*, 474 U.S. 284, 290, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), holding that *Doyle* barred the use of a defendant's post-*Miranda* request for counsel. In a footnote, the Court explained that *Doyle* not only barred reference to a defendant's "statement of a desire to remain silent," but also to his "desire to remain silent until an attorney has been consulted." *Id.* at 295 n. 13, 106 S.Ct. 634; *see also Jacks v. Duckworth*, 857 F.2d 394, 401 (7th Cir. 1988) (holding that *Doyle* applied to statement "[a]s regards to what happened this evening, I want to talk to my attorney.").

While *Doyle* and *Wainwright* impose a significant bar on what a prosecutor can mention at trial, they are also limited. As the Supreme Court explained in *Greer v. Miller*, 483 U.S. 756, 763, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), *Doyle* merely bars the "use" of the fact that a defendant invoked his rights under *Miranda*. It "does not impose a prima facie bar against any mention whatsoever of a defendant's right to request counsel, but instead guards against the exploitation of that constitutional right by the prosecutor." *Lindgren v. Lane*, 925 F.2d 198, 202 (7th Cir. 1991). Indeed, those federal courts that have addressed the issue are in general agreement that the "mere mention of a defendant's exercise of *Miranda* rights is not *per se* prohibited." *Noland v. French*, 134 F.3d 208, 216 (4th Cir.1998); *see also Jones v. Stotts*, 59 F.3d 143, 146 (10th Cir.1995); *United States v. Stubbs*, 944 F.2d 828, 835 (11th Cir.1991); *Lindgren*, 925 F.2d at 202.

█ In the present case, there was no *Doyle* violation because the prosecution did not use or exploit the fact that Pursell invoked his right to counsel. In fact, any reference to Pursell's right to counsel came mostly in response to questions asked by the court, not the prosecutor. (Tr. 1/21/82, at 120–21). Indeed, after Krahe mentioned that Pursell had asked for his lawyer, the fact never came up during the remainder of the trial, not even during Pursell's cross-examination or during closing arguments. The reference consumed but a few seconds in a trial that ran over a week, and took up only a few sentences in a trial transcript more than 900 pages in length. An unfortunate and irrelevant reference was injected into Pursell's trial; but this reference, standing alone, does not amount to a violation of the due process clause of the Fourteenth Amendment. *Greer*, 483 U.S. at 763–64, 107 S.Ct. 3102; *Noland*, 134 F.3d at 216.

█ Even if a constitutional error did occur, that error was most definitely harmless. A writ of habeas corpus may issue only if the reviewing court finds that the constitutional error " 'had a substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v.*

*Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).[29]

> If, when all is said and done, the [court] ... is sure that the error did not influence the jury, or had but a very slight effect, the verdict and the judgment should stand.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, *or if one is left in grave doubt,* the conviction cannot stand.

*O'Neal v. McAninch,* 513 U.S. 432, 437–38, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (quoting *Kotteakos,* 328 U.S. at 764–65, 66 S.Ct. 1239). In making its assessment, the court must consider the "impact of the error on the minds of the jurors in the total setting." *Yohn v. Love,* 76 F.3d 508, 523 (3d Cir.1996). It must weigh the impact of the evidence on the jury and must judge how the jury would reasonably perceive the case without the constitutional error. *Hassine,* 160 F.3d at 955. In the present case, any alleged error had no effect on the jury's verdict, let alone "a substantial and injurious" one. *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710.

First, as explained above, the reference to Pursell's counsel was not used or exploited for any purpose during the trial. The statement had limited impact on the phase of the trial in which it appeared and, in all likelihood, no impact on the trial as a whole. The prosecution never mentioned the fact that Pursell asked for a lawyer, and the jury probably scarcely remembered it when it deliberated nearly a week after the inadvertent reference was made.

Second, the court issued two instructions that seemed to cure any potential prejudice that could have arisen from the reference to Pursell's invocation of counsel. Officer Krahe testified that Pursell asked for a lawyer only after he was accused of raping Brine. (Tr. 1/21/82, at 120). The court's prompt instruction that there was no evidence of sexual molestation in the case, *id.,* was certain to defuse any inference that the jury could have drawn based on the connection between the accusation and the invocation of counsel. The second reference to Pursell's invocation of counsel came when Krahe explained that Pursell said his lawyer "got me out of jail before." *Id.* at 121. In response to this statement, the trial court stated that "the last statement made by Officer Krahe, the attorney part, which he answered, you are to completely disregard." *Id.* at 131. While the court's primary concern was the reference to Pursell's prior criminal record, the instruction also told the jury to disregard

---

**29.** The United States Supreme Court has identified two kinds of errors: structural and trial. *Arizona v. Fulminante,* 499 U.S. 279, 306–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). "A structural error is a defect in the trial mechanism itself, affecting the entire trial process, and is per se prejudicial." *Hassine v. Zimmerman,* 160 F.3d 941, 949 (3d Cir.1998) (internal quotations omitted). A trial error, in contrast, " 'occur[s] during the presentation of the case to the jury,' and is amenable to harmless-error analysis because it 'may be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].' " *Brecht,* 507 U.S. at 629, 113 S.Ct. 1710 (quoting *Fulminante,* 499 U.S. at 307, 111 S.Ct. 1246). The Supreme Court has held that "*Doyle* error fits squarely into the category of constitutional violations which we have characterized as trial error." *Id.*

the reference to Pursell's lawyer. While neither instruction directly addressed the issue that I confront today, both adequately circumscribed it and assured that any prejudice that arose was limited.

Finally, the evidence against Pursell was strong, and the reference at issue did nothing to undermine the strength of that evidence. *See supra* at 328. This was not a case where Pursell's request for a lawyer undercut his credibility in any way. *See, e.g., Doyle*, 426 U.S. at 613–14, 96 S.Ct. 2240. And it was not a case where the reference helped the government prove some aspect of its case. *See, e.g., Wain-*

*wright*, 474 U.S. at 287, 106 S.Ct. 634. Instead, the reference undermined no part of Pursell's defense, bolstered no part of the government's case, and had no relevance to the case as a whole. If there had been no reference to Pursell's request for counsel, the jury surely would have viewed the case against Pursell in precisely the same light. Thus, I conclude that any alleged constitutional error was harmless. Pursell's claim for relief under *Doyle* is denied.[30]

Pursell next claims that Krahe's reference to his invocation of counsel violates his Fifth Amendment privilege against self

---

**30.** Although the parties do not address the issue, Pursell's *Doyle* claim is also likely barred under *Teague v. Lane.* A court has the discretion to raise the *Teague* issue *sua sponte,* although it need not do so. *Wilmer v. Johnson,* 30 F.3d 451, 455 (3d Cir.1994). While, as a general rule, I think it unwise for a district court to ignore a *Teague* defense when the issue so plainly presents itself, I also understand that the Third Circuit has considered such defenses waived in cases like the present one. *Id.* Accordingly, I address this issue in a footnote.

In *Teague,* the Supreme Court held that federal courts should not grant habeas relief when a petitioner relies on a new rule of constitutional law. *Teague,* 489 U.S. at 316, 109 S.Ct. 1060. Under *Teague,* "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Id.* at 301, 109 S.Ct. 1060. A *Teague* inquiry should proceed in three steps. First, the court should determine the date on which the defendant's conviction became final. *O'Dell v. Netherland,* 521 U.S. 151, 156, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997). Second, the court should consider whether "a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution." *Id.* (internal quotations and citations omitted). If not, then the rule is new and habeas relief is barred, unless, under the third step, one of two exceptions apply. *Id.* at 156–57, 117 S.Ct. 1969. Neither exception is relevant to the present case.

Under the first step of this *Teague* inquiry, Pursell's conviction became final on December 23, 1985. *See supra* n. 4. Because the Court's decision in *Wainwright* was not decided until 1986, the Pennsylvania Supreme Court would not have had the benefit of that decision at the time it decided Pursell's appeal. Accordingly, the next question is whether the *Wainwright* decision, extending *Doyle* to statements concerning a request for counsel, was a new rule or not. For three reasons, I believe that the *Wainwright* decision was new. First, the *Doyle* decision focused exclusively on the issue of silence and did not discuss requests for counsel at all. *Doyle,* 426 U.S. at 617–20, 96 S.Ct. 2240. Second, there was a great deal of dispute at the time Pursell's conviction became final about whether *Doyle* extended to requests for counsel. *See Jacks,* 857 F.2d at 400–01 (discussing conflict). Third, even in *Wainwright* itself, there was some discussion from two concurring Justices about the fact that did not clearly extend to requests for counsel. *Wainwright,* 474 U.S. at 296–97, 106 S.Ct. 634. For these reasons, I conclude that a state court at the time that Pursell's conviction became final would not have "felt compelled by [*Doyle*] to conclude that the rule [Pursell] seeks was required by the Constitution." *O'Dell,* 521 U.S. at 156, 117 S.Ct. 1969. Thus, the *Wainwright* rule is a new one. *See Vanda v. Lane,* 962 F.2d 583, 585 (7th Cir. 1992). Because the two *Teague* exceptions obviously do not apply, relief under this new rule is barred.

incrimination. While there is a significant amount of case law on the Fifth Amendment, there is very little on the issue presented by Pursell's petition: whether the Fifth Amendment is violated when the government introduces at trial the fact that a defendant invoked his right to counsel after being read his *Miranda* rights?

A number of cases circumscribe the issue. First, *Miranda* itself states that "it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation." *Miranda*, 384 U.S. at 468 n. 37, 86 S.Ct. 1602. Second, *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), a case cited by Pursell, bars the government from penalizing a defendant for exercising his Fifth Amendments rights. Finally, a number of circuit courts have held that reference to a defendant's request for a lawyer, even before he has been read his *Miranda* rights, violates the Fifth Amendment. *See, e.g., Combs v. Coyle*, 205 F.3d 269, 282–83 (6th Cir.2000) (citing cases).

 The problem for Pursell, of course, is that the government did not use the fact that he invoked his right to counsel in any way at trial. As the Third Circuit explained in *United States v. Yeager*, 476 F.2d 613, 616 (3d Cir.1973), the Supreme Court's decision in *Griffin* was limited to those instances when the government sought to harm or penalize the defendant for exercising his constitutionally protected rights. *Yeager*, 476 F.2d at 616 (explaining that the relevant question under *Griffin* "is whether the particular *defendant* has been *harmed* by the state's use of the fact that he engaged in constitutionally protected conduct."). Additionally, the above-quoted language in *Miranda* bars the government from "penaliz[ing] an individual" for exercising his Fifth Amendment rights. *Miranda*, 384 U.S. at 468 n.

37, 86 S.Ct. 1602. In the present case, there is little evidence that the government sought to penalize Pursell for invoking his right to counsel, and no evidence that he was harmed by the reference. Under such circumstances, I conclude that no Fifth Amendment violation occurred. Nonetheless, even if one did, the violation was undoubtedly harmless. *See supra* at 333–35.

 Finally, Pursell claims that his counsel was ineffective for failing to object to Krahe's references to his request for counsel. Dkt. no. 26, at 122. To make out an ineffectiveness claim under *Strickland*, Pursell must prove both that his counsel was deficient and that he was prejudiced by his counsel's conduct. *Strickland*, 466 U.S. at 688–89, 694, 104 S.Ct. 2052. In the present case, he is unable to establish either prong. Thus, I will deny his claim for ineffective assistance of counsel.

While Krahe's testimony about Pursell's invocation of his right to counsel was certainly unfortunate, it does not merit habeas relief. I will deny Pursell's claims under the Fifth, Sixth, and Fourteenth Amendments, and deny him a certificate of appealability on these claims. 28 U.S.C. § 2253(c).

**(b) Testimony About Pursell's Prior Criminal Record and Counsel's Withdrawal of Motion for Mistrial**

 Pursell's second claim concerning Krahe's testimony focuses on Krahe's statement that Pursell had a prior criminal record. When asked by the court for the name of Pursell's lawyer, Krahe said the following: "He said Gary Skiba. 'He got me out of jail before.'" (Tr. 1/21/82, at 121). Pursell's counsel objected to this statement and moved for mistrial. He later withdrew that motion when the government agreed not to introduce the testimony of DeFoy, a jailhouse informant who

claimed that Pursell admitted to the killing. Today, Pursell claims that Krahe's testimony violated his rights under the Fifth Amendment, and that his defense counsel was ineffective when he abandoned the motion for a mistrial. The Pennsylvania Supreme Court addressed the merits of the ineffectiveness claim, and I will apply AEDPA's deferential standard of review to that claim. 28 U.S.C. § 2254(d)(1). In all other respects, my review is *de novo*.

■■■ There is little question that Krahe's statement about Pursell's prior record violated the Fifth Amendment. Indeed, any statements made by Pursell after he invoked his rights to counsel and silence were inadmissible under *Miranda*. *Miranda*, 384 U.S. at 473–75, 86 S.Ct. 1602 (holding that once *Miranda* warnings have been given, "[i]f the individual indicates in any manner ... that he wishes to remain silent, the interrogation must cease.... [A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise."); *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (holding that defendant's statements not admissible once he had invoked right to counsel without proof of waiver).[31] The Commonwealth concedes the inadmissibility of the statement, and acknowledges that defense counsel properly moved for a mistrial. Dkt. no. 28, at 29.

Whether Krahe's testimony violated Pursell's Fifth Amendment rights, however, is really beside the point. First, any violation was most certainly harmless, considering that the trial court instructed the jury to completely disregard Krahe's statement, (Tr. 1/21/82, at 131), and Pursell ultimately took the stand and admitted his prior criminal record. (Tr. 1/25/82, at 77–

78). Second, the trial court recognized the error and would have granted a mistral had Pursell not voluntarily withdrawn his motion and decided to proceed with the case. (Tr. 1/21/82, at 127–28). Pursell has cited no cases that suggest that habeas relief is required under such unique circumstances, and I see no reason to grant it.

The real issue is whether Pursell's lawyer was ineffective when he decided to forego the motion for mistrial. To succeed on his ineffectiveness claim, Pursell must show first that his counsel's performance fell below "an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, and second that this deficient performance prejudiced him. *Id.* at 694, 104 S.Ct. 2052. There is little doubt that Pursell has shown prejudice: if his lawyer had pursued the mistrial motion, a new trial would have been granted. Thus, the only issue for me is whether counsel's decision was objectively reasonable. Pursell claims that his counsel was deficient for one simple reason: the deal struck between the government and the defendant was illusory. In that deal, the government agreed not to introduce the testimony of DeFoy as long as Pursell withdrew his mistrial motion. Yet, according to Pursell, DeFoy's testimony was never admissible to begin with, a point, he says, his counsel never seemed to grasp.

At the heart of Pursell's argument is the United States Supreme Court's decision in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). In *Massiah*, the defendant was indicted for violating the federal narcotics laws and was released on bail pending trial. *Id.* at 201, 84 S.Ct. 1199. While free on bail, one

---

**31.** The statement was also inadmissible under Pennsylvania law. *Commonwealth v. Spruill,* 480 Pa. 601, 391 A.2d 1048, 1049–50 (1978).

of Massiah's co-defendants decided to co-operate with the government and permitted federal agents to install a listening device under the front seat of his car. *Id.* at 202–23, 84 S.Ct. 1199. A short time later, Massiah and the co-defendant had a lengthy conversation while sitting in the co-defendant's car. *Id.* at 203, 84 S.Ct. 1199. Unbeknownst to Massiah, a federal agent sat in a parked car a short distance away and listened to the conversation between the two men. *Id.* Massiah made several incriminating statements, and these statements were brought to the jury's attention through the testimony of the federal agent. *Id.* The jury convicted Massiah and the conviction was affirmed in the Court of Appeals. On appeal, the United States Supreme Court reversed. In particular, the Court held that the government violated Massiah's Sixth Amendment right to counsel when it "deliberately elicited" incriminating statements from him "after he had been indicted and in the absence of counsel." *Id.* at 206, 84 S.Ct. 1199.

The rule in *Massiah* was refined in the years following the Supreme Court's decision in that case. First, in *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), the Court held that *Massiah* applies to statements made to a cellmate when that cellmate is an undisclosed government agent who deliberately elicits statements from the defendant. Key to the decision in *Henry* was the fact that the cellmate was more than just "a passive listener," *id.* at 271, 100 S.Ct. 2183, who overheard a confession. Second, in *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), the Court followed-through on its distinction in *Henry,* holding that the Sixth Amendment is *not* violated when a defendant makes incriminating statements to someone who is a mere passive listener.

[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached," a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Id.* at 459, 106 S.Ct. 2616 (internal citations omitted).

 Whether an informant's testimony violates the Sixth Amendment turns, just as it did at the time of Pursell's trial, on the existence of three factors. First, the right to counsel must have attached at the time that the alleged incriminating statements were made to the informant. *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 892 (3d Cir.1999) (*en banc*). This right attaches at the initiation of adversarial judicial proceedings "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (plurality opinion). Second, the informant must have been working as a government agent. *Matteo,* 171 F.3d at 892. At a minimum, this requires some evidence, express or implied, that an agreement existed between the informant and the government at the time the incriminating statements were made. *Id.* at 893. Finally, the informant must have "deliberately elicited" incriminating information from the defen-

dant. *Id.* at 892. To satisfy this prong, the defendant must show more than just the fact that an informant reported his statements to the police. *Kuhlmann,* 477 U.S. at 459, 106 S.Ct. 2616; *Matteo,* 171 F.3d at 895. Rather, he must show that the informant "affirmatively [sought] to induce [incriminating statements]." *Matteo,* 171 F.3d at 895–96.

▮ Pursell seizes on the rule in *Massiah* and claims that DeFoy's testimony was inadmissible under that case. Yet, it is far from clear that *Massiah* applied to this case. First, the record provides no indication that DeFoy was working as a government agent at the time that Pursell made the incriminating statements to him. *Matteo,* 171 F.3d at 892–93. When defense counsel presented a motion to suppress DeFoy's testimony, he made statements that suggested that perhaps DeFoy was not an agent of the government.

> Your honor, on last Friday I was given a statement by the district attorney's office, by Shad here, and he told me of an inculpatory nature, and it's of the most inculpatory nature, and specifically on Friday the district attorney's office or officers *were approached by a fellow prisoner* who stated and will testify that Alan Pursell admitted killing the boy. Now that is something that is dramatic to say the least, and was certainly not in the case before, and I do understand that it was *provided to the district attorney's office only on Friday* and they gave it to me immediately.

(Voir Dire Tr. 1/19/82, at 368–69) (emphasis added).[32] If anything, counsel's statement creates the impression that DeFoy approached the government, without any

prior agreement. Indeed, DeFoy's statement seemed to have caught the police themselves off guard, coming as it did on the eve of trial. Under these circumstances, Pursell's counsel could reasonably conclude that *Massiah* simply did not apply to this case. *See United States v. Yeager,* 428 F.2d 182, 184 (3d Cir.1970) (holding that Sixth Amendment not violated when defendant makes incriminating statements, after indictment, to persons who are not related to the government).

Second, there is nothing in the record to suggest that DeFoy "deliberately elicited" a confession from Pursell. *Kuhlmann,* 477 U.S. at 459, 106 S.Ct. 2616; *Matteo,* 171 F.3d at 895. The three page statement that DeFoy had provided to the police might have shed some light on this issue, but it was not made a part of the record for my review. No doubt, an affidavit from Pursell could have easily proven the point (although it would have put him in the precarious situation of admitting his guilt), but no statement was submitted for review. The lack of evidence concerning DeFoy is remarkable, particularly because the parties engaged in discovery and were given leave to expand the record in this case. Dkt. no. 52. With such sparse facts supporting Pursell's claim that *Massiah* governed DeFoy's testimony, I can only conclude that defense counsel was reasonable to assume that *Massiah* did not apply.

▮ Nonetheless, even if DeFoy's testimony was barred by *Massiah,* counsel's decision was still objectively reasonable under *Strickland.* "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particu-

---

**32.** The transcript from January 19, 1982 is broken into two different parts. The first part is the end of the jury voir dire and it ends at dkt. no. 16, at 931. The second part is the beginning of the actual trial, including opening statements and trial testimony, and this is found at dkt. no. 17, at 1418. When there is possible confusion, I will refer to one as the Voir Dire Tr. and the other as the Trial Tr.

lar case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. At the time in question, nearly every court to have addressed the issue held that statements that were inadmissible under *Massiah* as substantive evidence were nonetheless admissible for impeachment purposes. *United States v. McManaman,* 606 F.2d 919, 925 (10th Cir.1979) (holding that statements taken in violation of *Massiah* can be used for impeachment purposes); *United States v. Taxe,* 540 F.2d 961, 968–69 (9th Cir.1976) (same); *United States v. Frank,* 520 F.2d 1287, 1291 (2d Cir.1975) (same). These cases all relied on the Supreme Court's decision in *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) in which the Court held that statements inadmissible under *Miranda* were nonetheless admissible to impeach a defendant who took the stand. *Id.* at 226, 91 S.Ct. 643. In *Michigan v. Harvey,* 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990), decided a few years after Pursell's conviction became final, the Supreme Court agreed with these lower courts and held that the government may use statements taken in violation of the Sixth Amendment right to counsel to impeach a defendant who takes the stand at trial. *Id.* at 345–46, 110 S.Ct. 1176.

Had Pursell's lawyer thoroughly researched the *Massiah* issue, he would have learned that his best option was the one that he ultimately took: withdraw the motion for mistrial in exchange for the government's withdrawal of DeFoy's testimony. By all accounts, Pursell intended to take the stand at trial. (Tr. 1/21/82, at 128–30). Indeed, Pursell's theory of the case depended on him doing so. Yet, had he done so, and had he denied murdering Brine, the DeFoy statement could have

been introduced to impeach him. *McManaman,* 606 F.2d at 925. If he had denied making the statement, DeFoy himself could have taken the stand and testified to it. *Commonwealth v. Brown,* 302 Pa.Super. 391, 448 A.2d 1097, 1103–04 (1982) ("where, as here, the witness does not admit making the inconsistent statement, it may be proved by extrinsic evidence, such as the testimony of the person to whom the statement was made."). While DeFoy's testimony would not have come in as substantive evidence of guilt, it would have nonetheless been extremely damaging to Pursell. Counsel's decision to completely eliminate this testimony was not only objectively reasonable, it seems to have been a wise tactic as well.

The problem, of course, is that Pursell's lawyer did not consider *Massiah* when he withdrew the motion for mistrial.[33] But *Strickland* does not require subjectively good decisions, or even knowing and intelligent ones. It merely mandates that the choices made, and the strategies employed, be objectively reasonable. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. Counsel's strategy, while perhaps not completely informed, achieved an objectively reasonable end. As *Strickland* itself explains, "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation.... The purpose is simply to ensure that criminal defendants receive a fair trial." *Id.* at 689, 104 S.Ct. 2052. In the present case, I have little doubt that counsel's decision to withdraw the mistrial motion helped to assure that Pursell's trial was fair. It removed extremely damaging testimony from the jury's ears, either as substantive evidence of guilt or for im-

---

**33.** The record suggests that Pursell's counsel did not know about *Massiah.* In fact, he filed a motion to suppress DeFoy's testimony, but never mentioned *Massiah* when he presented

that motion to the court. (Voir Dire, Tr. 1/19/92, at 368–69). After reviewing the matter in chambers, the trial court denied the motion. (Trial Tr. 1/19/82, at 1).

peachment purposes. And it posed little downside risk, especially because the jury would hear about Pursell's prior criminal record anyway. Accordingly, Pursell has failed to prove that his lawyer was deficient—the first prong of a *Strickland* claim.

All of this is merely a prelude to the real question that I confront: whether the Pennsylvania Supreme Court's decision to deny Pursell's claim was "contrary to" or "an unreasonable application of" "clearly established Federal law." 28 U.S.C. § 2254(d)(1). I have little trouble disposing of those issues. First, the Pennsylvania Court's decision was not "contrary to" *Strickland*. Although that Court did not cite *Strickland* in denying Pursell's ineffectiveness claim, it did rely on Pennsylvania cases that set forth an identical standard for ineffectiveness. *Pursell–1*, 495 A.2d at 192; *see also Werts v. Vaughn*, 228 F.3d 178, 202–03 (3d Cir.2000) (examining Pennsylvania ineffectiveness law and determining that it is the same as the *Strickland* standard); *see also Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975 (1987) (same). As the *Williams* Court explained, "a run-of-the mill state-court decision applying the correct legal rule from [Supreme Court] cases," does "not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406, 120 S.Ct. 1495.

Second, the Pennsylvania Court's decision was not an "unreasonable application" of *Strickland*. That Court denied Pursell's ineffectiveness claim for a simple reason: counsel's decision to forego the mistrial "had a reasonable basis designed to effectuate [Pursell's] interests." *Pursell–1*, 495 A.2d at 192.

> The Commonwealth's agreement not to introduce [DeFoy's testimony] against [Pursell] in exchange for continuing with the trial certainly can be considered to have advanced and promoted [Pursell's] interest because this evidence was the only admission defendant had made to anyone concerning his involvement in Christopher Brine's death, and *was in direct contradiction to the testimony he would give at trial and to statements he had given to the police.* Since we can conclude that the course chosen had a reasonable basis designed to effectuate [Pursell's] interests, counsel's assistance is deemed constitutionally effective.

*Id.* (emphasis added). Pursell argues that the Pennsylvania Court assumed that DeFoy's testimony was admissible, without being aware of *Massiah*. I am not sure that Pursell is correct. In fact, the Court clearly stressed that DeFoy's testimony was important because of its impeachment value. *Id.* Nevertheless, based on my analysis above, the Pennsylvania Supreme Court's opinion was a correct application of *Strickland*, whether it understood the full implications of *Massiah* or not. A correct application of federal law cannot be unreasonable.

I will deny Pursell's claim for ineffective assistance of counsel, along with his claims under the Fifth Amendment. Because I have concluded that injection of Pursell's prior crimes violated the Fifth Amendment, even though that testimony was harmless error, I will grant him a certificate of appealability on that claim alone. 28 U.S.C. § 2253(c).

### (c) Krahe's Testimony About Conley's Accusation of Rape

Pursell's third attack on Krahe's testimony is targeted at the admission of the following statement: "I can see how it happened. That boy looked good to you. You took that boy. You raped that boy." (Tr. 1/21/82, at 118, 120). Pursell claims that this testimony was deliberately elicited by the prosecution and amounts to

prosecutorial misconduct in violation of the due process clause of the Fourteenth Amendment. The Pennsylvania Supreme Court did analyze whether a mistrial was required due to the admission of the testimony in question, but it did not address the prosecutorial misconduct issue before me today. Accordingly, my review is *de novo*.

■■■ Federal habeas relief may be granted when a prosecutor's conduct during trial "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868. To constitute a due process violation, however, the prosecutor's misconduct must constitute a " 'failure to observe the fundamental fairness essential to the very concept of justice.' " *Id.* at 642, 94 S.Ct. 1868 (quoting *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)). In analyzing a claim for prosecutorial misconduct, the court must "examine the prosecutor's offensive actions in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 108 (3d Cir.2001).

■■ The major problem with Pursell's claim is that it really is not an instance of prosecutorial misconduct at all. Rather, Krahe's statement seems more the product of witness freelancing than prosecutorial wrongdoing. At the time that Krahe first testified to Conley's accusation of rape, he was responding to a question that had nothing to do with the answer he gave. (Tr. 1/21/82, at 117) ("How far from where Alan Pursell was seated were those glasses placed?"). The second time that Krahe

made the statement, he was following the court's instruction to "state what you were stating." *Id.* at 120. In neither instance did the prosecutor pose a question designed to bring out Conley's statement.[34] While Krahe's testimony was irrelevant, offensive, and certainly inadmissible, there are simply no facts that tie that testimony to the prosecution. Under these circumstances, such conduct does not amount to prosecutorial misconduct.

Nonetheless, I am mindful of the undercurrent of sexual assault that existed during this trial. During trial, the jurors learned that Brine was found naked with his pants folded neatly over a branch of a nearby tree, and his shoes placed next to his right knee in an orderly manner. (Tr. 1/19/82, at 130–31). They were told that Brine's anus was distended and that it was "possible" that entry was made, but left no marks. (Tr. 1/20/82, at 188–89). And during closing arguments, the prosecution speculated that Pursell had very little blood on his clothes because he undressed before he killed Brine. (Tr. 1/26/82, at 69). When this evidence is coupled with the fact that there was no evidence of motive introduced at trial, the specter of sexual assault certainly looms. Krahe's two statements about rape only added to the problem.

■■■ But even when I consider this evidence in total, I do not believe that there was a due process violation in this case. First, the references to sexual assault, while troubling, were brief and, in one instance, were followed by a strong cautionary instruction from the trial court. (Tr. 1/21/82, at 120) (trial court stating that "there is no evidence whatsoever of sexual molestation that has been brought out" in

---

**34.** Even after the trial court admitted the statement, the prosecution sought to lessen the impact of this testimony. *Id.* at 120–21 (prosecutor Connelly stating that the Commonwealth was offering this evidence not as substantive evidence, but merely to show what responses Pursell made).

the case.). A jury is presumed to follow an instruction unless there is an "overwhelming probability" that they will not, and a "strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer*, 483 U.S. at 766, 107 S.Ct. 3102 (citations omitted). Second, the Commonwealth never argued that Brine was assaulted sexually and, in fact, it admitted that it had no such proof. (Tr. 1/20/82, at 187). Third, the evidence against Pursell was solid and, as a general rule, prejudicial prosecutorial arguments are curable when the evidence against the defendant is strong. *Darden v. Wainwright*, 477 U.S. 168, 182, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Finally, the undercurrent in this case was perhaps unavoidable: a thirteen year-old boy was found naked and dead. The Commonwealth did not overtly exploit this issue, and the trial judge did all in his power to inform the jury that sexual assault was not at issue. Due process requires no more.

Thus, I will deny Pursell's claim for prosecutorial misconduct, and deny a certificate of appealability on this claim. 28 U.S.C. § 2253(c).

### (d) Krahe's Testimony That Pursell Was "Nervous"

 Pursell's final attack on Krahe's testimony is directed at Krahe's testimony that Pursell was nervous during the interrogation. In particular, Pursell focuses on two statements. First, Krahe testified that Pursell looked "nervous" during the interrogation, although "[h]e didn't show many outward signs of nervousness." (Tr. 1/21/82, at 102). Second, Krahe testified about Pursell's conduct after a pair of glasses were placed ·in front of him. "I was watching for physical reactions at that point .... [a]nd I noted at that time that his breathing increased, [and] that his hands were moving at a faster rate than they had been prior ..." *Id.* at 118. Pur-

sell claims that this testimony violated Pennsylvania law, and that his lawyers were ineffective for failing to object to this testimony and raise this issue on appeal. Because the Pennsylvania Supreme Court did not address these claims, I will review them *de novo.*

 To the extent that Pursell claims that Krahe's testimony violated state law, his claim is no basis for habeas relief. *Pulley*, 465 U.S. at 41, 104 S.Ct. 871. A federal district court can grant habeas relief only on behalf of a person in custody in violation of "the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). State law violations, unless egregious enough to amount to a violation of due process, are not sufficient to merit habeas relief. *Pulley*, 465 U.S. at 41, 104 S.Ct. 871. Even so, Pursell has cited no case that even remotely suggests that Krahe's testimony violated Pennsylvania law. Krahe's testimony did not bolster the credibility of a witness, *see e.g., Commonwealth v. Gallagher*, 519 Pa. 291, 547 A.2d 355, 357 (1988), nor did it imply that Pursell was guilty. *See, e.g., Commonwealth v. Kitchen*, 730 A.2d 513, 521 (Pa.Super.Ct.1999). Instead, Krahe testified about what Pursell looked like and how he acted, the kind of testimony routinely given by percipient witnesses in every court of the Commonwealth, every day. Such testimony does not violate Pennsylvania law, and Pursell's lawyer was not ineffective for failing to object to this testimony or raise this issue on appeal. I will deny Pursell's claims for relief and deny a certificate of appealability on these claims. 28 U.S.C. § 2253(c).

### (2) The Testimony of the Erie County District Attorney

 Pursell's broad-reaching prosecutorial misconduct claim does not stop at the testimony of Officer Mark Krahe.

Pursell also attacks the prosecution's decision to introduce the testimony of Erie County District Attorney Michael Veshecco. In particular, he argues that the introduction of Veshecco's testimony denied him the kind of fair trial required by the due process clause of the Fourteenth Amendment. Because the Pennsylvania Supreme Court did not address this claim, my review is *de novo*. Once again, I will deny Pursell's claim for relief.

At the time of Pursell's trial, Pennsylvania law did not bar the testimony of a sitting District Attorney, as long as the witness was not prosecuting the case at trial. *Commonwealth v. Willis*, 380 Pa.Super. 555, 552 A.2d 682, 694–98 (1988) (*en banc*) (interpreting disciplinary rules in effect at the time of Pursell's trial); *Commonwealth v. Turner*, 390 Pa.Super. 216, 568 A.2d 622, 624–25 (1990). Pursell acknowledges this case law and admits that there is nothing either "wrong or prejudicial" about Veseccho's testimony in particular. Dkt. no. 23, at 37. Nevertheless, he claims that the testimony violated due process by exploiting the prestige of Veshecco's office to bolster the government's case.

■ At a minimum, to prove a due process violation, Pursell must show that the introduction of Veshecco's testimony amounted to a "'failure to observe the fundamental fairness essential to the very concept of justice.'" *Donnelly*, 416 U.S. at 642, 94 S.Ct. 1868 (citation omitted). Veshecco's testimony was proper and far from a due process violation. For one, it was brief, running less than twenty pages in a trial transcript of nearly 900. (Tr. 1/20/82, at 259–77). Second, it was directed at an issue about which only Veshecco had personal knowledge: the fact that the news media did not know about Pursell's glasses until after Pursell's arrest. *Id.* at 268–70. This testimony was crucial for the

prosecution, and could have come in evidence in no other way. Coupled with Pursell's statement to Diane Walters, (Tr. 1/21/82, at 57) ("[o]ut of nowhere he asked me if they could trace anyone through the[ir] glasses."), Veshecco's testimony helped the Commonwealth show that Pursell had left his glasses at the murder scene. In the present case, this testimony did not violate due process.

Í will deny Pursell's claim for relief concerning the testimony of District Attorney Veshecco, and I will deny a certificate of appealability on this claim. 28 U.S.C. § 2253(c).

### (3) The Use of Prior Consistent Statements

■ Pursell next claims that he was denied due process and the effective assistance of counsel when the prosecutor tried to bolster the credibility of James Lynch and Thomas Jagta by introducing and referring to prior written statements that the boys had given to the police. Again, the Pennsylvania Supreme Court did not address this claim, and my review is *de novo*.

### (a) Factual Background

Lynch lived in the trailer next to Pursell and testified that on the night of the murder, Thursday, July 23, 1981, between 10:30 and 11:00 p.m., he and his stepbrother Thomas Jagta had a conversation with Pursell. (Tr. 1/21/82, at 4). During that conversation, Pursell told the boys that he had been in a fight during which he lost his glasses. *Id.* at 8, 26. Pursell also explained that during that fight he hit someone in the head with a brick. *Id.* After eliciting this testimony, the prosecution asked both boys if they had provided the police with written statements shortly after the murder. *Id.* at 11, 28–29. When both Lynch and Jagta said that they had given such statements, the prosecution

marked these statements as exhibits. *Id.* at 11–13, 29–30. It later moved for the admission of both exhibits, but specifically requested that the exhibits not be shown to the jury. (Tr. 1/22/82, at 210). Defense counsel did not object. *Id.*

In its closing statement, the prosecution referred to these prior statements in order to bolster the credibility of both witnesses. During her closing, Barbara Mallett suggested that, in order to render a verdict for the defendant, the jury would have to credit everything that Pursell had said and disbelieve all of the Commonwealth's witnesses.

> You have to disbelieve the boys Lynch and Jagta for they took the witness stand and *testified in accordance with their written statements and their prior testimony.* You heard the direct examination and the cross examination. They told you that on Thursday evening between 10:00 and 10:30 p.m. they talked with Alan Pursell on the steps of his trailer. Alan Pursell says it was Wednesday evening but Lynch and Jagta were positive in saying it was Thursday, and did you ever hear one reason—did you see one reason—as jurors for those two boys to lie? What reason would they have to say it was Thursday if it was Wednesday; but on the other hand, what reason would the defendant have to say it was Wednesday if it was Thursday? The boys told you that the defendant told them that he had been in a fight a while ago; obviously meaning that the defendant had been away from the trailer Thursday evening. They told you that the defendant said he was riding his bike, a couple of guys called him over, and he went over to have a drink with them and he told Lynch and Jagta what he told you; that he told them he was then jumped by six people and he had to hit one of them on the head with a brick and then he fled leaving behind

his smashed and broken glasses. That's what Lynch and Jagta told you the defendant told them. *Were they consistent with their statement to the police the day after the incident? I suggest to you that they were, and I suggest to you that [a]s consistent as Lynch and Jagta were; that's how inconsistent the defendant was.*

(Tr. 1/26/82, at 48) (emphasis added). Pursell's counsel did not object to Mallett's closing.

### (b) Prosecutorial Misconduct Claim

 Pursell now argues that the introduction of Lynch and Jagta's prior statements violated Pennsylvania law. In Pennsylvania, prior consistent statements of a witness are not admissible as either substantive evidence or as corroborative evidence. *Commonwealth v. Gore,* 262 Pa.Super. 540, 396 A.2d 1302, 1306 (1978); *Commonwealth v. Gaddy,* 468 Pa. 303, 362 A.2d 217, 223 (1976). "Were the rule otherwise, there would be considerable opportunity for the fabrication of testimony, and the relative credibility of witnesses might be premised on who had previously repeated his story more often." *Gore,* 396 A.2d at 1306.

> However, there are certain well-recognized exceptions to this general rule: prior declarations of a witness, which are consistent with his present testimony, may be admissible to corroborate his present testimony if it be alleged that the witness' present testimony is recently fabricated, or if it be claimed that the witness is testifying from corrupt motives.

> Evidence of consonant statements, if admissible, are admissible only for the purpose of showing that that which the witness now testifies to has not been recently fabricated and not for the pur-

pose of proving the truth of the present testimony.

*Commonwealth v. Wilson*, 394 Pa. 588, 148 A.2d 234, 242 (1959).

 In the present case, the prosecution did not violate this rule when it asked about and marked the prior statements of Lynch and Jagta during direct examination. For one, the statements themselves were never read or shown to the jury. Second, during direct examination, the prosecution did not try to show that Lynch or Jagta's testimony was consistent with their prior statements. Indeed, the statements appear to have been marked for the sole purpose of identification in case they were later used for impeachment purposes. (Tr. 1/22/82, at 210). Under these circumstances, there is simply no violation of Pennsylvania law.

More problematic, however, are the remarks made by prosecutor Mallett during her closing argument. During that closing, she clearly stated that Lynch and Jagta "testified in accordance with their written statements and their prior testimony." (Tr. 1/26/82, at 48). In fact, Malett asked the jury to consider the following question: "Were they consistent with their statement to the police the day after the incident? I suggest to you that they were, and I suggest to you that [a]s consistent as Lynch and Jagta were; that's how inconsistent the defendant was." *Id.* Indeed, when she was discussing the issue of credibility with the jury, she asked them to consider if the witnesses ever gave "prior consistent statements or did they ever give prior inconsistent statements[?]" *Id.* at 44. Through these remarks, the prosecutor sought to tell the jury that Lynch and Jagta were credible because their testimony at trial was consistent with their prior written statements. Such evidence would have been inadmissible under Pennsylvania law had the Commonwealth sought to introduce it in its case in chief. *Gore*, 396 A.2d at 1306. And such an argument was equally improper during the government's closing.[35]

 But Pursell cannot obtain habeas relief merely by showing that the prosecutor made a remark that violated Pennsylvania law. *Pulley*, 465 U.S. at 41, 104 S.Ct. 871. Rather, he must show that the remark violated the due process clause of the Fourteenth Amendment. Once again, in analyzing a claim for prosecutorial misconduct, I must "examine the prosecutor's offensive actions in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore*, 255 F.3d at 108. While I believe that Mallett's statements were improper, I do not think that they violated due process for three reasons.

First, her remarks were simply not that serious. They consumed a brief part of the prosecutor's lengthy closing argument, *compare* (Tr. 1/26/82, at 48) *with id.* at 37–72, and an almost undetectable portion of the entire trial. They were a small part of the government's larger effort to credit

---

**35.** Pursell does not argue that Mallett's statements constituted improper vouching, and, accordingly, I need not address that issue here. Nevertheless, as the Third Circuit has explained, vouching requires two elements. First, the prosecutor must assure the jury that the testimony of a government witness is credible, and second, this assurance must be based on either the prosecutor's personal knowledge, or other information not contained in the record. *United States v. Walker*, 155 F.3d 180, 187 (3d Cir.1998). In the present case, the prior statements of Lynch and Jagta were in the record of the case. The problem was that Pennsylvania law forbade the jury from drawing certain inferences from the existence of these statements. The prosecutor drew just these improper inferences in her closing.

the testimony of Lynch and Jagta and discredit the testimony of Pursell. At issue between them was an important issue of timing: the two boys said that they spoke with Pursell on July 23, 1981, the night of the murder, while Pursell said the conversation took place on July 22, 1981. Most of the government's focus was on showing that the two boys were impartial, *id.* at 48 (asking the jury "did you see one reason—as jurors for those two boys to lie?"), and comparing that impartiality to Pursell's obvious bias. *Id.* (asking "[w]hat reason would they have to say it was Thursday if it was Wednesday; but on the other hand, what reason would the defendant have to say it was Wednesday if it was Thursday?"). No doubt, Lynch and Jagta were important government witnesses, and their testimony formed one of the four evidentiary pillars that was used against Pursell at trial. But when viewed in the context of the entire trial, I conclude that the improper effort to bolster these witnesses was simply not that severe.

Second, the trial court provided the jury with a number of instructions that had the effect of curing any prejudice that might have accrued from Mallett's closing statement. At the beginning of the trial, the trial judge informed the jurors that they "[were] not bound by any opinion you might think counsel or I have expressed concerning guilt or innocence, credibility of witnesses, weight of evidence, facts proven by the evidence, or inferences to be drawn from the facts." (Tr. 1/19/82, at 8–9). He repeated this charge after the closing arguments. (Tr. 1/26/82, at 73). Further, he instructed them a number of different times that it was their view of the facts and evidence that mattered, and not the view of the lawyers in their opening or closing arguments. *Id.* at 84–85. While the trial judge did not directly address the prosecutor's remark at issue, he did adequately inform the jury that the lawyers' statements were not evidence and that its view of the evidence in the case controlled.

Finally, the evidence against Pursell was still strong. There were obvious reasons to credit the testimony of Lynch and Jagta, even without the prosecutor's improper attempt to bolster them. The two boys were impartial witnesses, whose entire testimony was basically corroborated by Pursell himself with one exception: Pursell testified that the conversation took place on July 22, 1981, and not July 23, 1981. Certainly, the jury had every reason to believe the final link in a chain of testimony that had already been credited by the defendant himself. Nonetheless, even if the prosecutor's comment influenced the jury, that remark only affected one of the government's four evidentiary pillars in the case. The other evidence—the glasses, the blood, and Pursell's statement to Diane Walters—was untouched, and it was substantial evidence upon which the jury could render a guilty verdict. For these reasons, I will deny Pursell's claim for prosecutorial misconduct.

### (c) Ineffective Assistance Claim

 Pursell also argues that his counsel was ineffective for failing to object to Mallett's closing remarks and for failing to pursue this claim on appeal. Based on my analysis of the prosecutorial misconduct claim, I conclude that Pursell has not established the prejudice prong of his *Strickland* claim. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

### (d) Conclusion

For the foregoing reasons, I will deny Pursell's claims for prosecutorial misconduct and ineffective assistance of counsel. I will also deny him a certificate of appealability on these claims. 28 U.S.C. § 2253(c).

## (4) Prosecutor's Remarks About Pursell's Appearance

Pursell's next claim also turns on remarks made by the prosecutor Mallett during her closing arguments. In particular, he argues that his rights were violated when the prosecution argued that the jury should judge Pursell's credibility based on the fact that Pursell had shaved his beard and cut his hair for trial. Once again, I will deny Pursell's claim.

### (a) Factual Background

Nine witnesses testified that Pursell's appearance at trial was strikingly different from his appearance during the days leading up to and following the death of Christopher Brine. (Tr. 1/20/82, at 245–47 (June Perry), 253 (Juanita Balognae), 273–74 (D.A.Veshecco)); (Tr. 1/21/82, at 12–14 (James Lynch), 27 (Thomas Jagta), 59–60 (Diane Walters), 74–75 (Almon Hall), 98–99 (Trooper Loftus), 102 (Officer Krahe)). For example, Erie County District Attorney Veshecco testified that there was a "dramatic change of appearance from that time and this time. [At the time of his arrest, h]e was dressed in a t-shirt, jeans, I remember, an army jacket, sandals, rather long hair, beard, kind of unkempt." (Tr. 1/20/82, at 273–74). Additionally, Trooper John Loftus noted that there was "a considerable difference" between the way that Pursell looked at trial and the way he looked at the night of his arrest. (Tr. 1/21/82, at 98–99). Loftus explained that Pursell had shaved his beard and that his hair was "[m]uch shorter and much better groomed than it was on that particular evening." *Id.*

In her closing argument, Assistant District Attorney, Barbara Mallett, seized on this testimony and told the jurors precisely how they should consider it:

> You may also want to take into account the changes in appearance. There is one particular extreme change in appearance which you've heard about as jurors, the change in appearance of the defendant. You see him sitting before you today, ladies and gentlemen, a nice, clean-cut short-hairdo, and then you see him as he was in July, 1981. Is there a dramatic change in the defendant's appearance? Obviously there is, and *I suggest that you can take that into account in determining credibility to determining who is telling the truth and who is not.* The defendant tells you that he cut his hair because it was hot in the jail. I suggest to you that picture was taken July 27, 1981, mid summer. Was it hot July 27, 1981? Was it hot when the defendant was doing the labor—physical labor—as an employee of Walter Kowalczyk's? Was it hot when the defendant was busy pedaling his bicycle from Wesleyville into town? He didn't bother to change his haircut then, to shorten his hair but he bothered to change it to come before you, the jurors, who are going to have to make that determination of credibility. I suggest to you that the defendant more than anyone else involved in this case may have a motive to fabricate testimony. He more than anyone else has a stake in your verdict in this case. *In determining his credibility, I urge you not only to take into account that stake, that motive to perhaps fabricate, but take into account his change of appearance ....*

(Tr. 1/26/82, at 44–45) (emphasis added). Near the end of her closing, as she was reviewing all of the evidence against Pursell, Mallett reminded the jury that Pursell had "dramatically and drastically changed his appearance and since the time of the incident." *Id.* at 71.

Pursell argues that the admission of testimony about his change of appearance, and the prosecution's reliance on this testimony in its closing, violated his constitu-

tional rights in a number of ways. First, he claims that the admission of this evidence amounted to a violation of the due process clause of the Fourteenth Amendment. Second, he claims that the prosecution engaged in misconduct by eliciting this testimony and by using it to attack Pursell's credibility. Finally, he argues that his lawyer was ineffective for failing to object to the admission of this testimony and to the prosecution's closing argument.

### (b) Admission of Evidence in Case in Chief

■■■■■ The Pennsylvania Supreme Court in *Pursell–2* addressed the first issue and part of the third. In particular, the Court held that "[i]t is entirely appropriate ... for a prosecutor to comment on a defendant's change in appearance where such a change may affect the ability of trial witnesses to identify the defendant." *Pursell–2*, 724 A.2d at 293. The Pennsylvania Court was certainly correct as a matter of Pennsylvania evidence law because there was an issue of identification raised at Pursell's trial. In particular, the government claimed that Pursell went to Dr. Perry's office on July 24, 1981, the afternoon after the murder took place, to obtain a new pair of glasses. Pursell, on the other hand, claimed that he went to Dr. Perry's on July 23, 1981, the afternoon before Christopher Brine was killed. A number of witnesses took the stand and identified Pursell as the man that they saw in Dr. Perry's office on July 24, 1981. (Tr. 1/20/82, at 245–47, 253). These witnesses explained that Pursell looked different on July 24, 1981 than he did at the time of

trial. *See, e.g., id.* at 253. And this testimony helped the jury determine the credibility of the witnesses identifying Pursell and the accuracy of their identification. As the Pennsylvania Supreme Court correctly held, the admission of this evidence was relevant and not unduly prejudicial. Accordingly, it cannot amount to a violation of due process, *Lisenba*, 314 U.S. at 228–29, 62 S.Ct. 280 (holding that the mere fact that relevant evidence is "shocking to the sensibilities" does not make the admission of that evidence a violation of due process),[36] and defense counsel's failure to object to its admission did not amount to ineffectiveness. The Pennsylvania Supreme Court's decision, therefore, was not "contrary to" or "an unreasonable application of" "clearly established Federal law." 28 U.S.C. § 2254(d)(1).

### (c) Prosecutor's Closing Remarks

■■■■■ The Pennsylvania Supreme Court did not address whether the prosecutor engaged in misconduct when she tied Pursell's change in appearance to his credibility, and whether defense counsel was ineffective for failing to object to those closing remarks. I will review these claims *de novo*. For four reasons, I conclude that Mallett's comments did not amount to misconduct.

■■■■ First, it is unclear whether her remarks, while ill-advised, were a violation of Pennsylvania evidence law. At the time of Pursell's trial, the Pennsylvania Supreme Court permitted juries to infer guilt based on a defendant's change of appear-

---

**36.** The Third Circuit has defined due process violations arising out of the admission of evidence as follows: "When it must be said that the probative value of such evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence by a state may rise to the posture of fundamental fairness and due process of law." *Bisaccia v. Attorney General of New Jersey*, 623 F.2d 307, 313 (3d Cir.1980) (quotations omitted). "[O]nly if the inflammatory nature of [the evidence] so plainly exceeds its evidentiary worth, will we find that a constitutional error has been made." *Lesko v. Owens*, 881 F.2d 44, 52 (3d Cir.1989).

ance. *See Commonwealth v. Holland,* 480 Pa. 202, 389 A.2d 1026, 1033 (1978); *Commonwealth v. Osborne,* 433 Pa. 297, 249 A.2d 330 (1969). In each of these cases, the defendant had changed his appearance with the purpose of avoiding subsequent identification. *Commonwealth v. Horwat,* 511 Pa. 398, 515 A.2d 514, 516 (1986) (describing cases). The facts of Pursell's case were clearly different and, accordingly, these cases do not sanction Mallett's remarks. Nevertheless, these cases do suggest that Mallett's argument did not clearly violate Pennsylvania law. While Mallett used Pursell's change of appearance solely to question his credibility, other cases went much further, permitting such evidence to infer a defendant's guilt.

Second, even if Mallett's remarks were improper, they were not that severe when judged against the backdrop of the entire trial. The remarks themselves consumed but a brief part of the prosecutor's lengthy closing argument, *compare* (Tr. 1/26/82, at 44–45) *with id.* at 37–72, and a tiny portion of the entire trial. Even when viewed in isolation, the remarks were a small part of the Commonwealth's larger effort to discredit Pursell's trial testimony. In fact, for thirteen pages of her closing argument, the prosecutor attacked Pursell's credibility. *Id.* at 43–55. She mentioned Pursell's prior convictions for theft. *Id.* at 45–46. She detailed the inconsistencies between his testimony at trial and his prior statements to the police and other witnesses in the case. *Id.* at 48, 50–55. She even sought to undermine his theory that every alleged piece of evidence against him was a mere "coincidence." *Id.* at 57–59. By the end of her closing, the prosecutor had so fully attacked Pursell's credibility that her brief reference to his change in appearance likely did not even register on the jury's radar screen when it sat down to deliberate.

Third, the trial court's instructions certainly cured any prejudice that might have accrued from Mallett's remarks. The trial judge informed the jurors that they "[were] not bound by any opinion you might think counsel or I have expressed concerning guilt or innocence, credibility of witnesses, weight of evidence, facts proven by the evidence, or inferences to be drawn from the facts." (Tr. 1/19/82, at 8–9); (Tr. 1/26/82, at 73). Further, he instructed the jurors a number of different times that only their view of the facts and evidence mattered, and not the views of the lawyers in their opening or closing arguments. (Tr. 1/26/82, at 82–85, 92). While the trial court did not directly address Mallett's remark about Pursell's change of appearance, he adequately informed the jury that the lawyers' statements were not evidence, and that its view of the evidence in the case controlled. (Tr. 1/19/82, at 9).

Finally, the evidence against Pursell was strong. The jury had obvious reasons to disbelieve Alan Pursell, and the prosecutor detailed these reasons during her closing argument. (Tr. 1/26/82, at 44–55). Pursell had two prior convictions for theft, he had been impeached with numerous inconsistent statements during trial, and his defense, when broken down, appeared like a string of coincidences, each coincidence less plausible than the previous one. Mallett's remark had little effect on the four evidentiary pillars in the case, and, even without it, the jury's verdict would have been the same. I will deny Pursell's claim for prosecutorial misconduct.

■■■ All that remains is Pursell's claim for ineffective assistance of counsel. Based on my analysis of the prosecutorial misconduct claim, I conclude that Pursell has not shown that he was prejudiced by his counsel's conduct. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Accordingly, his ineffectiveness claim is denied.

### (d) Conclusion

I will deny all of Pursell's constitutional claims concerning the prosecution's admission and use of evidence concerning his change of appearance. I will also deny him a certificate of appealability on these claims. 28 U.S.C. § 2253(c).

### (5) Prosecutor's Reference to Personal Knowledge

■ Pursell's next prosecutorial misconduct claim is also directed at remarks made by the prosecutor during her closing argument. In particular, he argues that his due process rights were violated when the prosecutor told the jury to rely on her own personal knowledge of the case in rendering its verdict. The particular testimony at issue is the following:

> You may remember the facts better than I; and as Attorney Martone told you, if my recollection of the evidence differs from yours, then yours controls. You are the fact finders in this Courtroom, and I apologize ahead of time if I do sometimes state the facts differently from the way you remember them but sometimes I may get confused between what I expected the witness to say based upon their pre-trial statements and what the witness actually did say from the witness stand. For example, such may be the case with the testimony of the defendant, the defendant's mother, and the sister of the defendant's girlfriend or as the Commonwealth attempted to establish for you, their testimony in this Courtroom varied from the statements which they gave before trial. So, where I may not better remember the facts from you, I believe that I have one advantage: I've known the facts before you did. I've had the time, I've

had the liberty, I've had the opportunity to review everything in totality, to review it in an orderly, consistent fashion, not in the fragmented way that it comes to you as is necessary we must from the witness stand and because of that opportunity to put it all together in one cohesive whole and help you to ascertain what exactly happened on July 23, 1981. For that reason, I hope you will indulge me if I attempt to serve as your guide in your attempt for truth.

(Tr. 1/26/82, at 38). Because the Pennsylvania Supreme Court did not address the propriety of these remarks, my review is *de novo.*

■ "Although counsel may state his views of what the evidence shows and the inferences and conclusions that the evidence supports, it is clearly improper to introduce information based on personal belief or knowledge." *United States v. Zehrbach,* 47 F.3d 1252, 1266 n. 11 (3d Cir.1995) (*en banc*) (citing 1 *ABA Standards for Criminal Justice* 3–5.8(b) (2d ed.1980)). A prosecutor's expression of personal opinion is a form of "unsworn, unchecked testimony" that "exploit[s] the influence of the prosecutor's office ..." 1 *ABA Standards for Criminal Justice* 3–5.8(b), commentary, at 3–89. Not surprisingly, therefore, this kind of argument is generally barred by the Rules of Professional Conduct, as it was at the time of Pursell's trial. *See, e.g.,* ABA, *Code of Professional Responsibility* DR 7–106(c)(4).

■ The problem for Pursell is that Mallett did not violate this ethical principle. At no time did she refer to her personal knowledge or to facts not in evidence.[37] In fact, her remarks show that

---

**37.** The only arguable reference to facts not in evidence was Mallett's reference to Lynch and Jagta's prior consistent statements. While these statements were introduced and admitted, they were not admitted for the purpose for which the prosecutor used them in her

she was merely trying to sum up the evidence for the jury in an orderly way, something that all lawyers do in their closing arguments. While her statement about knowing "the facts before you did" was unnecessary, it did not imply that she had secret personal knowledge of the case that the jury did not possess. Quite the contrary, the statement was merely Mallett's way, though not well articulated, of giving the jury a comprehensive view of the facts in evidence. These remarks were not unethical, and they hardly amount to a violation of the due process clause of the Fourteenth Amendment.

I will deny Pursell's claim of prosecutorial misconduct and deny a certificate of appealability on this claim. 28 U.S.C. § 2253(c).

### (6) Prosecutor's Reference to Time of Death

Pursell's final individualized claim of prosecutorial misconduct is aimed at the prosecutor's closing remarks concerning time of death. Because the Pennsylvania Supreme Court did not address this claim, I will review it *de novo*.

At trial, three pieces of evidence were introduced concerning Brine's time of death. First, Brine's mother testified that Brine left home at approximately 6:30 p.m. on July 23, 1981. (Tr. 1/19/82, at 103). This was the last time that Brine was seen alive. Second, Brine's dead body was found at 2:00 p.m. on July 24, 1981, *id.* at 57–61, indicating that he died sometime before that time. Finally, the coroner testified that death "possibly" could have occurred between midnight and 3:00 a.m. on July 24, 1981. *Id.* at 78. Nonetheless, his testimony about rigor mortis also supported the idea that Brine could have died before midnight, *id.*, and he conceded that

it was "difficult to estimate time of death." *Id.*

Pursell seized on the coroner's statement that death "possibly" occurred between midnight and 3:00 a.m. and used it as the foundation for his defense. First, he claimed that all of the Commonwealth's witnesses, including Lynch, Jagta, and Almon Hall, had seen Pursell without his glasses well before midnight on July 23, 1981. (Tr. 1/26/82, at 13–14). Second, Pursell's mother testified that Pursell was with her from approximately 10:00 p.m. on July 23 through the morning of July 24, including well after 3:00 a.m. (Tr. 1/25/82, at 31–35, 37–38). Based on these facts, Pursell's lawyer argued that Pursell could not have killed Brine.

In her closing, prosecutor Barbara Mallett addressed the time of death issue. First, she detailed the coroner's testimony. (Tr. 1/26/82, at 43). Second, she noted that Mrs. Brine last saw her son at approximately 6:30 p.m. on July 23, 1981. *Id.* Finally, she made the following comment at issue today:

> Defense counsel even agreed in his opening statement—"We all agree that Christopher Brine died sometime between 8:00 p.m. and 2:00 a.m." He made that point to you, and so we have a span of about 8:00 p.m. to 2:00 a.m. during which Christopher Brine died, and conveniently alibi has him home during that entire period, who makes the alibi? The defendant and the defendant's mother.

*Id.* In his petition, Pursell claims that defense counsel's opening statement is not evidence, and the prosecutor's reference to it was improper. While I agree that Mallett's reliance on defense counsel's opening statement was an improper reference to items not in evidence, I nonetheless reject

closing. I have discussed these remarks in Section V.D(3) *supra*.

Pursell's claim for prosecutorial misconduct.

First, the evidence in the case supported the prosecutor's theory that Brine died between 8:00 p.m. on July 23 and 2:00 a.m. on July 24. There was no dispute that Brine died sometime within a broad window of 6:30 p.m. on July 23 (when he left home) and 2:00 p.m. on July 24 (when his body was found), and the coroner's testimony merely tried to narrow that broad window. Nonetheless, the coroner refused to give a definitive statement on time of death, (Tr. 1/19/82, at 77), and his testimony never foreclosed the idea that Brine could have died before midnight. *Id.* Thus, the prosecutor's statement about time of death was consistent with the evidence in the case.

Second, even if the prosecutor's statement was unsupported by the evidence, there was no due process violation in the present case. For one, the jury was told on more than one occasion that statements of counsel were not evidence. *Id.* at 9; (Tr. 1/26/82, at 73, 84–85). It was further instructed that its recollection of the evidence controlled, even when that recollection conflicted with arguments made by the lawyers in the case. (Tr. 1/26/82, at 82–85, 92). More importantly, however, time of death was an insignificant point at Pursell's trial because no matter when Brine died, Pursell had an alibi. Accordingly, for the prosecution, the key to winning the case was to show that Pursell's alibi was not credible, not to bicker over time of death. *Id.* at 43–44. This is precisely what Mallett tried to do in her closing. Her reference to time of death was merely a way to concede the point and to get on with the work of undermining Pursell's credibility. Under these circumstances, I find that the prosecutor's remarks had little, if any, effect on the trial of this case.

Accordingly, I deny Pursell's claim for prosecutorial misconduct, and deny a certificate of appealability on this claim. 28 U.S.C. § 2253(c).

## (7) Cumulative Effect of Errors

[105] The past forty pages have merely been a long but necessary way of getting to Pursell's real claim: a due process claim based on the cumulative effect of the prosecutorial misconduct in his case. The cumulative effect of prosecutorial misconduct can amount to a constitutional violation where each instance, standing alone, does not warrant relief. *Lesko v. Lehman,* 925 F.2d 1527, 1541, 1546 (3d Cir.1991); *Moore,* 255 F.3d at 118. The Pennsylvania Supreme Court did not address this claim and, accordingly, I review it *de novo.*

### (a) What Errors Should Be Considered?

The first question any court confronts in analyzing a claim for cumulative error is a question of definition: what prosecutorial conduct should be placed in the mix for cumulative review? There are really three options, each of which fall somewhere on a sliding scale. First, I could include all allegations of misconduct, whether there is merit to them or not. Obviously, such an approach would be the best for Pursell, placing nearly all prosecutorial conduct under a microscope. Second, and at the other extreme, I could consider only those claims of prosecutorial misconduct that individually rise to the level of a constitutional violation. Obviously, such an approach benefits the Commonwealth, and makes cumulative review essentially meaningless. Finally, I could adopt a middle ground, and place only those claims that amount to actual trial error in the cumulative mix, either because they are obvious state law errors or because they are harmless constitutional errors.

This middle approach is the one adopted by the Third Circuit in *Lesko*. In that case, the Third Circuit reviewed two remarks by a prosecutor in his closing statement of the sentencing phase of a capital trial. The Court held that one remark was an improper reference to the defendant's Fifth Amendment privilege against self-incrimination and violated *Griffin v. California*. *Lesko*, 925 F.2d at 1544–45. The second remark involved the prosecutor's "appeal to vengeance," in which he told the jurors to even the score by sentencing the defendants to death. *Id.* at 1540–41. The Court found that this second remark was "improper," but not, standing alone, a violation of due process. *Id.* at 1546. Nevertheless, the Court put the two remarks together and held that, when considered cumulatively, they amounted to a constitutional violation. *Id.* at 1546–47. It is this middle approach that I adopt in the present case.

But the question remains: what errors fall into the cumulative petri dish in the case before me? There are three: 1) the prosecutor's remark that witnesses Lynch and Jagta had given prior consistent statements in the past; 2) the prosecutor's remark that the jury could judge Pursell's credibility based on the fact that he changed his appearance; and 3) the prosecutor's reference to the defense counsel's agreement that time of death occurred between 8:00 p.m. and 2:00 a.m. All of these remarks were improper under state law.[38]

#### (b) Legal Analysis of Cumulative Claim

██ Having decided which errors to include in my cumulative review, I must next decide how to perform this review. There are really two options. First, I could perform a standard prosecutorial misconduct analysis. This was the approach taken by the Third Circuit in *Moore*, where the Court examined a number of remarks made by the prosecution during its closing and determined that, taken together, they amounted to a violation of the due process clause of the Fourteenth Amendment. *Moore*, 255 F.3d at 118. Second, I could simply perform a harmless error analysis. This is what the Third Circuit did in *Lesko*. *Lesko*, 925 F.2d at 1546. The difference between the two approaches is really one of nomenclature and not of substance. I can hardly imagine a case in which prosecutorial misconduct "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process," *Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868, yet the error is deemed harmless. Accordingly, I will perform a standard due process analysis as the Third Circuit did in *Moore*. For three reasons, I conclude that the prosecutor's remarks at issue, when taken together, do not amount to a violation of due process.

First, the conduct was not that severe, even when considered cumulatively. The remarks themselves consumed but a brief part of the prosecutor's lengthy closing argument, *compare* (Tr. 1/26/82, at 43–45, 48) *with id.* at 37–72. They had no overarching significance to the case as a whole. *Compare Lesko*, 925 F.2d at 1544. And they were not so "highly prejudicial" that they hindered the jury's ability to judge the case fairly and objectively on the evidence presented at trial. *Compare Moore*, 255 F.3d at 119. Instead, the remarks at

---

**38.** While I recognize that Officer Krahe's two statements about rape were irrelevant and inadmissible, *see supra* at 341–42, I do not include them in this cumulative review for one simple reason: those statements were not elicited by the prosecution and cannot, therefore, constitute part of a claim of prosecutorial misconduct. Nevertheless, because the testimony was improper, I will include it in my cumulative review of all trial errors later in this opinion.

issue affected minor portions of the Commonwealth's case, and did so in extremely ineffective ways. They reveal a prosecutor who was more slothful than shifty, and more careless than cunning.

Second, the trial court provided the jury with numerous instructions that had the effect of eliminating, or at least mitigating, any potential prejudice. The judge told the jury that "statements and arguments of counsel are not binding on you and are not evidence . . ." (Tr. 1/19/92, at 9). After the closing, he told them that it was their recollection of the facts, and not the statements by counsel that controlled. (Tr. 1/26/82, at 73, 84–85, 92). Courts should normally presume that the jury will follow instructions, "unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer*, 483 U.S. at 766 n. 8, 107 S.Ct. 3102 (citations omitted). In the present case, there is little question that the instructions performed precisely the task that they were designed to perform.

Finally, the evidence against Pursell was strong, and the prosecutor's remarks did not enhance the strength of this evidence. For instance, the remarks had no effect on the fact that Pursell's glasses were found at the scene, that Brine's blood was found on his shoe, and that Pursell had made a damaging statement to Diane Walters. Although the remarks did tangentially affect Pursell's credibility and the credibility of Lynch and Jagta, this effect, in light of all the evidence in the case, was minimal. Even without the prosecutor's comments, the verdict in this case would have been the same.

### (c) Conclusion

I will deny Pursell's claim for relief based on the prosecutor's cumulative mis-

conduct and will deny a certificate of appealability on this claim. 28 U.S.C. § 2253(c). To the extent that Pursell has raised a claim for ineffective assistance of counsel, I will deny that claim as well.

### E. Ineffective Assistance of Counsel

In addition to the many claims of ineffective assistance of counsel scattered throughout his petition, Pursell also raises an ineffectiveness claim based on his counsel's failure to "adequately investigate, prepare, and present defense evidence." [39] While styled as one claim, it is in reality many. Because none of these individual claims merit relief, I will deny Pursell's claim for ineffectiveness.

### (1) Counsel's Failure to Request a Jury Instruction on Good Character

■■■ Pursell first argues that his counsel was ineffective for failing to request a jury instruction on his good character. The Pennsylvania Supreme Court did not address the merits of this claim, and, thus, my review is *de novo*.

Pursell's claim centers on the testimony of Marcia Wilson, a woman who had known him since he was a young boy. Wilson testified that Pursell stopped by her house on the afternoon of July 24, 1981 with her son Teddy Wilson. (Tr. 1/22/81, at 249). She explained that the two men then went fishing for the day. *Id.* On cross-examination, the prosecutor asked Wilson about allegations that Pursell was not allowed to stay overnight at her house. *Id.* at 251. Wilson said that Pursell was always welcome at her home. *Id.* Nonetheless, she admitted that on one night in particular he could not stay there because her husband, a truck driver, was returning home from a long trip. *Id.* Pursell now insists that

---

**39.** This is Claim 9 in Pursell's Memorandum of Law. Dkt. no. 26, Claim 9, at 156.

Wilson's statement that he was welcome at her home any time was evidence of his good character, and that his counsel was ineffective for failing to ask for an instruction to that effect.

It has long been the rule in Pennsylvania that a defendant in a criminal trial may introduce evidence of his own good character to convince the jury of his innocence. *Commonwealth v. Wood*, 432 Pa.Super. 183, 637 A.2d 1335, 1352 (1994). So important is this evidence that Pennsylvania courts must instruct a jury that character evidence alone may justify an acquittal. *Id.* Nevertheless, all defendants are not entitled to a character evidence instruction. In fact, to obtain such an instruction, a defendant must first come forward with proper character evidence. In Pennsylvania, "the only way in which character ... can be proved is by evidence of reputation. This excludes evidence of specific acts or blameless life and rules out opinion evidence as to the character of the accused for the trait in question based on the witness' knowledge and observation." *Commonwealth v. Scott*, 496 Pa. 188, 436 A.2d 607, 610 (1981) (citation omitted).

[111] In the present case, Pursell cannot show that his counsel was deficient for one reason: Wilson's testimony was not evidence of Pursell's good character. Wilson did not testify about Pursell's reputation for honesty, trustworthiness, or peacefulness, all acceptable ways of proving character. *Id.* Rather, she testified that he was welcome to stay at her house any time, a statement that says more about her kindness than Pursell's character, and one that is not character evidence under Pennsylvania law. *Id.* Accordingly, I will deny Pursell's *Strickland* claim and deny him a certificate of appealability. 28 U.S.C. § 2253(c).

### (2) Counsel's Failure to Rehabilitate Dorothy Pursell

Next, Pursell alleges that his counsel was ineffective for failing to rehabilitate the testimony of his mother, Dorothy Pursell. The Pennsylvania Supreme Court did not address the merits of this claim so, again, my review is *de novo.*

During trial, Dorothy Pursell testified that on Wednesday, July 22, 1981, the day before the murder, her son came home covered with blood and without his glasses. At that time, Pursell told his mother that he had been jumped, and that he had lost his glasses during this incident. (Tr. 1/25/82, at 22–23). On cross-examination, the prosecution attacked Mrs. Pursell's testimony:

Q. Mrs. Pursell, did you ever tell the officers at any point from the time you learned your son was arrested until you took the stand today that your son had been in a fight Wednesday evening, July 22nd?

A. I don't remember telling anybody that. I remember telling the attorney that when he came to the house Tuesday night.

Q. Mrs. Pursell, did you ever tell a police officer from the time you learned your son was arrested until you took the stand today that your son had lost his glasses in a fight Wednesday evening and, therefore, couldn't have had them Thursday night?

A. I might have when they came there to search. I am not going to say I didn't—I didn't—because I don't remember, and that is the God's honest truth. I don't remember too much after the officers got there, and that is the truth....

Q. Do you recall officers ever coming to talk to you to ask you to give a statement?

A. I might, yes, on a Friday....

Q. Did you, yourself, ever tell the police officer that you didn't wish to give a statement?

A. Did I ever?

Q. Right.

A. Yes, to that gentleman there. I told him I didn't care to say anything to him.

*Id.* at 66–67. During trial, Pursell's counsel did not seek to rehabilitate Mrs. Pursell in response to this cross-examination. Today, Pursell claims that his own counsel should have taken the stand and informed the jury that Mrs. Pursell told him just a few days after Pursell's arrest that Pursell lost his glasses on July 22, 1981. I reject this claim for two reasons.

First, it is unlikely that counsel's testimony would have been admissible. Under Pennsylvania law, a prior consistent statement is only admissible if it is alleged that the witness recently fabricated her testimony, and the prior statement was made before the time when the motive to fabricate arose. *Gore,* 396 A.2d at 1307; *Gaddy,* 362 A.2d at 223; *Keefer v. Byers,* 398 Pa. 447, 159 A.2d 477 (1960); *Risbon v. Cottom,* 387 Pa. 155, 127 A.2d 101, 105 (1956); *Craig v. Craig,* 5 Rawle 91, 97–98 (Pa.1835). This rule was in effect at the time of Pursell's trial, *Gore,* 396 A.2d at 1307, and has been the prevailing rule in the United States for more than a century. *Tome v. United States,* 513 U.S. 150, 156, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995). "[T]he applicable principle is that the prior consistent statement has no relevancy to refute the charge unless the consistent statement was made before the source of the bias, interest, influence or incapacity originated.'" *Id.* (citations omitted).

In the present case, Mrs. Pursell's prior statement was made after the time when her motive to fabricate arose. According to the trial testimony, Mrs. Pursell told counsel on the night of Tuesday, July 28, 1981 that her son had lost his glasses on July 22, 1981. (Tr. 1/25/82, at 66). But this statement was made after Pursell had been arrested for Brine's killing, (Tr. 1/21/82, at 95), and after the newspapers had reported that Pursell's glasses were found at the murder scene, *id.* at 87; dkt. no. 10, Ex. 10 (Erie Daily Times, 7/28/81). In fact, by July 28, 1981, Mrs. Pursell knew the full implication of her statements to counsel, and knew that her story would either support or undermine her son's prospects at trial. Under these circumstances, her prior consistent statement was simply not admissible, and counsel's failure to raise it was not unreasonable. *Commonwealth v. Hutchinson,* 521 Pa. 482, 556 A.2d 370, 372 (1989) (holding that trial counsel was not ineffective when he failed to introduce defendant's prior consistent statement. Statement was not admissible because it was made after defendant had been arrested, "clearly not a time when the effect of the statement could not have been foreseen.").

Even if the statement was admissible, Pursell's counsel was still objectively reasonable in not pursuing this matter. For one, Mrs. Pursell was not damaged that badly by the cross-examination. Even the prosecution seemed to acknowledge as much. Indeed, in its closing argument, it assumed that Mrs. Pursell's story had always been consistent, and merely sought to discredit her testimony as a mother's effort to protect her son. (Tr. 1/26/82, at 46).

Second, Pursell's counsel ran a grave risk in testifying at trial, a risk that any reasonable attorney would seek to avoid. First, he could have been disqualified, leaving Pursell with only one counsel. *Pennsylvania Code of Professional Re-*

*sponsibility,* DR–5–102(A) (quoted in *Coren v. DiDomenico,* 291 Pa.Super. 331, 435 A.2d 1252, 1255 (1981)) (stating lawyer "shall withdraw from the conduct of the trial" if it is obvious that he will be called as a witness on his client's behalf). Indeed, at the time in question, the Pennsylvania Supreme Court condemned the practice of one attorney testifying and then continuing as trial counsel. *Kraynick v. Hertz,* 443 Pa. 105, 277 A.2d 144, 146 n. 2 (1971). Second, even if counsel could have testified,[40] such testimony would have had little effect on the case. "[T]he value of [lawyer] testimony," the Third Circuit has explained, "must be discounted because of the interest of the lawyer or his firm in the outcome of the litigation." *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp., Inc.,* 546 F.2d 530, 539–40 (3d Cir.1976). By testifying, Pursell's counsel would have had a minimal impact on the trial, and personally injected himself into the case in a way that could have compromised his role as advocate. He was not deficient when he failed to take the stand to testify about Mrs. Pursell's prior consistent statement. Again, I will deny Pursell's claim and deny him a certificate of appealability. 28 U.S.C. § 2253(c).

### (3) Counsel's Failure to Object to Impeachment by Omission

 Pursell's next ineffectiveness claim also focuses on his lawyer's conduct during his mother's testimony. During cross-examination, the prosecutor asked the following question: "Mrs. Pursell, did you ever tell a police officer from the time you learned your son was arrested until you took the stand today that your son had lost his glasses in a fight Wednesday evening and, therefore, couldn't have had them Thursday night?" (Tr. 1/25/82, at 66). To Pursell, this constitutes "impeachment by omission" and is improper under Pennsylvania law. Pursell's lawyer did not object to the question, and Pursell now argues that this failure violated his Sixth Amendment right to effective assistance of counsel. Because the Pennsylvania Supreme Court did not address this claim, I will review it *de novo.* For two reasons, I reject Pursell's claim.

 First, Pennsylvania case law at the time of Pursell's trial did not clearly forbid this kind of questioning. "A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. At the time of Pursell's trial, there were no cases that clearly forbade the kind of question that was asked of Mrs. Pursell in this case. Even *Commonwealth v. Hammond,* 308 Pa.Super. 139, 454 A.2d 60, 64 (1982), a case decided shortly after Pursell's trial, did not cite any legal authority for its holding that "impeachment by omission" was improper. *Id.* Instead, that court relied on *Webster's New International Dictionary, id.* at 64 n. 6, a useful source, but hardly the kind

---

**40.** At the time in question, the Pennsylvania Code of Professional Responsibility permitted lawyers to testify in four limited circumstances:

 (1) If the testimony will relate solely to an uncontested matter. (2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony. (3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client. (4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

*Pennsylvania Code of Professional Responsibility,* DR 5–101(B)(1)(4) (quoted in *Coren,* 435 A.2d at 1255).

needed to convince a trial judge to make new law during the heat of a capital trial. As "there is no general duty on the part of defense counsel to anticipate changes in the law," *Government of the Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989) (citation omitted), I will deny Pursell's claim for relief.

Second, even today this kind of questioning is not barred under Pennsylvania law. In *Commonwealth v. Ragan*, 538 Pa. 2, 645 A.2d 811, 821 (1994), the government impeached a key defense witness with the fact that the witness's prior statement to the police omitted a crucial fact that the witness testified about at trial. *Id.* at 821. On appeal, the defendant argued that this cross-examination was improper. *Id.* "This claim is absurd," the Pennsylvania Supreme Court wrote. "Pleasant testified at trial that he spoke with appellant on the evening of June 26. His statement to police, however, makes no mention of such a conversation. This is an obvious inconsistency which provided a basis for the admission of the statement as a prior inconsistent statement." *Id.* Even if tried today, therefore, it is unlikely that Pursell could prevent the same kind of cross-examination that he now finds so objectionable.

Pursell's counsel was not deficient when he failed to object to the cross-examination at issue, and Pursell's claim for relief will be denied. Additionally, I will deny him a certificate of appealability on this claim. 28 U.S.C. § 2253(c).

### (4) Counsel's Failure to Challenge Contention That Nearest Rock Was Two Hundred Feet From Victim

At trial, the Commonwealth argued that the murder of Christopher Brine was premeditated because the only rock of the type that was used to kill Brine was found two hundred feet away, near railroad tracks. On appeal, the Pennsylvania Su-

preme Court addressed the evidence of premeditation presented to the jury:

> A blood-covered jagged rock was found near the body. The blood was similar to the victim's; the lacerations and punctures on the victim's head were caused by this rock. The nearest rocks were two hundred feet from the body and were similar to the rock used to strike the victim . . . .

> Since the victim was assaulted with a rock carried two hundred feet from its natural resting place, the jury could conclude that the killing was premeditated.

*Pursell–1*, 495 A.2d at 186–87; *see also* (Tr. 1/19/82, at 138–39) (Testimony of Officer Mark Krahe). At trial, Pursell's counsel did not challenge the Commonwealth's contention that the nearest rock to the victim was 200 feet away. Pursell now claims that counsel's failure to raise this issue amounts to ineffectiveness in violation of the Sixth Amendment.

Pursell raised this same claim in his first PCRA petition, but the Pennsylvania Supreme Court rejected it on the merits.

> [Pursell] asserts that this Court's statement in our opinion on his direct appeal . . . was erroneous, and that rocks similar to the one used to strike the victim could have been found nearer the body. According to [Pursell], the closer proximity between rocks similar to the one used to strike the victim and the body would have undermined the prosecution's case that the murder was premeditated, based on the distance the rock was carried preceding the striking of the victim. [Pursell] engages in pure speculation and conjecture concerning the proximity of slag rocks to the location of the murder, and is contradicted by the testimony of Officer Krahe concerning the presence of rocks at the scene. He offers no authority to explain why the

Commonwealth should have been prevented from testimony regarding the blood-covered rock, and we cannot find merit in a claim that the record clearly contradicts.

*Pursell–2,* 724 A.2d at 313.

[118] Pursell has again raised the same issue. In his habeas petition, he asks for discovery on this issue so that he can examine the crime-scene photographs. Dkt. no. 26, at 163. At a conference held earlier in these proceedings, Pursell's counsel explained his request:

> If you recall part of their theory of premeditation was he had to go 200 yards to the railroad bed to get this particular rock because no other rocks of this kind were found right in this area. And my position is, if the discovery of the crime scene photos do reveal that there are other rocks of this nature in the area, then that was certainly something counsel should have used to attack the Commonwealth's theory of premeditation. . . .
>
> If in fact the evidence available to defense counsel showed that this wasn't the only rock of its kind at the scene. . . .
>
> That would rebut the inference of premeditation and be consistent with, particularly, the evidence of the penalty phase of an unplanned, spontaneous kind of assault. I haven't been able to get access to these photographs, and I may look at them and agree with Mr. Zak that there is no evidence here, there is nothing to this issue. But until I see that, that's why I'm trying to explain, yeah, I'd like to see them.

Dkt. no. 23, at 54–56. Since this time, Pursell's counsel has been provided with the discovery he requested, dkt. no. 46, and he has been permitted to expand the record to support any of his claims. Dkt. no. 52, 53, 55. Nonetheless, he has come forward with no evidence that other rocks were found in the vicinity of Brine's body. Without factual support, Pursell's counsel would have had no basis to challenge the Commonwealth's argument concerning the location of the rocks in question. The Pennsylvania Supreme Court's decision is correct and certainly not "contrary to" or "an unreasonable application of" "clearly established Federal law." 28 U.S.C. § 2254(d)(1). Once again, I will deny a certificate of appealability on this claim. *Id.* § 2253(c).

### (5) Counsel's Failure to Impeach Diane Walters

■ Pursell's next ineffectiveness claim focuses on the testimony of Diane Walters, a friend who gave damaging testimony against him at trial. Pursell argues that his counsel was ineffective for failing to impeach Walters with evidence that she abused chemical solvents and was high at the time that Pursell made incriminating statements to her. The Pennsylvania Supreme Court addressed this claim in *Pursell–2,* 724 A.2d at 310–11, and, thus, AEDPA's deferential standard of review applies. 28 U.S.C. § 2254(d)(1).

At trial, Walters provided important testimony for the Commonwealth. Of particular relevance to Pursell's current claim is the following exchange during her direct examination:

Q. What were you doing while the news was on?

A. I was sketching.

Q. What was the Defendant doing?

A. Sitting there watching the TV.

Q. Did you have a conversation with the Defendant at this time?

A. No.

Q. Did there come a time when you or Alan Pursell said anything?

A. Well, out of nowhere he asked me if they could trace anyone through the glasses.

Q. When you say out of nowhere, do you recall about what time this was or what was on TV?

A. The news was still on. It could have been about seven-fifteen.

Q. Had you been talking to the Defendant at all or Alan at all? Had there been any conversation at this point?

A. No.

Q. Had you said anything about glasses?

A. No.

Q. Had the Defendant been talking about glasses or anything at that point?

A. Not until that time; no.

Q. So, you are saying you are both sitting in the room and suddenly the Defendant says to you, "Can they trace anybody through their glasses?"

A. Yes.

(Tr. 1/21/82, at 57–58). During his own direct examination, Pursell was asked about the statement he allegedly made to Walters:

Q. [T]here was testimony from Linda Walters about a statement you made about glasses while you were watching television. Do you remember her testimony?

A. I remember her testimony.

Q. What did she say?

A. What you just said.

Q. Well, repeat her testimony as you recall it, sir.

A. I don't think I can repeat it word for word really.

Q. Well, do you recall her testifying that during the seven o'clock news on Monday evening you asked her if they could trace someone by their glasses; is that right?

A. I don't recall that.

Q. You don't recall saying that?

A. No. I don't recall it.

Q. You don't recall it at all?

A. No. I don't recall.

Q. So, you are telling us right now to the best of your recollection you never said it?

A. I don't recall if I said it or not.

Q. Well, if you did say it, why would you have said that?

A. I had something in the back of my mind from what I—from what mother said—that I would have said it.

Q. You had something in the back of your mind about what your mother had said?

A. About what my mother said about it. She said something about false teeth and something or another, too.

Q. I see, so—actually, I don't see. Maybe you could explain it a little better.

A. I don't recall exactly what my mother told me either.

(Tr. 1/25/82, at 129–30).

In his first PCRA petition, Pursell alleged that Walters was an abuser of chemical solvents and that his counsel was ineffective for failing to cross-examine her on this point. The Pennsylvania Supreme Court rejected Pursell's claim, holding that Pursell had failed to prove the prejudice prong of his claim. *Pursell–2,* 724 A.2d at 311. Pursell now claims that this decision was an "unreasonable application" of *Strickland.* I disagree.

Even with an aggressive cross-examination of Walters on her use of chemical solvents, the jury still had good grounds to believe that Pursell made the statement in question. Indeed, Pursell himself did not even deny it, something that he easily could have done. Instead, the best he

could say was that "I don't recall if I said it or not", (Tr. 1/25/82, at 129), far from an unequivocal denial in the face of such serious allegations. But Pursell's weak defense grew even weaker when he acknowledged that he might have made the statement after all. In response to questions from his counsel, Pursell stated that if he "would have said it," it was only because he "had something in the back of my mind from what I—from what mother said ..." *Id.* at 129. When counsel pressed him to explain what his mother had said to him, Pursell first said that "[s]he said something about false teeth"— a statement having no credible connection to Pursell's question about whether the police can trace lost glasses. *Id.* at 130. Then, when even his own counsel confessed consternation, Pursell added "I don't recall exactly what my mother told me either." *Id.* Such a feeble retort to such damaging testimony, especially coming as it did during Pursell's own direct examination, must have left the jury with the view that Pursell had said exactly what Walters claimed he did.

Impeaching Walters' testimony could have done substantial damage to Pursell's as well. During its case in chief, the Commonwealth introduced a belt that Pursell was wearing at the time of his arrest. The belt had blood spots on it, (Tr. 1/22/82, at 181), and the prosecution argued that this blood was Brine's. (Tr. 1/26/82, at 56, 58, 62, 69, 71). But Walters said that the belt was not Pursell's, and that she had given him the belt on Monday, July 27, 1981, just a few hours before he was arrested. (Tr. 1/21/82, at 63–64). Had the defense shown that Walters has too high to have accurate-

ly recalled the events of July 27, it would have also undermined her testimony concerning the belt. Additionally, such cross-examination might have damaged Pursell's already shaky credibility. Because Pursell was the only one with Walters for much of July 27, the cross-examination could have created suspicion that Pursell had also been using drugs, precisely the kind of suspicion that Pursell and his counsel would want to avoid.

Finally, even without Walters' testimony, the case against Pursell was strong. The Commonwealth still had evidence that Brine's blood was found on Pursell's shoe. It still had evidence that Pursell had told Lynch and Jagta that he had been in a fight during which he lost his glasses and hit someone in the head with a brick. And it still had overwhelming evidence that Pursell's glasses were found at the scene of the murder. Even if the jury had discounted Walters' testimony, it still had sufficient evidence to support a guilty verdict against Pursell.

■■■ To establish prejudice under *Strickland,* Pursell "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Even if counsel had impeached Walters concerning her use of chemical solvents, the result of these proceedings would have been a guilty verdict. The Pennsylvania Supreme Court's decision to deny Pursell's claim was not "an unreasonable application" of *Strickland.* 28 U.S.C. § 2254(d)(1).[41] Thus, I will deny

---

**41.** The Pennsylvania Supreme Court addressed only the prejudice prong of Pursell's *Strickland* claim, but I doubt that Pursell can prove that his counsel was even deficient. Pennsylvania law permits introduction of evidence that a witness was intoxicated "at the time of an occurrence about which he has testified ..." *Commonwealth v. Drew,* 500 Pa. 585, 459 A.2d 318, 321 (1983). Nonetheless, it does not permit impeachment concerning "the use of drugs or alcohol at other irrelevant times." *Commonwealth v. Small,* 559

Pursell's claim for relief, and deny him a certificate of appealability on this claim. *Id.* § 2253(c).

### (6) Counsel's Failure to Rebut Claim of Premeditation

 Pursell's final individualized ineffectiveness claim is that his counsel should have presented expert evidence in an effort to rebut the prosecution's argument that a bloody rock found at the scene of the murder was used to hit Christopher Brine. According to Pursell, such evidence would have negated the Commonwealth's theory of premeditation. Because the Pennsylvania Supreme Court did not address this claim, I will review it *de novo.*

During trial, the Commonwealth introduced evidence that Brine was struck fifteen times in the head with a rock. (Tr. 1/20/82, at 172–77). The blood stains and hair samples on the rock were consistent with Brine's. *Id.* at 175. But blows to the head did not kill Christopher Brine. The ultimate cause of death was asphyxiation as his windpipe was crushed when he was strangled with the tree-limb. *Id.* at 180–82. As the Erie County pathologist Doctor Jack Rozwadowski testified, pressure was likely applied to Brine's windpipe for approximately one or two minutes before he died. *Id.* at 182. During her closing argument, prosecutor Barbara Mallett argued that Brine's murder was intentional and premeditated because Pursell placed a log over Brine's windpipe for a prolonged period of time. "Whatever the defendant meant to do to Christopher Brine when he hit him about the head and face fourteen or fifteen times," she explained to the jury, "what possibly could he have intended when he put that log over the victim's throat other than to kill him?" (Tr. 1/26/82, at 66). Moments later, she continued with that theme.

> [I]t wasn't until the log was placed on the victim's throat that the death of Christopher Brine occurred one or two minutes later; but one minute or two minutes with a log of that length, that weight on your neck, . . . and the victim was still alive when that log was placed upon his neck because as the doctor told you, his face turned purple. I suggest to you, ladies and gentlemen, that it can only be murder of the first degree.

*Id.* at 67–68.

Pursell now argues that his counsel was ineffective for failing to undercut the Commonwealth's case on the issue of premeditation. In particular, he cites an affidavit by Dr. John Smialek, the chief medical examiner for the State of Maryland.

> In this case, it is not possible to medically determine that the beating of the deceased occurred prior to the strangulation. . . . In this case, there is insufficient physical evidence which would permit any competent pathologist to de-

---

Pa. 423, 741 A.2d 666, 677 (1999); *see also Drew,* 459 A.2d at 321; *Commonwealth v. Yost,* 478 Pa. 327, 386 A.2d 956, 961 (1978). In the present case, the only permissible cross-examination of Walters would have targeted her drug use on Monday, July 27, 1981, the time that Pursell made the statement in question. There were only two witnesses to this drug use: Walters and Pursell. Counsel satisfied his investigatory duties under *Strickland* merely by inquiring of Pursell about what happened on this date. If Pursell did not advise his lawyer about Walters' behavior, counsel cannot be ineffective for failing to read his client's mind. Further, even if counsel knew that Walters was high at the time in question, but failed to pursue this issue, he was still not deficient. Counsel certainly had strategic reasons for avoiding the subject altogether. First, Walters provided valuable testimony for the defense concerning the blood found on Pursell's belt. Second, injecting the issue of drug use into the trial might have implied certain improper conduct by Pursell as well, something that defense counsel certainly would have wanted to avoid.

termine the order of injuries to any reasonable degree of scientific certainty.

\*　　\*　　\*　　\*　　\*　　\*

It is also my opinion that something other than the rock found at the scene of the crime was probably used to inflict the blows to the deceased's head and face. Had the rock been used to beat the deceased, most likely there would have been evidence of fractures to the skull. Neither the testimony of Dr. Rozwadowski, nor his autopsy report, discloses any such fractures.

Dkt. no. 10, Ex. 9, ¶¶ 3 & 5. Pursell contends that Dr. Smialek's conclusions undermine the Commonwealth's case on the issue of premeditation, and that his counsel was ineffective for failing to present such testimony. For the following reasons, I disagree.

 First, the evidence presented does nothing to rebut the "strong presumption" that counsel's conduct "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. At trial, Pursell's lawyer focused on whether Pursell killed Brine, and not on how that killing took place. Indeed, in his closing argument, Pursell's counsel only briefly and reluctantly mentioned the issue of premeditation. (Tr. 1/26/82, at 36). This was an objectively reasonable strategy. Pursell's best chance at trial, as any skilled lawyer would have realized, was convincing the jury that he did not commit the crime. By delving into alternative theories ("I did it, but it was not premeditated."), he ran the risk of diluting his case.

Second, Dr. Smialek's testimony does nothing to undermine the government's case on the issue of premeditation. He does not disagree with Dr. Rozwadowski's testimony that the strangulation must have taken place over the course of several minutes. Because this fact was at the heart of the government's theory of premeditation, Dr. Smialek's testimony did nothing to undercut that theory. Additionally, he does not address how Brine's blood and hair samples ended up on the rock in question if that rock was not used, in some way, to inflict blows to his head. Under these circumstances, Pursell's counsel was not objectively unreasonable in failing to present such testimony at trial.

Again, I will deny Pursell's claim for relief under *Strickland* and deny him a certificate of appealability on this claim. 28 U.S.C. § 2253(c).

### (7) Claim Based on Counsel's Cumulative Errors

 Finally, Pursell raises a claim for ineffective assistance based on counsel's cumulative errors. The Third Circuit endorsed such a claim in theory in *Berryman v. Morton*, 100 F.3d 1089, 1101–02 (3d Cir.1996). In that case, the Court examined each of the errors alleged by the petitioner and concluded, as to each error, that counsel had been deficient under *Strickland. Id.* at 1097–1101. Turning to *Strickland's* prejudice prong, the Court then cumulated all of counsel's errors for the purpose of deciding whether habeas relief was warranted. *Id.* at 1101–02. While *Berryman* shows that cumulative review is proper under *Strickland,* such review is simply not needed in the present case. None of Pursell's claims surmount the first prong of the *Strickland* analysis. Because I conclude that Pursell's counsel was not deficient in any way, I have no errors to bundle together for a cumulative prejudice review. Accordingly, I will deny Pursell's claim for relief and deny him a certificate of appealability on this claim. 28 U.S.C. § 2253(c).

### F. Challenge to Jury Instructions

 Pursell's next claim is leveled at the trial court's jury instructions on

the issues of malice and specific intent. Particularly, he argues that these instructions violated the due process clause of the Fourteenth Amendment, and that his counsel was ineffective for failing to object to them.[42] The Pennsylvania Supreme Court did not address these claims, thus, my review is *de novo*.

### (1) Jury Instruction on Malice

▮ The due process clause of the Fourteenth Amendment requires the government to prove beyond a reasonable doubt every element of the crime with which a defendant is charged. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *United States v. Gaudin*, 515 U.S. 506, 510, 522–23, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). Accordingly, a criminal conviction violates due process when the trial court fails to instruct the jury on an element that the prosecution must prove beyond a reasonable doubt. *Gaudin*, 515 U.S. at 522–23, 115 S.Ct. 2310. In *Gaudin*, for instance, the defendant was charged with making false statements under 18 U.S.C. § 1001, a statute that contains "materiality" as an element of the offense. *Gaudin*, 515 U.S. at 509, 115 S.Ct. 2310. At trial, the district court informed the jury that "[t]he issue of materiality ... is not submitted to you for your decision.... You are instructed that the statements charged in the indictment are material statements." *Id.* The Court of Appeals reversed the defendant's conviction, and the Supreme Court affirmed. *Id.* at 522–23, 115 S.Ct. 2310. "The Constitution," it wrote in an opinion by Justice Scalia, "gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged. The trial judge's refusal to allow the jury to pass on the 'materiality' of

Gaudin's false statements infringed that right." *Id.*

▮ In determining whether a jury instruction runs afoul of due process, a district court "must focus initially on the specific language challenged." *Francis v. Franklin*, 471 U.S. 307, 315, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *Smith v. Horn*, 120 F.3d 400, 411 (3d Cir.1997). The court must then consider the challenged language in the context of the jury charge as a whole. *Francis*, 471 U.S. at 309, 318–19, 105 S.Ct. 1965; *Smith*, 120 F.3d at 411. The ultimate question is " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)); *Smith*, 120 F.3d at 411. Nonetheless, even if a jury instruction is found to violate due process, a district court should grant a new trial only if the error is not harmless. *Neder v. United States*, 527 U.S. 1, 9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding that harmless error analysis applies to jury instructions that violate the principle of *Gaudin* ); *Smith*, 120 F.3d at 417–18 (applying the harmless error standard from *Brecht* to habeas petitioner's claim that trial court improperly instructed the jury that it could convict without finding that petitioner had specific intent to kill).

▮ Pursell claims that the trial court violated the principle set forth in *Gaudin* and *Winship* when it gave the following instruction on the elements of third degree murder:

Unless you are—in this case, unless you are returning a verdict of first degree murder, you may find the defendant

---

42. This is Claim 11 in Pursell's Memorandum of Law. Dkt. no. 26, Claim 11, at 170.

guilty of third degree murder if you are satisfied that the following three elements have been proven beyond a reasonable doubt: *First, that Christopher Brine is dead. That we know. Second, that the defendant killed him. That is where the dispute is. Third, that the killing was with malice.* Now, I've already defined malice. A killing is with malice if the killer acted with one of the following states of mind: An intent to kill or an intent to inflict serious bodily harm or wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty indicating an unjustified disregard for the probability of death or great bodily harm, and an extreme indifference to the value of human life. As I stated before, malice may be either expressed by a defendant, which we don't have here, or inferred from his words or conduct in light of the attending circumstances. As I said before, such as when a deadly weapon is intentionally used against a vital part of the human body— something like that—malice may be inferred to exist. Now, as my earlier definition of malice indicates, there can be no malice when certain reducing circumstances are present. When those circumstances are present, a killing may be voluntary manslaughter but never murder. This is true. To give you an example: When a defendant kills in the heat of passion following serious provocation, which was not shown in this case; but there is evidence when voluntary manslaughter would apply: Or a defendant kills under an unreasonable mistaken belief in justifying circumstances. (Tr. 1/26/82, at 78–79). According to Pursell, when the trial court instructed that

the "dispute" in the case was whether Pursell was the killer, it effectively directed the jury that the other elements of the crime, such as malice and specific intent, had been proven.[43] Pursell believes that this instruction relieved the prosecution of its burden of proving every element of the crime beyond a reasonable doubt. I disagree.

■ First, a review of the specific language challenged shows that the trial court did not run afoul of the due process clause. For one, the trial judge never told the jury, as the court did in *Gaudin*, that malice or specific intent were not at issue. *See Gaudin*, 515 U.S. at 509, 115 S.Ct. 2310. Indeed, he specifically instructed that the Commonwealth had to prove all three elements, including malice, beyond a reasonable doubt. (Tr. 1/26/82, at 78). Additionally, the trial judge told the jury that malice was an element of the offense of third degree murder. *Id.* at 78. He defined the term, referred the jury to his previous instruction on its meaning, and warned the jury that it could "find malice only if you are satisfied beyond a reasonable doubt" that certain circumstances were or were not present. *Id.* While he did instruct that the "dispute" between the parties focused on whether Pursell killed Brine, his statement was more a comment on the evidence than a command to disregard an element of the case. The specific language at issue did not violate the due process clause, and no fair reading of the instruction could lead to such a conclusion.

Second, when the challenged language is considered alongside the jury instructions as a whole my conclusion becomes even stronger. Throughout his instructions, the trial judge went to great lengths to define the term "malice." In fact, the first signif-

---

**43.** In Pennsylvania, a person may not be found guilty of first degree murder unless it is established beyond a reasonable doubt that he had specific intent. *See* 18 Pa. Cons.Stat.Ann. § 2502(a).

icant point that he made to the jury was to stress the significance of the term:

> There are three types [of homicide] that you might possibly find in this case: They are murder of the first degree, murder of the third degree, and voluntary manslaughter.... It will be your duty to decide whether or not to find the defendant guilty of any of these crimes. The term "malice" is a word which I shall use regularly in connection with the homicide charges. Malice when used in the law of criminal homicide has a special meaning. It does not mean simply hatred, spite, or ill will. The word "malice" is a short-hand way of referring to any of the various bad mental states or attitudes which a person who kills must have for the killing to be murder. A killing is with malice and is therefore murder if the killer acted with an intent to kill ...

*Id.* at 74. The trial judge immediately highlighted the term malice, equated it with specific intent to kill, and marked it off as an important term for the jury to consider as it deliberated. He defined the term again when he instructed the jury on the elements of first degree murder—an instruction that spans nearly two pages. *Id.* at 75–77. And he defined it a third time when he instructed on the elements of third degree murder. *Id.* at 78–79.

Finally, the challenged language comes from the trial judge's instruction on third degree murder, *id.*, a crime that Pursell was never convicted of committing. The instruction on first degree murder does not contain the objectionable language. Indeed, that instruction says nothing about the "dispute" between the parties, and it expressly tells the jury that it must find, "beyond a reasonable doubt," that Pursell had a "specific intent to kill." *Id.* at 75. Further, the trial judge specifically told

the jury that it only had to consider his third degree murder instruction if it was not returning a verdict of first degree murder. *Id.* at 78. In all likelihood, the jury never even considered the language that Pursell finds so objectionable. Under these circumstances, it can hardly be said that " 'there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle,* 502 U.S. at 72, 112 S.Ct. 475 (citation omitted).

### (2) **Mandatory Presumption of Malice and Intent to Kill**

Along with the kind of error found in *Gaudin,* the due process clause also "prohibits the States from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion ... of every essential element of a crime." *Francis,* 471 U.S. at 313, 105 S.Ct. 1965. Accordingly, when intent is an element of the crime charged, an instruction that "the law presumes that a person intends the ordinary consequences of his voluntary acts," violates due process. *Sandstrom v. Montana,* 442 U.S. 510, 517, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Such an instruction creates a mandatory "conclusive presumption," thereby relieving the state of the burden of persuasion on the issue of intent. *Francis,* 471 U.S. at 314, 105 S.Ct. 1965. Further, an instruction that "[t]he acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted," is said to create a "mandatory rebuttable presumption," which also violates due process. *Id.* at 317, 105 S.Ct. 1965. "A mandatory rebuttable presumption is perhaps less onerous from the defendant's perspective," the Supreme Court has explained, "but it is no less unconstitutional."

*Id.*[44]

In the present case, Pursell argues that the trial court's instructions created a mandatory presumption in violation of *Sandstrom* and *Francis*. In particular, he relies on the trial court's previously discussed instructions, along with the following three instructions:

Understand, also, that malice may be either expressed by a defendant or inferred from his words or conduct in the light of the attending circumstances, such as when a deadly weapon is intentionally used against a vital part of a human body, malice may be inferred to exist.

(Tr. 1/26/82, at 75). Later the trial judge made a similar comment:

[S]pecific intent like any other matter may be proven by circumstantial evidence; that is, by inferences that reasonably may be drawn from all the facts and circumstances including the defendant's acts and conduct which have been shown by the evidence in this case. Thus, you may conclude that the defendant specifically intended to kill Christopher Brine based on circumstantial evidence alone but only if the circumstantial evidence is strong enough to convince you that the Commonwealth has established a specific intent beyond a reasonable doubt. For example, if you believe that the defendant intentionally used a deadly weapon on a vital part of the victim's body, you may regard that as an item of circumstantial evidence from which you may infer that the defendant had the specific intent to kill.

*Id.* at 76. Finally, the judge used similar language when instructing on third degree murder:

As I said before, such as when a deadly weapon is intentionally used against a vital part of the human body—something like that—malice may be inferred to exist.

*Id.* at 78.

The first question is whether the challenged language creates a mandatory presumption or a permissive inference. While mandatory presumptions, whether conclusive or rebuttable, run afoul of the Constitution, *Francis*, 471 U.S. at 314, 317, 105 S.Ct. 1965, "[j]ury instructions that explain the inevitable process of drawing reasonable inferences from the record evidence are entirely consistent with [the] constitution[ ] and, indeed, highly effective tools in equipping the jury for carrying out its assigned responsibilities." *Rock*, 959 F.2d at 1245. The Supreme Court explained the difference between mandatory presumptions and permissive inferences in *Francis:*

A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion.

Mandatory presumptions must be measured against the standards of *Winship* as elucidated in *Sandstrom*. Such presumptions violate the Due Process Clause if they relieve the State of the burden of persuasion on an element of an offense. A permissive inference does

---

**44.** Again, an instruction is unconstitutional only if " 'there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle*, 502 U.S. at 72, 112 S.Ct. 475 (emphasis added). And habeas relief is only available if the error at issue is not harmless. *Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986).

not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved. Such inferences do not necessarily implicate the concerns of *Sandstrom.*

*Francis,* 471 U.S. at 314–15, 105 S.Ct. 1965 (citations omitted).

[134] There is little question that these instructions create permissive inferences and not mandatory presumptions. The first challenged instruction says only that "when a deadly weapon is intentionally used against a vital part of a human body, malice *may be* inferred to exist," (Tr. 1/26/82, at 75) (emphasis added), hardly mandatory language at all. The second and third challenged instructions use similar words. *Id.* at 76 ("you may regard" intentional use of a deadly weapon as evidence from which you "may infer specific intent to kill."); *id.* at 78 ("when a deadly weapon is intentionally used against a vital part of the human body ... malice may be inferred to exist."). These instructions are classic permissive inferences: the jury "may," but need not, draw a conclusion if certain predicate facts are proven. Courts that have examined similar instructions have reached the same conclusion. *See United States v. Warren,* 25 F.3d 890, 896–97 (9th Cir.1994); *McInerney v. Berman,* 621 F.2d 20 (1st Cir.1980); *Daniel v. West Virginia,* 191 F.3d 447, 1999 WL 713865, at *4 (4th Cir.1999); *Commonwealth v. Hunter,* 381 Pa.Super. 606, 554 A.2d 550, 553 (1989); *Commonwealth v. Carbone,* 524 Pa. 551, 574 A.2d 584, 589–90 (1990), *modified* 526 Pa. 226, 585 A.2d 445; *Commonwealth v. Miller,* 430 Pa.Super. 297, 634 A.2d 614, 618 (1993).

 Having decided that the instructions create a permissive inference,

the next question is whether they are nonetheless constitutional. "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Francis,* 471 U.S. at 314–15, 105 S.Ct. 1965 (citations omitted). This should be judged on a case by case basis. *County Ct. of Ulster County, New York v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979). In the present case, the jury heard that Pursell used two deadly weapons to kill Brine. He pummeled Brine in the head with a rock fifteen times, and then placed a large tree-limb over his throat for one to two minutes. After hearing these facts, the jury could rationally "make the connection permitted by the inference" and conclude that Pursell acted with malice and specific intent to kill. *Id.* at 157, 99 S.Ct. 2213.

### (3) Ineffective Assistance Claim

 Pursell also raises a claim of ineffective assistance based on his lawyer's failure to object to the instructions at issue. Because I hold that the challenged instructions were constitutional, Pursell's counsel was not deficient for failing to object. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

### (4) Conclusion

I will deny Pursell's Sixth and Fourteenth Amendment claims, and will deny him a certificate of appealability on these claims as well. 28 U.S.C. § 2253(c).

### G. Pursell Represented Himself On His PCRA Appeal

 Pursell's next claim is that his due process rights were violated when he was forced to represent himself on the appeal of his first PCRA petition.[45] Once

**45.** This is Claim 16 in Pursell's Memorandum of Law. Dkt. no. 26, Claim 16, at 224.

again, the Pennsylvania Supreme Court did not directly address the merits of this issue, and I will review it *de novo*.

### (1) Background

On June 24, 1991, the Court of Common Pleas appointed counsel to represent Pursell in the preparation and filing of a post-conviction petition under the PCRA. *Pursell–2*, 724 A.2d at 300. Pursell's counsel filed a petition raising only three claims. *Id*. Displeased with the limited number of issues raised by his counsel, Pursell requested a new lawyer and also sought leave to supplement his petition with additional claims. *Id*. The trial court denied both motions, and denied the three claims raised in the counseled-petition on the merits. *Id*. In response, Pursell filed a *pro se* appeal to the Pennsylvania Supreme Court. *Id*. In his brief in support of that appeal, Pursell stated the following: "This appeal is being brought *pro se only* because the lower court specifically failed to appoint legal counsel. Appellant specifically has not waived his *Faretta* right for this appeal; therefore, this *pro se* appeal is being brought *pro se* under duress." Dkt. no. 19, at 2279 (emphasis in original). The Pennsylvania Supreme Court ultimately denied Pursell's PCRA appeal, relying solely on the *pro se* brief filed by Pursell.[46]

In *Commonwealth v. Albert*, 522 Pa. 331, 561 A.2d 736, 738 (1989), the Pennsylvania Supreme Court explained that individuals like Pursell are entitled to representation of counsel while pursuing their first PCRA petition.

At the outset, we note that in this Commonwealth one who is indigent is entitled to the appointment of counsel to assist with an initial collateral attack after judgment of sentence. It is axiomatic that the right to counsel includes the concomitant right to effective assistance of counsel. Indeed, the right to counsel is meaningless if effective assistance is not guaranteed. Since appellant was entitled to representation by an attorney in his pursuit of this collateral attack, he was entitled to adequate representation at both the hearing and appellate levels.

*Id*. at 738 (internal citations omitted).

This requirement is not without exceptions. For one, petitioner himself can always waive his right to counsel during any stage of the PCRA proceedings. *See Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Nonetheless, this waiver must be knowing, intelligent, and voluntary. *Id.; see also Henderson v. Frank*, 155 F.3d 159, 166 (3d Cir.1998). Second, appointed counsel may decline to litigate a meritless petition, leaving a petitioner to proceed *pro se*, as long as certain requirements are met. *Commonwealth v. Turner*, 518 Pa. 491, 544 A.2d 927, 928–29 (1988); *Albrecht*, 720 A.2d at 699 n. 7. Counsel must independently review the record and file a "no merit" letter, explaining why the claims raised by petitioner lack merit. *Albrecht*, 720 A.2d at 699 n. 7. Further, the court itself must independently review the record and agree with counsel that the petition is without merit. *Id*. In the present case, there is nothing in the record to suggest either that Pursell waived his right to counsel or that his appointed counsel filed a "no merit" letter with the Penn-

---

**46.** There was subsequent activity in the trial court after Pursell filed his *pro se* appeal to the Pennsylvania Supreme Court, in which new counsel was allowed to represent Pursell, although no new counsel ever entered an appearance on his behalf. *Pursell–2*, 724 A.2d at 301. Nevertheless, nothing in the record shows that this new counsel, or any counsel for that matter, represented Pursell during his PCRA appeal to the Pennsylvania Supreme Court.

sylvania Supreme Court. Reading all facts in Pursell's favor, I conclude that Pursell's state law right to counsel on his PCRA appeal was denied.

 This does not mean that Pursell is entitled to relief. A federal habeas court lacks the power to grant relief simply for violations of state law. *Pulley*, 465 U.S. at 41, 104 S.Ct. 871. Instead, Pursell is only entitled to habeas relief if he can show that this state law violation amounted to a violation of "the Constitution or laws ... of the United States." 28 U.S.C. § 2254(a). For two reasons, I reject Pursell's claim.

### (2) Claim is Barred By Teague

 First, Pursell's claim is barred by *Teague v. Lane.*[47] In *Teague,* the United States Supreme Court held that federal courts should not grant habeas relief when a petitioner relies on a new rule of constitutional law that came into existence after his conviction became final. *Teague*, 489 U.S. at 316, 109 S.Ct. 1060. A *Teague* inquiry proceeds in three steps. First, the court determines the date on which the defendant's conviction became final. *O'Dell,* 521 U.S. at 156, 117 S.Ct. 1969. In this case, that date is December 23, 1985. *See supra* n. 4. Second, the court decides whether the defendant's claim rests on a new rule of constitutional law. New rules "break[ ] new ground or impose[ ] ... new obligation[s] on the States or the Federal Government." *Teague,* 489 U.S. at 301, 109 S.Ct. 1060. Old rules, in contrast, are those that are so "compelled by existing precedent," *Saffle v. Parks,* 494

U.S. 484, 488, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), that an objectively reasonable jurist would readily conclude that they were required by the Constitution. *O'Dell,* 521 U.S. at 160, 117 S.Ct. 1969. To determine whether the rule sought by the petitioner is new or old, the court should survey the legal landscape at the time the defendant's conviction became final. *Graham v. Collins,* 506 U.S. 461, 468, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993). Finally, if the petitioner seeks the benefit of a new rule, then habeas relief is barred, unless one of *Teague's* two narrow exceptions applies. *O'Dell,* 521 U.S. at 156–57, 117 S.Ct. 1969.[48]

In the present case, Pursell seeks application of the following legal rule: the due process clause of the Fourteenth Amendment is violated when a state promises counsel for post-conviction proceedings, and then fails to live up to this promise. In support of his claim, he relies on the Supreme Court's decision in *Evitts*, a decision in existence at the time Pursell's conviction became final. In *Evitts,* the Supreme Court held that a defendant was entitled to the effective assistance of counsel during his first appeal as of right. *Evitts,* 469 U.S. at 396–400, 105 S.Ct. 830. Indeed, two lines of cases seemed to compel the result. Under one line, the Court had held that criminal defendants had a constitutional right to counsel during their first appeal as of right. *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). Under the second line, the Court had held that the right to counsel under the Sixth Amendment

---

**47.** The parties did not raise the *Teague* issue. Nonetheless, a court has the discretion to raise the *Teague* issue *sua sponte,* although it need not do so. *Wilmer,* 30 F.3d at 455.

**48.** The first exception is for new rules "forbidding criminal punishment of certain primary conduct [and] rules prohibiting a certain cate-

gory of punishment for a class of defendants because of their status or offense." *Id.* (citations omitted). The second exception is for those new rules that are "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Id.* (citations omitted).

meant the right to effective assistance of counsel. *Strickland,* 466 U.S. at 668, 104 S.Ct. 2052. When put together, the *Evitts* Court concluded that these two lines of cases required states to provide effective counsel for a defendant's first appeal as of right.

Based on its holding, the *Evitts* case has little connection to the claim that Pursell now raises. Nevertheless, Pursell claims that some *dicta* from the *Evitts* opinion mandates relief in the present case. After announcing its holding, the *Evitts* Court addressed a number of the arguments raised by the state. In particular, it addressed the state's argument that, because appeals are not constitutionally required, the state could limit the kind of appeal given to a defendant without violating due process. *Evitts,* 469 U.S. at 400–01, 105 S.Ct. 830. The *Evitts* Court rejected this argument and made the following statement: "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution ..." *Id.* at 401, 105 S.Ct. 830.

*Evitts* certainly does not compel the relief that Pursell now seeks. *Saffle,* 494 U.S. at 488, 110 S.Ct. 1257. The holding of *Evitts* is limited, granting only a right to *effective* counsel on *direct appeal,* and saying nothing at all about counsel during state post-conviction proceedings. The *dicta* in the case do add some support for Pursell's claim, but these *dicta* were not essential to the holding, and came only in response to arguments made by the state. A state court reviewing *Evitts* at the time Pursell's conviction became final would have been wholly reasonable in rejecting the claim that Pursell raises today. *O'Dell,* 521 U.S. at 155, 117 S.Ct. 1969 (stating that "we will not disturb a final state conviction ... unless it can be said that a state court, at the time the conviction ... became final, would have acted objectively unreasonably by not extending the relief later sought in federal court."). In fact, a state court probably would have been wrong if it had granted the relief sought by Pursell on so slender a reed as *Evitts* itself. Under these circumstances, the rule proposed by Pursell is most definitely new.

A review of the legal landscape at the time Pursell's conviction became final bolsters this conclusion. First, at the time in question, the Supreme Court had rejected the idea that there was a constitutional right to counsel in post-conviction proceedings. *See Johnson v. Avery,* 393 U.S. 483, 488, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) ("It has not been held that there is any general obligation of the courts, state or federal, to appoint counsel for prisoners who indicate, without more, that they wish to seek post-conviction relief."). Second, nearly every lower court that had taken up the issue had held that there was no constitutional right to counsel during post-conviction proceedings. *McCartney v. United States,* 311 F.2d 475 (7th Cir.1963); *Day v. United States,* 428 F.2d 1193 (8th Cir.1970); *Norris v. Wainwright,* 588 F.2d 130, 132 (5th Cir.1979); *Dankert v. Wharton,* 733 F.2d 1537, 1538 (11th Cir.1984). Finally, the Supreme Court had drawn a firm line in the constitutional sand, requiring counsel for indigent defendants at trial, *Gideon v. Wainwright,* 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and during their first appeal as of right, *Douglas,* 372 U.S. at 358, 83 S.Ct. 814, but refusing to extend that right to discretionary appeals. *Wainwright v. Torna,* 455 U.S. 586, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982); *Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974). No reasonable jurist, even in light of the *dicta* in *Evitts,* could have interpreted these cases as requiring the kind of relief that Pursell now seeks.

Granted, there are cases imposing general requirements on states when they venture into areas where they are not constitutionally required to tread. *See, e.g., Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (holding that, although state is not required to operate welfare program, it must do so in accordance with the due process clause). These cases were adequately summarized in *Evitts* and acted as the basis for the *Evitts* Court's famed *dicta. Evitts,* 469 U.S. at 400–01, 105 S.Ct. 830 (citing cases). But these cases do not address the specific issue raised by Pursell today, and they furnish little support for the relief he now seeks.

No cases in existence at the time Pursell's conviction became final compelled the result that he now seeks. In fact, most cases at the time suggested that Pursell's claim was a loser. Under these circumstances, the rule sought by Pursell is new and, therefore, barred under *Teague.* Because *Teague's* two exceptions clearly do not apply, I will deny Pursell's claim for relief.

### (3) Merits of the Claim

Even if *Teague* does not bar the claim, the claim still falters on its merits. In *Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), the Supreme Court held that the due process clause of the Fourteenth Amendment did not mandate the appointment of counsel for indigent defendants during post-conviction proceedings. Central to the Court's holding were two factors. First, the Court had held in the past that the right to counsel under the due process clause was limited and did not extend either to discretionary appeals or post-conviction proceedings. *Id.* at 555–56, 107 S.Ct.

1990. Second, post-conviction procedures were different in kind from the brand of proceedings where counsel is required. *Id.* at 556–57, 107 S.Ct. 1990. Although the respondent in *Finley* cited the same language in *Evitts* that Pursell relies on today, the Supreme Court held that *"Evitts* provides respondent no comfort." *Id.* at 558, 107 S.Ct. 1990. As the Court explained, "the substantive holding of *Evitts*—that the State may not cut off a right to appeal because of a lawyer's ineffectiveness—depends on a constitutional right to appointed counsel that does not exist in state habeas proceedings." *Id.*[49] In *Murray v. Giarratano,* 492 U.S. 1, 10, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989), the Supreme Court held that the *Finley* decision applied to capital and non-capital defendants alike.

Some cases go even further than *Finley* and *Giarratano,* suggesting that there is no federal right to state post-conviction counsel even when state law itself requires such counsel. For example, in *Caswell v. Ryan,* 953 F.2d 853, 862 (3d Cir.1992), the Third Circuit held that post-conviction review counsel's ineffectiveness did not excuse a procedural default, even when state law itself required effective counsel for such proceedings, because there was no federal constitutional right to counsel in state post-conviction proceedings. *See also In re Goff,* 250 F.3d 273, 275–76 (5th Cir.2001) (barring a second petition based on the ineffectiveness of state post-conviction lawyer, even when state law itself required the appointment of counsel). In both *Caswell* and *Goff,* the petitioners argued that their state post-conviction counsel were ineffective. And in both cases, state law itself required the appointment of counsel for post-conviction proceedings.

**49.** An alternative reason for distinguishing *Evitts* was that the respondent in *Finley* had been given all that state law required. Ac-cordingly, "she cannot claim any deprivation without due process." *Id.*

Nevertheless, the *Caswell* and *Goff* Courts rejected the petitioners' claims for a simple reason: the due process clause does not require counsel for state post-conviction proceedings, whether state law requires such counsel or not.

� Even if Pursell could theoretically make out a due process claim based solely on the existence of a state law violation, his claim would falter. On two occasions, the trial court provided Pursell with counsel for his PCRA petition. *Pursell–2*, 724 A.2d at 300–01. Although Pursell consistently sought to act on his own behalf, and repeatedly sought to remove the lawyers he had been given, the record shows that both lawyers adequately aided Pursell with the preparation of his petition before the trial court. *Id.* It was only on appeal that Pursell acted alone. Nevertheless, during this appeal, the Pennsylvania Supreme Court carefully scrutinized the record in the case, considered every claim raised by Pursell, and engaged in the kind of independent examination of the record that it requires in any case where a petitioner proceeds *pro se* in a post-conviction proceeding. *See, e.g., Albrecht,* 720 A.2d at 699 n. 7. While Pursell's PCRA appeal was far from ideal, the due process clause does not require flawless justice. It merely requires that the procedures employed by the state comport with "fundamental fairness." *Finley,* 481 U.S. at 557, 107 S.Ct. 1990; *Giarratano,* 492 U.S. at 8, 109 S.Ct. 2765. In the present case, Pursell was given all the process that he was due. Accordingly, I will deny his claim for relief.

### (4) Conclusion

Although Pursell's state law right to counsel was probably violated during his appeal of his first PCRA petition, this state law error did not amount to a violation of the federal Constitution. Accordingly, I will deny his due process claim and deny him a certificate of appealability on this issue. 28 U.S.C. § 2253(c).

### H. Challenge to Conduct of All Prior Counsel

Having exhausted the individual claims of error concerning the guilt-phase of Pursell's trial, I next turn to two claims that can only be described as catchall claims. In this section, I address Pursell's claim that his trial and appellate counsel were ineffective for failing to raise the issues presented in this petition either at trial, on post-trial motions, or on appeal.[50] The Pennsylvania Supreme Court did not review the merits of this claim, and, accordingly, my review is *de novo.*

I have little trouble rejecting Pursell's massive *Strickland* claim. As the foregoing pages attest, I have exhaustively analyzed each individual claim raised by Pursell and found each without merit. I have also, where appropriate, analyzed the cumulative effect of certain state law errors and found those errors to be insufficient to merit a new trial either on direct, state post-conviction, or federal habeas corpus review. Pursell can show neither that his lawyers were deficient in failing to raise the many claims addressed in this petition, *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, nor that he suffered prejudice from any of their alleged missteps, *id.* at 694, 104 S.Ct. 2052. Accordingly, I will deny his claim for relief and deny him a certificate of appealability on this claim. 28 U.S.C. § 2253(c).

### I. Claim for Cumulative Trial Error

▪ Pursell's second catchall claim is also his final attack on his twenty year-old conviction. Unlike his previous claim, this one poses more subtle problems that re-

---

50. This is Claim 17 in Pursell's Memorandum of Law. Dkt. no. 26, Claim 17, at 228.

quire a more detailed discussion. Pursell argues that he is entitled to a new trial because the cumulative effect of the errors committed in his case undermined confidence in his guilty verdict.[51] Because the Pennsylvania Supreme Court did not address this claim, I will review it *de novo*.

### (1) Analyzing Claims for Cumulative Error

▇ That the reliability of a state criminal trial can be substantially undermined by a series of events, none of which individually amounts to a constitutional violation, is an idea that has been accepted by nearly every federal court to have addressed the issue. *Taylor v. Kentucky*, 436 U.S. 478, 487–88, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978); *Sullivan v. Cuyler*, 631 F.2d 14, 17 (3d Cir.1980); *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992); *Lundy v. Campbell*, 888 F.2d 467, 472, 481 (6th Cir.1989); *Bell v. Duckworth*, 861 F.2d 169, 170 (7 th Cir.1988); *but see Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir.1990) ("cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own."). Almost universally, these courts have held that such a claim springs from the due process clause of the Fourteenth Amendment. *Sullivan*, 631 F.2d at 17 ("the cumulative effect of the alleged errors may violate due process, requiring the grant of the writ, whereas any one alleged error considered alone may be deemed harmless."); *Derden*, 978 F.2d at 1456. Under the due process clause, a petitioner is entitled to a new trial only if "the cumulative effect of the alleged trial errors was so highly prejudicial as to deprive the [petitioner] of a fair trial." *Cannon v. Maroney*, 373 F.2d 908, 910 (3d Cir.1967); *Derden*, 978 F.2d at 1456 (requiring that cumulative errors

deny "fundamental fairness."); *Lundy*, 888 F.2d at 481 (same).

This general agreement, however, masks the subtle and protracted problems that arise whenever a court undertakes a cumulative error analysis. Which errors should be included in the cumulative mix? And what standard, other than "I know it when I see it," governs the due process inquiry in cumulative error cases? Most courts deny relief on claims of cumulative error with little or no discussion and, thus, avoid these questions altogether. Yet, the questions remain. So unclear is the law in this area that there are basically three different ways that a court could conduct a cumulative review, each with some support in the case law.

First, a court could adopt the "cautious approach to granting habeas relief for cumulative errors," taken by the *en banc* Fifth Circuit in *Derden*, 978 F.2d at 1457.

> "Cumulative error" is an infinitely expandable concept that, allowed to run amok, could easily swallow the jurisprudence construing the specific guarantees of the Bill of Rights and determining minimum standards of procedural due process.... The legal certainty afforded by rules drawn from the specific Bill of Rights provisions related to criminal law could then yield to the subjectivity of fundamental fairness determinations....
>
> Equally important, granting habeas relief from state convictions for aggregated non-constitutional errors may too easily conflict with established limits on the scope of federal habeas relief. The result would thwart recent decisions that emphasize due regard for the finality of state court judgments.

*Id.* at 1457–58. Due to these serious problems, the Fifth Circuit imposed four limita-

---

**51.** This is Claim 18 in Pursell's Memorandum of Law. Dkt. no. 26, Claim 18, at 229.

tions on cumulative error review. First, the court should only consider actual "errors" committed at the trial court. Thus, if the trial court cures a putative error with an appropriate instruction, that "error" cannot be added to the cumulative mix. *Id.* Second, the error complained of must not be procedurally barred, and, regardless of procedural bar, the defendant must have objected to the error at trial. *Id.* Third, state law errors are not cognizable, unless they individually amount to a due process violation. *Id.* Finally, the court must review the trial record as a whole and ask whether "the errors more likely than not caused a suspect verdict." *Id.*

A second possible approach is that adopted by federal courts when directly reviewing claims for cumulative error from federal criminal convictions. The Tenth Circuit's decision in *United States v. Rivera,* 900 F.2d 1462, 1469–71 (10th Cir.1990) (*en banc*) is an excellent overview of this approach.[52] First, the court aggregates only "actual errors," defined as "any violation of an objective legal rule." *Id.* at 1470 & n. 7. Second, the court applies a harmless error analysis to the errors that have been amassed.

> A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. Unless an aggregate harmlessness determination can be made, collective error will mandate re-

versal, just as surely as will individual error that cannot be considered harmless. The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error ..."

*Id.* at 1470. On a petition for habeas corpus, the harmless error standard is that from *Brecht,* that is, whether the error in question " 'had a substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. 1239).

A final approach is one that derives from the prejudice analysis set forth by the Supreme Court in *Strickland* and *Bagley.* Under this approach, the court would cumulate all errors, whether constitutional or state law, and ask whether the cumulative effect of these errors, in light of the trial as a whole, creates a "reasonable probability" that "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see also Bagley,* 473 U.S. at 678, 105 S.Ct. 3375. This standard is not satisfied by "[t]he mere possibility that ... [the errors in question] ... might have affected the outcome of the trial." *Agurs,* 427 U.S. at 109–10, 96 S.Ct. 2392. Instead, to demonstrate a reasonable probability of a different outcome, the defendant must show that the cumulative effect of trial errors "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555.

While these three approaches differ in significant ways, they share one common

---

**52.** The *Rivera* case did not concern a petition for habeas corpus from a state law conviction. Nonetheless, the *Rivera* approach has been cited as a useful way to analyze claims of cumulative error in habeas petitions. Rachel A. Van Cleave, *When Is An Error Not An "Error"? Habeas Corpus and Cumulative Er-*

*ror Analysis,* 46 Baylor L.Rev. 59, 90–91 (Winter, 1994); *see also Derden,* 978 F.2d at 1456 (noting that several Circuit Courts have drawn an analogy between cumulative error analysis in habeas and cumulative error analysis in direct review of federal criminal cases).

feature: they focus on trial errors, and not those errors that occurred either pre-trial, after trial, or on appeal. Accepting the wisdom of this approach, I will confine myself to trial errors as well.

### (2) The Errors

No matter which approach I apply, I must first identify those errors that could potentially fall within the cumulative mix. Despite the many claims raised by Pursell, I have narrowed the actual errors in this case to five. First, there are the three arguable state law errors that I noted during my analysis of Pursell's prosecutorial misconduct claim: 1) the prosecutor's remark that witnesses Lynch and Jagta had given prior consistent statements in the past; 2) the prosecutor's remark that the jury could judge Pursell's credibility based on the fact that he changed his appearance; and 3) the prosecutor's reference to the defense counsel's agreement concerning time of death. *See supra* at 354. Second, there are two evidentiary errors that arose during Officer Krahe's testimony: 1) Krahe's testimony that Pursell said Gary Skiba "got me out of jail before"; and 2) Krahe's testimony that Trooper Conley accused Pursell of raping Brine. *See supra* at 336–37, 341–42.[53] All

other claims have been dismissed outright, either because they did not amount to a violation of state law, or because they did not amount to a constitutional violation.[54] Having set forth the scope of the errors for review, I can now address the merits of Pursell's claim for cumulative error.

### (3) Merits of the Claim

First, Pursell's claim does not even get to first base under the stringent analysis proposed by the Fifth Circuit in *Derden*. The three errors made by the prosecution are not cognizable under the *Derden* Court's analysis, first because defense counsel never objected to them at trial, and second because they are state law errors that do not individually rise to the level of a constitutional violation. *Derden*, 978 F.2d at 1458. Similarly, Krahe's statement about rape cannot be considered, because it is merely a state law violation that does not amount to a violation of due process. *Id.* Thus, only Krahe's statement about Pursell's prior stint in jail would be considered. As my previous analysis demonstrates, *see supra* at 336–37, this error did not so infect Pursell's trial with unfair-

---

**53.** Krahe's statement about Pursell's prior stint in jail was a clear violation of *Miranda*, though it was a harmless one. And his statement about rape injected an irrelevant and potentially prejudicial idea into Pursell's trial.

**54.** Three of these potential errors are worth noting here. First, I held that Pursell did not make out a *Brady* claim because he failed to allege facts proving the materiality prong of his claim. On the one hand, dismissing this claim from cumulative review is easy because there was no legal violation here. On the other hand, I dismissed this claim because there was not a reasonable probability that the undisclosed evidence would have made a difference at trial, a determination that is really about prejudice. Nonetheless, because I noted my strong doubt about whether Pur-

sell had satisfied even the other *Brady* prongs, I omit this claim here. *See supra* at 327–28. Second, Pursell alleged that his counsel was deficient for failing to cross-examine Diane Walters concerning her use of solvents. I ultimately dismissed that claim based on failure to show prejudice. Nonetheless, in a footnote, I noted that Pursell's counsel was not deficient under *Strickland*. *See supra* 361–62 n. 41. Accordingly, I need not include that claim under any cumulative analysis. Finally, I do not include Pursell's claim concerning his invocation of counsel. I dismissed that claim on the merits under both the Fifth Amendment and the due process clause of the Fourteenth Amendment. *See supra* at 333, 335–36. My harmless error analysis, therefore, was merely an alternative ground for my holding.

ness "as to render his conviction a denial of due process." *Id.* at 1461.

Pursell's cumulative claim fares better under the *Rivera* approach, but the result is the same. Although all five errors are considered under this approach, these errors, even when taken together, did not have "a substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. 1239). I have already analyzed the cumulative effect of the prosecutor's errors on this case, *see supra* at 353–54, but adding Krahe's testimony to the mix does not alter my conclusion. First, Krahe's statement concerning Pursell's prior record adds nothing to Pursell's claim because Pursell himself took the stand and admitted his prior criminal record. (Tr. 1/25/82, at 77–78). While his statement about rape was more serious, even it does not tip the scales in favor of Pursell's claim. The statement was immediately followed by a strong curative instruction, (Tr. 1/21/82, at 120), and the Commonwealth never pursued the sexual assault issue, admitting that it had no such proof. (Tr. 1/20/82, at 187). I conclude that even when considered together, these five errors did not have a substantial effect on the verdict in this case.[55]

Finally, I will also deny Pursell's claim under the *Strickland* and *Bagley* "reasonable probability" standard. Pursell's trial lasted nearly a week, and the errors in question only a matter of seconds. Had these errors impermissibly strengthened the heart of the government's case, or significantly undermined Pursell's defense, they might merit more attention. But

they did not. They dealt with minor issues, only tangentially related to Pursell's guilt or innocence, and had little impact on the trial as a whole. Even Krahe's reference to rape, the only error with the potential to have a lasting impact on the trial, was quickly remedied and never raised again. Under these circumstances, I conclude that, even without the errors, the outcome of this trial would have been a guilty verdict.

### (4) Conclusion

 No matter what standard I apply, my result is the same: Pursell's claim for cumulative error is denied. I will deny him a certificate of appealability on this claim as well. 28 U.S.C. § 2253(c).

## J. Conclusion to Guilt–Phase Analysis

Having reviewed all of Pursell's claims at length, I concede that errors were committed at his trial for first-degree murder. Errors should not be condoned in any criminal trial, especially one where the defendant faces the prospect of a death sentence. Yet, no trial is perfect, and some error is to be expected in any criminal proceeding as lengthy and complex as the one in this case. Voltaire once observed that we "love truth, but pardon error." *Discours sur l' Homme. Discours* 3. While I do not pardon the errors that took place at Pursell's trial, the writ of habeas corpus seeks higher values than simple error before it will allow itself to be granted. I have reviewed the entire record of this case, from voir dire to jury verdict, and despite finding several errors, I have found nothing to undermine confidence in the verdict reached by this jury. In sum, I have found no federal constitutional er-

---

**55.** A basic problem arises when trying to cumulate errors such as those in the present case. Certain errors (like the prosecutor's closing remarks in this case) are like apples, while others (like Krahe's statement about rape) are like oranges. Both share the same shape (they are errors), but they have decidedly different textures, colors, and tastes, making it extremely difficult to judge their combined effect on the jury.

rors warranting relief. Pursell's guilty verdict will stand, and his request for a new trial under 28 U.S.C. § 2254 is denied.

## VI. PURSELL'S SENTENCING–PHASE CLAIMS

Having disposed of Pursell's challenge to his conviction, I now turn to his attack on his death sentence. In contrast to the minor errors that occurred during the guilt-phase of Pursell's trial, the errors during his sentencing hearing were of constitutional dimension. While numerous errors occurred during this sentencing-phase, I rest my decision today on two of them, each standing alone sufficient grounds for vacating Pursell's death sentence. First, Pursell's lawyer was constitutionally ineffective in violation of the Sixth Amendment when he failed to investigate, develop, or introduce any mitigating evidence about Pursell's background, character, and mental deficiencies. Second, the trial court's instruction on torture, the only aggravating circumstance considered by the jury, violated the Eighth Amendment. For these reasons, I will grant Pursell's petition and vacate his sentence of death.

### A. Counsel's Failure to Investigate and Introduce Mitigating Evidence

 First, Pursell claims that his trial counsel was ineffective in violation of the Sixth Amendment when he failed to investigate, develop, and present substantial mitigating evidence.[56] The Pennsylvania Supreme Court did not address the merits of this claim and, thus, my review is *de novo*. For the reasons set forth below, I will grant Pursell's claim for relief.

### (1) Factual Background

At the time of Pursell's trial, Pennsylvania law provided for the death penalty for a defendant convicted of first degree murder if certain requirements were met. 42 Pa. Cons.Stat.Ann. § 9711. First, only the jury had the power to sentence someone to death, *id.* § 9711(a)(1), (c)(1)(iv) & (f), and it could do so only after considering evidence presented at a separate sentencing hearing. *Id.* § 9711(a)(1). Second, at this sentencing hearing, the Commonwealth had the burden of proving beyond a reasonable doubt that at least one statutorily-defined aggravating factor accompanied the murder. *Id.* § 9711(c)(1)(iii). Third, at this hearing, the defendant could introduce, and the jury could consider, mitigating evidence. *Id.* § 9711(c)(1)(ii). Finally, the jury could impose the death penalty only if it found that the statutorily-defined aggravating circumstances proven by the government outweighed any mitigating circumstances presented by the defendant. *Id.* § 9711(c)(1)(iv).

It is the third factor—the jury's consideration of mitigating evidence—that is at issue today. Pursell attacks his counsel's representation during the sentencing phase of his trial, arguing that there was a wealth of mitigating evidence that his counsel failed to investigate, develop, or introduce. In support of his claim, Pursell submits affidavits, school and criminal records, and expert reports detailing his childhood abuse and neglect, his psychological problems, and his general good character.

### (a) Pursell's Early Years

Alan Pursell was born on April 28, 1959 to Pearl Chapman (later Pearl Weaver), dkt. no. 27, Ex. B, ¶ 1; *id.* Ex. F, ¶ 7, an alcoholic who abused herself both before and throughout her pregnancy. *Id.* Ex. B, ¶ 4. "Nothing changed after Alan's birth," she explained. "I loved my son but I just

---

**56.** This is Claim 1 in Pursell's Memorandum of Law. Dkt. no. 26, Claim 1, at 39.

did not care if Alan or I lived or died." *Id.* Living in squalor in a local motel, Chapman worked as a prostitute to make ends meet for her young family. *Id.* Ex. B ¶ 6–7; *see also id.* Ex. F, ¶ 5. After trying to raise Pursell for four years, she gave him away to Dorothy Pursell, a woman that she hardly knew. *Id.* Ex. B, ¶ 9; Dkt. no. 10, Ex. 3, ¶ 3; dkt. no. 27, Ex. B, ¶ 8–10. The transaction took place in a bar without the aid of any social service organization.

When Mrs. Pursell returned to her house with her new son, she saw just how poorly he had been treated during the formative years of his life. The only clothes that he owned were the ones that he had on his back. Dkt. no. 10, Ex. 3, ¶ 4. He was malnourished and in extremely poor health. *Id;* dkt. no. 27, Ex. I, ¶ 2. When he was given his first bath, a worm crawled out of his body. Dkt. no. 10, Ex. 3, ¶ 4. A trip to the doctor confirmed that he had tapeworms. *Id.;* dkt. no. 27, Ex. I, ¶ 2. From his time with Pearl Chapman, Pursell had learned how to smoke cigarettes, dkt. no. 10, Ex. 3, ¶ 5, and his knowledge and use of obscenities was astounding for his age and exceptionally disturbing. *Id.* Ex. 4, ¶ 3; dkt. no. 27, Ex. D, ¶ 4. Young Pursell was so well versed in the ways of his biological mother, in fact, that on one occasion, when a man came to the front door of his new home, he said: "Lay down, man here. Make money." Dkt. no. 10, Ex. 3, ¶ 5. He was still only four years old.

### (b) Physical and Sexual Abuse

Pursell did not fare any better in the home of his adoptive parents, Elmer and Dorothy Pursell. Elmer Pursell was an alcoholic who regularly beat his wife and children, including Alan himself. Dkt. no. 27, Ex. F, ¶ 8; *id.* Ex. I, ¶ 3; dkt. no. 10, Ex. 3, ¶ 7. One time, Elmer Pursell became so enraged that he chased Alan and Dorothy Pursell down the street with a gun.

Dkt. no. 10, Ex. 3, ¶ 8. Luckily, neighbors called the police, who stopped Elmer's rampage. *Id.* For his beatings, Elmer was taken to jail a number of times, but each time Dorothy Pursell refused to press charges. *Id.* The result was that Elmer always returned to his family and the beatings, no doubt, continued.

In addition to the physical abuse, Elmer Pursell was also a sexual abuser. He abused Alan a number of times when the boy was between the ages of five and nine, including penetrating the young boy's anus. Dkt. no. 27, Ex. F, ¶ 11. Pursell's mother knew all about her husband's conduct and, while she may have wanted to stop it, she never did. *Id.* Pursell was so marked by his sexual abuse and his early exposure to prostitution that, by the time he was eight, he told his friends about different sexual positions, *id.* Ex. E, ¶ 2; *see also* dkt. no. 10, Ex. 4, ¶ 12, and taught them about the concept of trading sex for money. Dkt. no. 27, Ex. E, ¶ 2; *see also* dkt. no. 10, Ex. 4, ¶ 12. "Alan was not yet out of elementary school and had already endured more abandonment, [and] physical and emotional abuse than most people experience in a lifetime." Dkt. no. 26, at 49.

### (c) Drug and Alcohol Abuse

Not surprisingly, "at a time when most children his age begin collecting baseball cards," *id.* at 52, Alan Pursell developed a serious drug and alcohol habit. When he was only seven or eight years old, he began sniffing airplane glue. Before he was a teenager, he began sniffing chemical solvents, dkt. no. 27, Ex. E, ¶ 6; dkt. no. 10, Ex. 4, ¶ 14, drinking, and smoking marijuana. Dkt. no. 10, Ex. 3, ¶ 17. Most of his teenage years, he spent as an addict, "huffing" chemical solvents all day long. Dkt. no. 27, Ex. F, ¶ 2. In time, he began to use acid, PCP, and mushrooms as well. *Id.* Even into the 1980s, a short time before

the murder of Christopher Brine, Alan Pursell was still a regular drug user. *Id.*

### (d) Psychological Impairments

These years of abandonment, neglect, physical and sexual abuse, and drug use left Pursell psychologically impaired. For instance, Drew A. Nagele, a licensed psychologist in the Commonwealth of Pennsylvania, evaluated Pursell at the request of his current counsel and concluded the following:

> The testing that I have conducted demonstrates patterns of impairment consistent with the existence of damage, particularly in the right hemisphere of Mr. Pursell's brain. Most severely impaired is memory for novel visual information, spatial problem solving, rhythm discrimination and fine motor coordination. These impairments are long-standing, significant, and substantially affect his cognitive and emotional functioning. Generally, brain damage, such as that from which Mr. Pursell suffers, affects overall functioning, emotional ability, impulse control, judgment reasoning, the ability to measure consequences and the ability to control behavior and fully understand one's actions.

Dkt. no. 10, Ex. 1, ¶ 3. Pursell's brain damage resulted from a number of factors, including the physical abuse that he suffered as a child, and his long-term drug and alcohol use. *Id.* Ex. 1, ¶¶ 4, 6. In concluding his evaluation, Dr. Nagele stated the following:

> In summary, Mr. Pursell presents with a history of head trauma and substance abuse which were likely the cause of his neuropsychological impairment. This impairment is permanent and is still manifested to this day by the results of this neuropsychological evaluation. The deficits from which Mr. Pursell suffered and suffers constitute substantial mental health mitigating evidence that could

have been provided to the jury at the capital sentencing hearing. His brain damage constitutes a significant impairment. Mr. Pursell's brain damage and related impairments constitute a substantially impaired capacity to understand, reason, appreciate actions and consequences, and conform conduct to requirements of law, and constitute an extreme mental/emotional disturbance.

*Id.* Ex. 1, ¶ 7.

Likewise, Dr. Patricia Ambrose, a licensed psychologist specializing in the practice of clinical and forensic psychology, also determined that Pursell suffered from an extreme psychological impairment. "Mr. Pursell's life presents," she stated, "a persistent history of psychological, functional, emotional, social, behavioral, and educational deficits that began in early childhood and continued throughout his life." *Id.* Ex. 2, ¶ 3. Continuing, she detailed a number of Pursell's psychological problems.

> Children from violent and dysfunctional upbringing homes like Alan's develop cognitive deficits in the processing of social information, including a failure to attend to relevant cues, a tendency to attribut[e] hostile intentions to others, and a failure to develop competent ways to solve interpersonal problems. They carry fear with them and are paranoid. Alan's childhood was traumatic, and seriously impaired and debilitated him. *Alan has all of the psychological scars, difficulties and dysfunctions described above, because of the childhood trauma he endured.*

*Id.* Ex. 2, ¶ 10 (emphasis added). Both Nagele and Ambrose put Pursell's unfortunate childhood into a psychological context. They explained how Pursell's traumatic childhood influenced his actions and his thoughts well up until the time of Christopher Brine's death.

### (e) Kind, Loving, and Peaceful Person

Finally, in spite of the abandonment, neglect, and abuse, Pursell was a caring and peaceful person. Many of Pursell's friends and family explained that he was a kind and respectful person, dkt. no. 27, Ex. D, ¶ 7; *id.* Ex. I, ¶ 9; dkt. no. 10, Ex. 4, ¶ 13, who loved children, dkt. no. 27, Ex. D, ¶ 8, and treated his girlfriend's two children as though they were his own. *Id.; see also id.* Ex. E, ¶ 4, 8; *id.* Ex. F, ¶ 16; dkt. no. 10, Ex. 4, ¶ 8. As Pursell's girlfriend stated, Pursell was not violent at all, and he loathed violence because of all that he had suffered as a child. Dkt. no. 27, Ex. F, ¶ 14.

All of this evidence—about Pursell's abusive and neglectful childhood, his drug and alcohol abuse, his psychological impairments, and his character—was available to Pursell's lawyer at the time of Pursell's sentencing hearing. Dkt. no. 10, Ex. 3, ¶ 25; *id.* Ex. 4, ¶ 19; dkt. no. 27, Ex. B, ¶¶ 11–12; *id.* Ex. C, ¶ 9; *id.* Ex. D, ¶ 10; *id.* Ex. E, ¶ 12; *id.* Ex. I, ¶ 15. But the jury that decided whether Pursell should live or die heard none of it.

### (2) Expansion of the Record

First, Pursell asks for an evidentiary hearing in order to add the foregoing mitigating evidence to the record in this case. While evidentiary hearings are one way to expand a habeas record, they are not the only way, and often not the most efficient. The Supreme Court has repeatedly explained that evidentiary hearings are appropriate only if a petitioner "alleges facts which, if proved, would entitle him to relief," and "where the facts are in dispute." *Townsend,* 372 U.S. at 312–13, 83 S.Ct. 745. While Pursell has introduced facts that entitle him to relief, the Commonwealth does not dispute any of these material facts. Accordingly, just as on a motion for summary judgment under Fed. R.Civ.P. 56, the only question before me is whether those undisputed facts make out a claim as a matter of law. In such an instance, an evidentiary hearing is both unnecessary and extremely inefficient.

▇▇▇ But how, then, do I place these undisputed facts into the record of this case? The Rules Governing Section 2254 Cases ("2254 Rules") provide an easy answer. Under Rule 7, federal district courts may expand the record in a case to include "additional materials relevant to the determination of the merits of the petition." Rule 7, 2254 Rules. Indeed, the Advisory Committee Notes state that Rule 7's purpose is to "eliminate some unnecessary hearings." In accordance with Rule 7, therefore, I will expand the record in this case to include Pursell's mitigation evidence.[57] This approach is consistent with Rule 7 and case law interpreting that provision. *See, e.g., Jacobs v. Horn,* 129 F.Supp.2d 390, 403 (M.D.Pa. 2001) (expanding the record on a claim for ineffective assistance based on trial counsel's failure to introduce mitigating evi-

---

**57.** Most of the evidence presented by Pursell consists of affidavits from individuals with personal knowledge of events in his life. Dkt. no. 27, Exs. B–I. Other evidence involves expert affidavits. Dkt. no. 10, Exs. 1 & 2. Some evidence, however, is presented through affidavits by employees of the Federal Defender's Office in Philadelphia. These affidavits recount what witnesses said in interviews. *Id.* Exs. 3 & 4. While one of these Federal Defender's affidavits is repetitive, describing interviews with individuals who themselves gave affidavits, *compare id.* Ex. 4 *with* dkt. no. 27, Exs. D, E, G, & H, one of them is not. Dkt. no. 10, Ex. 3. As to three witnesses, therefore, Mary Ann Alacce (Pursell's sister by adoption), Cindy Nichols, and Mercedes Santiago, there is a potential hearsay problem. *Id.* Ex. 3, ¶¶ 2–25, 34–46. Nonetheless, this problem is quickly remedied because the witness statements in question are not offered for their truth, but merely to show the information that was available to Pursell's counsel had he investigated.

dence during the sentencing hearing when the facts were not in dispute); *see also Woods v. Dugger*, 923 F.2d 1454, 1460 (11th Cir.1991) (holding that there is no need for an evidentiary hearing when the petitioner's habeas submissions demonstrate that the petitioner is conclusively entitled to relief; in such circumstances an evidentiary hearing "would be a waste of judicial resources.").

■ Admittedly, questions arise when courts use Rule 7 to expand the evidentiary record in a case. For instance, can a federal district court expand an evidentiary record under Rule 7 when an evidentiary hearing would otherwise be barred under AEDPA? AEDPA itself, remember, bars evidentiary hearings when a petitioner "failed to develop the factual basis of a claim in State court proceedings . . ." 28 U.S.C. § 2254(e)(2). While some courts have touched on this question, *see, e.g., Holloway v. Horn*, 161 F.Supp.2d 452, 509 n. 49 (E.D.Pa.2001); *McNair v. Haley*, 97 F.Supp.2d 1270, 1279–86 (M.D.Ala.2000), I need not address it because Pursell has shown sufficient diligence to overcome § 2254(e)(2)'s hurdle. He specifically requested an evidentiary hearing on his claim in state court, dkt. no. 19, 2680–90, 2717–18, and that alone is enough. *Williams*, 529 U.S. at 437, 120 S.Ct. 1479. That the Pennsylvania Supreme Court deemed his request procedurally barred does not alter my decision. As I have already explained, the Pennsylvania Supreme Court's decision in *Pursell–3* did not rest on an adequate bar for purposes of federal review. *See supra* 290–97. Accordingly, that decision does not foreclose Pursell's request for an evidentiary hearing. *See e.g., Cochran v. Herring*, 43 F.3d 1404, 1407–10 (11th Cir.1995) (district court properly held an evidentiary hearing on claims that were denied in state court

on the basis of state court procedural rule that was not adequate to bar federal review). It does not prevent me from expanding the record in this case.

One question remains: based on the undisputed facts of this case, was Pursell's counsel ineffective in violation of the Sixth Amendment when he failed to investigate, develop, and introduce the above-detailed mitigating evidence at Pursell's sentencing hearing? For the following reasons, I conclude that he was.

### (3) Legal Analysis

By now, I have already described the legal requirements for a claim of ineffective assistance of counsel. To review briefly, there are two. First, Pursell must show that his counsel's performance was deficient. This requires showing that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052; *see also Williams*, 529 U.S. at 390–91, 120 S.Ct. 1495. Second, he must prove that he was prejudiced by the deficient performance. This requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *see also Williams*, 529 U.S. at 391, 120 S.Ct. 1495. In the present case, Pursell has clearly proven both prongs of the *Strickland* test.

### (a) Counsel Was Deficient

■ Trial counsel has an "obligation to conduct a thorough investigation of the defendant's background" in capital cases. *Williams*, 529 U.S. at 396, 120 S.Ct. 1495 (citing 1 *ABA Standards for Criminal Justice* 4–4.1, commentary, at 4–55 (2d

ed.1980)).[58] While the scope and intensity of this investigation differs with the facts of each case, trial counsel cannot abandon his responsibility without having an objectively reasonable basis for doing so. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *Berryman,* 100 F.3d at 1101. In the present case, Pursell's lawyer had no basis, let alone an objectively reasonable one, for failing to investigate potential mitigating evidence in preparation for the sentencing hearing.

Pursell's counsel admits his own failing. In fact, in an affidavit filed with this court, he concedes that he never explored any of the above-mentioned mitigating evidence.

> From early in my representation of Mr. Pursell, I realized that there was a potential for this case to reach the death penalty phase. In preparing for the penalty phase of the trial, the defense concentrated primarily on defeating the Commonwealth's attempt to use torture as an aggravating circumstance. I believed then, and believe now, that the evidence in this case was insufficient to prove torture. To the best of my recollection, I did not investigate Mr. Pursell's family background, the circumstances of his adoption, the circumstances of his childhood, or his history of substance abuse. I did not investigate whether Mr. Pursell suffered from any mental health deficits which might have been used as evidence of mitigating circumstances. I did not seek to obtain any records from Mr. Pursell's adoption proceedings, schooling, juvenile court and/or probation, or previous incarceration. I did not seek to have Mr. Pursell evaluated by any mental health professional. I do not recall having any strategic reason for failing to investigate Mr. Pursell's background or mental health in an effort to present mitigation evidence.

Skiba Aff. ¶ 3, dkt. no. 12, attach.

The problem with counsel's representation is not that he chose to attack the Commonwealth's proof of torture. That decision was certainly reasonable. Instead, the problem here is that counsel used that decision to foreclose any investigation into potential mitigating evidence. No strategy, no reasoned judgment, and no tactical maneuvering supported counsel's failure to explore the mounds of mitigating evidence that was readily available to him.

> In order for counsel to make a professionally reasonable decision whether or not to present certain mitigating evidence ..., that counsel must be informed of the available options.... "[C]ase law rejects the notion that a 'strategic' decision can be reasonably made when the attorney has failed to investigate his options and make a reasonable choice between them."

*Jackson v. Herring,* 42 F.3d 1350, 1367 (11th Cir.1995) (citations omitted) (cited

---

**58.** The commentary to the ABA Standards, cited with approval in *Williams,* state as follows:

> The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. This cannot effectively be done on the basis of broad general emotional appeals or on the strength of the statements made to the lawyer by the defendant. Information concerning the defendant's background, edu-

> cation, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. Investigation is essential to fulfillment of these functions. Such information may lead the prosecutor to defer or abandon prosecution and will be relevant at trial and at sentencing.

> 1 *ABA Standards for Criminal Justice* 4-4.1, commentary, at 4-55.

with approval in *Jermyn v. Horn*, 266 F.3d 257, 308 n. 25 (3d Cir.2001)).

To make matters worse, there was a wealth of mitigating evidence available to counsel if he had only made a few phone calls. He would have learned of evidence that could have shown the following: that Pursell was the son of a prostitute, who spent the first four years of his life living in squalor; that life was equally horrifying in the Pursell household, where his client was physically and sexually abused by an alcoholic father; and that his client began self-medicating at an early age and was a drug addict by the time he was a teenager. He would have learned that the neglect, the abuse, and the drugs had caused severe psychological problems for his client, affecting his impulse control and his ability to understand right from wrong. And, he would have seen that, despite all that life had done to Alan Pursell, there were those who were prepared to testify that Pursell was a loving father, a caring brother, a dear friend, and a man to be ·trusted. Pursell's counsel knew none of this. "The significance of the information that counsel failed to discover and present simply required more than the bare bones effort that counsel put forth." *Jermyn*, 266 F.3d at 308.

What compounds the constitutional error is that trial counsel knew of his legal obligation but did not live up to it. Indeed, the Pennsylvania death penalty statute in effect at the time of Pursell's trial called for the admission of evidence concerning a defendant's background, psychological profile, and character. *See* 42 Pa. Cons.Stat.Ann. § 9711(e)(2)-(3) & (8). Additionally, in his closing argument, Pursell's counsel told the jury that he was "allowed to discuss mitigating circumstances." (Tr. 1/26/82, at 137). He explained that "[m]itigating circumstances are those which indicate because of the nature of the crime or the type of person the defendant is or the manner in which the crime was committed, that it wasn't bad." *Id.* But despite his awareness, counsel's handling of mitigating evidence was woefully lacking. He introduced no mitigating evidence during the sentencing hearing. And, although he did discuss some general mitigating factors in his closing, he did so only as an after thought, giving the jury little reason to spare his client's life. *Id.* at 137–38.[59] All told, his discussion of mitigating evidence lasted less than a page in a sentencing hearing that spanned more than forty-six.

A host of recent cases dealing with similar facts demonstrate how clearly counsel strayed from his constitutional obligation. For example, in *Williams v. Taylor*, the United States Supreme. Court held that Williams' counsel was deficient when he failed to investigate and introduce mitigating evidence concerning the defendant's ·abusive childhood, his "borderline mental

---

**59.** In his closing argument, Pursell's counsel discussed the following mitigating evidence:

Despite the outburst we had here, the defendant has no significant history of prior criminal convictions. I am allowed to tell you that. It's the truth. He has no significant history of prior criminal convictions. To steal a go-cart, cashed a $191.00 check that he took improperly. I am allowed to tell you, ladies and gentlemen, that that is a mitigating factor because there is no significant history of prior criminal convictions. What he did is not considered to be signifi-

cant. He is twenty-two ... years of age. He is a young man. I am allowed to say that to you because young men sometimes have emotional problems, sometimes are immature for their age, and you are allowed to consider that in your verdict. I am allowed to bring up anything else—the law says—that I want to bring up. I had mentioned this to you before at the trial. He has a girlfriend who—I think he said— who he is still going with. He wants to live.

(Tr. 1/26/82, at 137–38).

retardation," his possible "mental impairments," and his commendable behavior in prison. *Williams,* 529 U.S. at 373, 395–96, 120 S.Ct. 1495. Similarly, in *Jermyn v. Horn,* the Third Circuit held that counsel was deficient when he failed to investigate and introduce mitigating evidence, including evidence that his client was abused as a child while his mother stood by and let it happen. *Jermyn,* 266 F.3d at 306–08.[60] Like Pursell's counsel, counsel in both *Williams* and *Jermyn* had no tactical or strategic reason for failing to gather mitigating evidence and each knew full-well about his obligation to present such evidence. That kind of conduct clearly runs afoul of *Strickland's* first prong.

■■■ Capital defendants, like Pursell, have "a right—indeed, a constitutionally protected right—to provide the jury with [ ] mitigating evidence ..." *Williams,* 529 U.S. at 393, 120 S.Ct. 1495. As the Supreme Court has held, "the sentencer [may] not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion) (emphasis in original); *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Mills v. Maryland,* 486 U.S. 367, 374, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). In the present case, the jury did not hear anything about Pursell's history, character, background, or mental deficiencies. "It was not that such information could not be found, or that counsel made a reasoned decision to withhold the information for tactical or strategic reasons. The information was not presented

to the jury because counsel never took the time to develop it." *Glenn v. Tate,* 71 F.3d 1204, 1207 (6th Cir.1995) (cited with approval in *Jermyn,* 266 F.3d at 308 n. 25). Under the present circumstances, Pursell has shown that his counsel was deficient.

### (b) Counsel's Conduct Prejudiced Pursell

Pursell has also introduced sufficient evidence to satisfy the prejudice prong of *Strickland.* In any death penalty case in Pennsylvania, "the jury's decision on the penalty must be unanimous." *Jermyn,* 266 F.3d at 308. Accordingly, Pursell "can show prejudice in this case if there is a reasonable probability that the presentation of the specific and disturbing [mitigating] evidence ... would have convinced *one juror* to find the mitigating factors to outweigh the single aggravating factor [torture] the Commonwealth relied upon in this case." *Id.* at 308–09 (emphasis added). For three reasons, I believe that such a reasonable probability exists.

First, the mitigating evidence actually heard was anemic when compared to the powerful evidence that should have been presented. The jury that decided Pursell's fate was given only four mitigating factors to consider: 1) that Pursell had a minor criminal history; 2) that he was a young man; 3) that he had a girlfriend; and 4) that he wanted to live. (Tr. 1/26/82, at 137–38). While counsel briefly listed these factors at the end of his closing, he never fleshed them out in a convincing manner. In fact, the only mitigating circumstance discussed at any length during the trial was Pursell's previous criminal record, hardly the kind of evidence needed to evoke sympathy from a jury that had just handed down a conviction for first degree

---

**60.** The evidence concerning Jermyn's mother was particularly relevant because he had been

convicted of killing her. *Id.*

murder. Pursell, the man, was a mere skeleton: a young killer with a prior criminal record and a girlfriend, nothing more and nothing less.

Had Pursell's lawyer tapped into the mitigating evidence available to him, however, he would have added flesh, bones, a mind, and a heart to Alan Pursell. The jury would have understood Pursell's background, learned about the boy raised in poverty, and been forced to consider the young man who was a constant victim of physical, sexual, and emotional abuse. It would have had sympathy for his dependence on drugs and alcohol, and maybe even excused his turn to petty crimes. It could then have viewed his murder in context, perhaps even construed it as driven by the psychological and social circumstances of his life. Finally, it would have heard evidence that Pursell provided love, comfort, and friendship to others; and it may have believed that his life, though shattered beyond repair, was still worth saving. In hearing this evidence, the jury would have seen Pursell more completely as it considered whether to sentence him to life or death.

Second, introduction of this mitigating evidence might have demonstrated to the jury that the attack on Brine was an "an outburst," not a preplanned or premeditated attack. *Id.* at 123, 135. While there was testimony to this effect at the sentencing hearing, Pursell's psychological evidence would have given more weight to this argument. For instance, Drew A. Nagele would have explained that Pursell's brain damage affected his "impulse control" and his "ability to control [his] behavior." Dkt. no. 10, Ex. 1, ¶ 3; *see also id.* Ex. 1, ¶ 7. The jury could have easily married Nagele's testimony with the other evidence supporting an "outburst" murder and found death inappropriate for two reasons. First, it could have found that Pur-

sell did not torture Brine, mainly because he lacked the requisite intent. Second, it could have concluded that Pursell's motive for killing Brine was substantially less than it had previously imagined. Either way, the introduction of the mitigating evidence would have given the remaining evidence in the case "an entirely different weight and quality." *Jermyn*, 266 F.3d at 310.

Finally, the introduction of the mitigating evidence "might well have influenced the [jury's] appraisal of [Pursell's] moral culpability." *Williams*, 529 U.S. at 398, 120 S.Ct. 1495. As the Supreme Court explained in *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse." Pursell's early years of abandonment, neglect, and abuse, coupled with his serious mental problems, might have caused at least one member of the jury to see sufficient grounds to spare his life.

But the jury in Pursell's case did not have the chance to see Pursell, the man. It did not have the opportunity to feel sympathy or pity. Instead, it knew nothing about Pursell's childhood, his history of abuse, his drug and alcohol problems, his psychological diagnosis, and his character when it decided to impose the ultimate punishment. Had it heard this evidence, it would have had a better understanding of how this murder occurred, a thorough picture of Pursell's life, and substantial reasons withholding the death penalty. While this evidence may not have swayed every juror, Pursell need only show a reasonable probability that one juror would have

found death an inappropriate punishment. *Jermyn,* 266 F.3d at 309. In case after case, federal courts have found prejudice when counsel fails to investigate, develop, or introduce mitigating evidence that is similar to the evidence in Pursell's case. *See, e.g., Williams,* 529 U.S. at 397–98, 120 S.Ct. 1495; *Jermyn,* 266 F.3d at 257. This case is no different. Pursell has shown that he was prejudiced by his counsel's conduct.

### (4) Conclusion

 A jury in a capital case may not be barred from hearing any mitigating evidence offered by the defendant concerning his character or background. *Lockett,* 438 U.S. at 604, 98 S.Ct. 2954. In the present case, the jury was prevented from hearing such evidence, not because the court precluded its admission, but merely because Pursell's counsel made an objectively unreasonable decision not to look for it. " 'Given the severity of the potential sentence and the reality that [Pursell's] life was at stake, ... it was [counsel's] duty ... to collect [and present] as much information as possible' for use at the penalty phase of the trial." *Jermyn,* 266 F.3d at 312 (quoting *Hill v. Lockhart,* 28 F.3d 832, 845 (8th Cir.1994)). By failing to do so, counsel was ineffective in violation of the Sixth Amendment.

### B. The Trial Court's Instruction on the Meaning of Torture

[154] Next, Pursell argues that the trial court's instruction on torture was unconstitutionally vague in violation of the Eighth Amendment.[61] The Pennsylvania Supreme Court addressed the merits of this issue in *Pursell–1,* 495 A.2d 183. Thus, my review is limited to whether that Court's decision was "contrary to" or "an unreasonable application of" "clearly es-

tablished Federal law." 28 U.S.C. § 2254(d)(1).

### (1) Factual Background

At Pursell's trial, the Commonwealth sought to prove one, and only one, aggravating circumstance: that "[t]he offense was committed by means of torture." 42 Pa. Cons.Stat.Ann. § 9711(d)(8). Torture was the theme of the sentencing hearing and the focus of both sides in their closing arguments. Because Pursell's presentation of mitigating evidence was feeble at best, his life hung on the jury's understanding of this word and how it applied to the grisly facts of his case.

At the completion of the sentencing hearing, the trial judge gave a brief instruction, turning immediately to the definition of torture.

> For purposes of this case, only one aggravating circumstance can be considered. There are several in the *Crimes Code,* but there is only one that applies to this particular case, and that aggravating circumstance is that the offense; that is, the murder, was committed by means of torture. Now, we usually like to define certain terms that may not have common meaning. Unfortunately under the laws of cases of the Commonwealth of Pennsylvania, we do not have the definition of torture. There is no legal precedent for me to follow and state, "This is what our Courts"—or— "this is what our laws say torture is."

(Tr. 1/26/82, at 146). The trial judge then gave two alternative definitions of the word.

> So, what happens in a case like this is that we must look elsewhere for some sort of definition of the word "torture." So, I've looked at several, and these are the two definitions I've come up with.

---

61. This is Claim 2 in Pursell's Memorandum of Law. Dkt. no. 26, Claim 2, at 57.

One of them is the *Model Penal Code* in which they say that the offense or murder committed by means of torture is designed for the defendant who causes a considerable amount of pain and that the language used for this particularly aggravating circumstance is the murder was especially "heinous, atrocious, or cruel manifesting exceptional depravity." Also, another place that I felt may be appropriate in trying to define for you "torture" was in the *American Law Reports*. They stated—these reports stated that since murder is an intentional act, that many Courts have determined, regarding murder by torture, a specific intention that the torture[r]/murder[er] has in committing the homicide. It has been held that this is an intention to inflict pain, suffering, or both pain and suffering.

*Id.* The trial court's discussion of the word torture was more than a page in a jury instruction that spanned barely four.

Almost immediately, the jury confessed confusion about the trial court's instructions on the meaning of torture. Indeed, even before returning to the jury room, one juror asked for further guidance.

MR. CZERWINSKI: Could you define "exceptional depravity"?

THE COURT: I'm afraid I can't. I think that's a common word that you are going to have to discuss in the jury room at this time. I could be maybe stating what it could be, exceptional depravity, then going on and on. That is only to help you in defining what the word "torture" means. Okay.

*Id.* at 149. After deliberating for more than two hours, the jury posed another question.

THE COURT: You are asking me to redefine the term "torture" for yourselves?

JURY FOREMAN: Yes, your Honor.

THE COURT: As I stated to you before, we have no precedent to follow in Pennsylvania, so I have used more or less two terms or two definitions; one from the *American Law Reports* and the other from the *Model Penal Code*. Now, as far as the *American Law Reports* is concerned, since murder is an intentional act in many Courts, other Courts outside of Pennsylvania have determined, regarding murder by torture, the specific intention of that torture[r]/murder[er] has in committing the homicide. It has been held that this is an intention to inflict pain, suffering, or both pain and suffering. With respect to the *Model Penal Code*, they state that the language used for this particularly aggravating circumstance is the murder was "especially heinous, atrocious, or cruel manifesting exceptional"—you know what the word "exceptional" means—"depravity." You've often heard the words "a depraved mind." Well, that's what "depravity" means, a type of mind that's depraved. I hope that answers your question. I will send you out again, and you can still continue your deliberations.

*Id.* at 150–51. Less than fifteen minutes later, the jury sentenced Pursell to death. *Id.* at 152.

### (2) Clearly Established Federal Law

 Pursell now challenges that death sentence, arguing that the trial court's definition of torture was unconstitutionally vague under the Eighth and Fourteenth Amendments. The first question under AEDPA is whether Pursell seeks the application of clearly established federal law at the time his conviction became final. *Williams,* 529 U.S. at 390, 120 S.Ct. 1495. That question is easily answered. In fact, in a series of cases beginning with *Furman v. Georgia,* 408 U.S.

238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court held that "the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner." *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Only a few years after *Furman*, the Court again sounded this theme in *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976): "[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably limited so as to minimize the risk of wholly arbitrary and capricious action."

There are two ways that state sentencing procedures can run afoul of the rule set down in *Furman* and *Gregg*. First, the state can define its aggravating circumstances too broadly, either in a statute or in an instruction given to the jury, such that these circumstances could apply to every possible defendant convicted of murder. *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994); *see also Godfrey*, 446 U.S. at 428, 100 S.Ct. 1759. Second, the state can define its aggravating circumstances in a way that is too vague, such that they fail to "channel the [jury's] discretion by 'clear and objective standards' that provide 'specific and detailed guidance.'" *Godfrey*, 446 U.S. at 428, 100 S.Ct. 1759 (citations omitted). When jury instructions are overly broad or overly vague they create the risk that the jury will arbitrarily impose the death penalty. This is a violation of the Eighth Amendment. *See, e.g., id.* at 428, 100 S.Ct. 1759.

In the years following *Furman* and *Gregg*, the Supreme Court decided two cases that are particularly relevant to Pursell's challenge. First, in *Godfrey v. Geor-*

*gia*, a Georgia jury was instructed under a statute that defined an aggravating circumstance as the commission of a first-degree murder that "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." *Id.* at 422, 426, 100 S.Ct. 1759. A few years earlier, in *Gregg*, the Supreme Court had held that this statutory aggravator was constitutional on its face. *Gregg*, 428 U.S. at 201, 96 S.Ct. 2909. Nonetheless, recognizing that the aggravator could include almost any murder, the *Gregg* Court held that "this language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction." *Id.* In the four years after *Gregg*, the Georgia Supreme Court did not limit the aggravating circumstance, and Robert Godfrey was sentenced to death under the language quoted above, with no limiting instruction whatsoever. *Godfrey*, 446 U.S. at 426, 100 S.Ct. 1759. The Georgia Supreme Court affirmed Godfrey's sentence, holding that Godfrey's crime was, like the statute, "outrageously or wantonly vile, horrible and inhuman." *Id.* at 428, 100 S.Ct. 1759.

The United States Supreme Court reversed. It held that the words "outrageously or wantonly vile, horrible and inhuman" did not, standing alone, impose any limitation on "the arbitrary and capricious infliction of the death sentence." *Id.* at 428, 100 S.Ct. 1759. Indeed, the Court continued, "[a] person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.'" *Id.* at 428–29, 100 S.Ct. 1759. Without a narrowing instruction, the jury had no guidance concerning the meaning of those words and its interpretation of them "can only be the subject of sheer speculation." *Id.* at 429, 100 S.Ct. 1759. Because there was "no

principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not," the Supreme Court held that the jury instruction was unconstitutionally vague. *Id.* at 433, 100 S.Ct. 1759.

The holding in *Godfrey* was applied in *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988),[62] a unanimous decision where the Court again struck down a jury instruction as unconstitutionally vague. In that case, the jury sentenced Maynard to death relying on two aggravating circumstances, one being that the murder was "especially heinous, atrocious, or cruel." *Id.* at 358–59, 108 S.Ct. 1853. Addressing the jury instruction, the Supreme Court stated the following.

> [T]he language of the Oklahoma aggravating circumstance at issue—"especially heinous, atrocious, or cruel"—gave no more guidance than the "outrageously or wantonly vile, horrible or inhuman" language that the jury returned in its verdict in *Godfrey*. The State's contention that the addition of the word "especially" somehow guides the jury's discretion, even if the term "heinous" does not, is untenable. To say that something is "especially heinous" merely suggests that the individual jurors should determine that the murder is more than just "heinous," whatever that means, and an ordinary person could honestly believe that every unjustified, intentional taking of human life is "especially heinous."

*Id.* at 363–64, 108 S.Ct. 1853. Accordingly, the Court held that the instruction violated the Eighth Amendment and vacated Maynard's death sentence. *Id.*

### (3) Unconstitutionality of the Instruction

 In the present case, the able trial judge failed to provide the jury with any more guidance than the juries received in *Godfrey* and *Maynard*. While he attempted to aid the jury in its deliberations, his instructions did just the opposite. Torture, a word commonly understood as having a limited meaning, became a word whose meaning was both overly vague and overly broad. In short, it became a moving target. The instructions given violated the Eighth Amendment because they failed to provide any "inherent restraint on the arbitrary and capricious infliction of the death sentence." *Godfrey*, 446 U.S. at 428, 100 S.Ct. 1759.

### (a) Especially Heinous, Atrocious, or Cruel Manifesting Exceptional Depravity

The first alternative definition given by the trial court was unconstitutionally vague in violation of the Eighth Amendment. The United States Supreme Court has held that the words "especially heinous, atrocious, or cruel" are too vague to meaningfully channel a sentencer's discretion. *Maynard*, 486 U.S. at 363–64, 108 S.Ct. 1853; *Shell v. Mississippi*, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) (same). Yet, on two different occasions, the trial judge chose to define torture by using these very words. (Tr. 1/26/82, at 146, 151). By equating torture with a clearly unconstitutional phrase, the trial judge instructed the jury in a way that was unconstitutionally vague itself.

---

**62.** Although *Maynard* was decided two and a half years after Pursell's conviction became final, *Maynard* was not a new rule in 1985. *See Stringer v. Black*, 503 U.S. 222, 228–29, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). Reliance on this decision is neither barred by *Teague, id.*, nor by AEDPA itself, *Williams*, 529 U.S. at 412, 120 S.Ct. 1495 (holding that "old rules" under *Teague* constitute "clearly established Federal law" under AEDPA).

Although the instruction given in Pursell's case differs slightly from the one given in *Maynard*, these differences do not cure the vagueness problem at issue.

First, the trial court added the phrase "manifesting exceptional depravity" to the clearly unconstitutional phrase "especially heinous, atrocious, or cruel." While this addition was meant to limit the "especially heinous, atrocious, or cruel" phrase, it actually exacerbated the constitutional problem. For one, the United States Supreme Court has held that the use of the word "depravity," even when accompanied by the words "especially heinous [or] cruel," is unconstitutionally vague. *Walton v. Arizona*, 497 U.S. 639, 654, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (holding that "there is no serious argument that [the] 'especially heinous, cruel or depraved' aggravating factor is not facially vague."); *Richmond v. Lewis*, 506 U.S. 40, 47, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992) (same). Second, the trial judge's attempt to define "depravity" through the use of the word itself was a mere tautology which was, at the very least, unhelpful. (Tr. 1/26/82, at 151) (informing the jury that "depravity" means a "a depraved mind .... a type of mind that's depraved."). Finally, in Pennsylvania, the malice needed for a conviction of murder was often referred to as "depravity" at the time of Pursell's trial. *See, e.g., Commonwealth v. Moore*, 488 Pa. 361, 412 A.2d 549, 551 (1980). Thus, the term itself could "fairly characterize almost every murder." *Godfrey*, 446 U.S. at 428, 100 S.Ct. 1759. By adding the "manifesting exceptional depravity" phrase, the trial judge took a vague instruction and made it overly broad as well.

 Second, the first time that the trial judge gave the *Model Penal Code* definition of torture, he said that torture was "designed for the defendant who causes a considerable amount of pain."

(Tr. 1/26/82, at 146). Had this been the only version of the *Model Penal Code* definition heard by the jury, my conclusion might be different. But it was not. After deliberating for more than two hours, the jury asked the judge to define torture again. He did so, this time omitting any reference to pain and stating simply that a murder is committed by means of torture if it is " 'especially heinous, atrocious, or cruel manifesting exceptional ... depravity.' " *Id.* at 151. Less than fifteen minutes later, the jury sentenced Pursell to death. *Id.* at 152. Assuming that the jury relied on the *Model Penal Code* definition in imposing its sentence, the question arises: which version did its verdict rest on, the one requiring a finding of pain or the one that did not? While timing alone provides the obvious answer, that answer is also legally insignificant. When a jury is given alternative theories upon which to rest its death sentence, the unconstitutionality of one requires that the sentence be overturned. *Shell*, 498 U.S. at 3, 111 S.Ct. 313 (Marshall concurring).

That the jury could impose death without a finding of pain had serious practical consequences for Pursell. Pursell's primary defense was that Brine became unconscious sometime during the series of blows to his head, perhaps even after the first one. (Tr. 1/26/82, at 121, 124). Three facts supported Pursell's position. First, Brine had no defensive wounds on his arms or legs, meaning that he did not try to block Pursell's advances. *Id.* at 124. Second, Dr. Rozwadowski, the Erie County pathologist, testified that Brine was likely unconscious at some point during the attack. *Id.* at 121, 124. Finally, Dr. Rozwadowski also testified that a person does not suffer pain while he is unconscious. *Id.* at 121, 124–25. Thus, Pursell argued that even though Brine had been repeatedly pummeled with a rock, the boy felt

almost no pain, and, without pain, there was no torture.

The problem for Pursell, of course, was that the definition of torture given by the trial court did not require that Brine actually feel pain. Indeed, the prosecutor, Shad Connelly, seized on this idea during the sentencing hearing. First, during his cross-examination of Dr. Rozwadowski, the prosecutor equated torture with the existence of physical injury to the victim.

> Q. Okay, would a person striking another person with this [rock] realize that when this hits there is going to be pain?
>
> A. Oh, yes.
>
> Q. Absolutely, isn't that correct? At each time it hits, there is going to be pain; is that right?
>
> A. If the victim is conscious, yes.
>
> Q. If he is not conscious, what is there going to be if not pain?
>
> A. There won't be pain from the assailant if the victim[ ][is] unconscious[ ].
>
> Q. *But there will be pain in terms of severe physical injury; is that correct?*
>
> A. There will be severe physical injury.

*Id.* at 125 (emphasis added). Later, in his closing argument, counsel focused on the physical injury to Brine's body, disregarding completely whether Brine felt any pain when these injuries were inflicted.

> Fourteen or fifteen blows constitute a conscious moving of the arm into the head of the victim by the defendant and pulling it back for a sufficient distance to strike another blow of sufficient force to cause what the doctor described as severe injuries to the head. Each and every one of those injuries to the head of

that thirteen-year-old boy were caused while *that boy was still alive*. . . . From those blows the brain was completely covered with blood. *He was still alive*. From those blows you heard testimony as to the severity of the injuries down to the bone, to the skull, *still alive*. You heard that the facial features of the victim were not discernable after those blows rained upon him while *he was still alive*. You heard testimony that the marks on the neck were consistent with strangulation or an attempt at manual strangulation by hand while *he was still alive*. . . . You heard testimony and saw the log in this courtroom that was approximately twenty-five feet long and placed upon the neck of the victim while *he was still alive* . . .

*Id.* at 140–42 (emphasis added).[63] As the prosecutor insisted, and the trial judged permitted, the jury could have sentenced Pursell to death based solely on the existence of physical injury to the body, whether or not those injuries caused pain.

The third difference between the instruction in *Maynard* and the one given in Pursell's case is also not enough to alter my conclusion. Unlike *Maynard*, in which the unconstitutional phrase itself was the aggravator, the aggravator at issue in Pursell's case was torture, a word with limited meaning. Indeed, in a number of cases, federal courts have recognized that torture itself is not a vague term. For instance, in *Maynard* the United States Supreme Court explained in *dicta* that the phrase "especially heinous, atrocious, or cruel," while unconstitutional standing alone, nonetheless passed constitutional muster when there was "some kind of torture or serious physical abuse." *Maynard*, 486 U.S. at 364–65, 108 S.Ct. 1853. No doubt

---

**63.** The prosecutor even referred to injuries that Brine suffered "after he died." *Id.* at 139, 143. Clearly, Brine could not have felt pain from the infliction of these injuries.

seizing on this language, the Federal Death Penalty Act ("FDPA") provides that a defendant can be sentenced to death if "[t]he defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim." 18 U.S.C. § 3592(c)(6). Those courts that have addressed this provision of the FDPA have upheld its constitutionality. *See e.g., United States v. Frank,* 8 F.Supp.2d 253, 277–78 (S.D.N.Y.1998); *United States v. Minerd,* 176 F.Supp.2d 424, 437–38 (W.D.Pa.2001). Had the trial judge in Pursell's case instructed the jury in the way suggested by the Supreme Court in *Maynard* and endorsed by the FDPA, the instruction would perhaps survive constitutional scrutiny.

But he did not. In fact, the trial judge's instruction differed in two ways. First, the trial judge stripped torture of its limited meaning in a way that the *Maynard* Court did not. He told the jury that torture was a word that "may not have common meaning." (Tr. 1/26/82, at 146). Continuing, he said that "we do not have [a] definition of torture. There is no legal precedent for me to follow and state, 'This is what our Courts'—or—'this is what our laws say torture is.'" *Id.* By the time this brief introduction to the meaning of torture had ended, the jurors must have thought that torture was a far more complicated word then they had imagined. It eluded "common meaning," had stymied Pennsylvania jurists, and had left at least one trial judge somewhat perplexed. In groping for the meaning of torture, the jury must have felt like a ship cast adrift with neither ballast nor compass.

What the trial judge did next, however, is what sets this case far apart from the famed *dicta* in *Maynard.* Having told the jury that torture had no legally binding meaning, he tried to fill in the gap by

equating torture with any crime that was "especially heinous, atrocious, or cruel manifesting exceptional depravity." *Id.* at 146, 151. Whatever torture meant to the jurors when they entered the courtroom, its meaning was now substantially different. To sentence Pursell to death, the jury had only to find that he had committed a crime that was "especially heinous, atrocious, or cruel manifesting exceptional depravity." As the Supreme Court has repeatedly held, such an instruction is clearly unconstitutional. *Maynard,* 486 U.S. at 363–64, 108 S.Ct. 1853; *Shell,* 498 U.S. at 1, 111 S.Ct. 313; *Walton,* 497 U.S. at 654, 110 S.Ct. 3047; *Richmond,* 506 U.S. at 47, 113 S.Ct. 528. While the *Maynard* Court suggested that "torture" could be used to limit an otherwise unconstitutionally vague phrase, it never held that the word itself could be equated with such a phrase. Thus, I conclude that the trial court's first definition of torture was unconstitutionally vague in violation of the Eighth Amendment.

### (b) Intention to Inflict Pain or Suffering

 After defining torture under the *Model Penal Code,* the trial judge provided the jury with an alternative definition: torture, he said, involves the "intention to inflict pain, suffering, or both pain and suffering." (Tr. 1/26/82, at 146, 150–51). If the trial judge's first definition was vague, then his second was unconstitutionally broad. Indeed, what is important about this second definition is what it does not say. It does not require that the intent to cause pain be above and beyond whatever intent is needed to kill. *Compare Commonwealth v. Crawley,* 514 Pa. 539, 526 A.2d 334, 347 (1987) (requiring such an instruction). It does not mandate that the defendant actually cause any pain. *Compare Commonwealth v. Nelson,* 514 Pa. 262, 523 A.2d 728, 737 (1987) (requiring

the infliction of pain). And, even assuming that pain is required, it does not necessitate that the pain felt by the victim be more than the kind felt by every victim of murder. *Compare id.* (stating that the pain must be "considerable"). Simply put, the instruction is so broad that it could apply to "almost every murder." *Godfrey*, 446 U.S. at 428–29, 100 S.Ct. 1759. By failing to "provide a meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not," *id.* at 428, 100 S.Ct. 1759, the instruction runs afoul of the Eighth Amendment.

Little imagination is needed to catalogue the class of cases that fall within this instruction's expansive reach. It is the extremely rare murderer who does not also have the intent to cause pain or suffering to his victim. As the Pennsylvania Supreme Court itself has acknowledged, "[i]n virtually all cases of murder the perpetrator inflicts terrible pain and suffering on the victim and by definition, the person who inflicts the killing upon another does so with specific intent." *Commonwealth v. Ockenhouse*, 562 Pa. 481, 756 A.2d 1130, 1136 (2000).

What makes this instruction even broader, however, is that, like the *Model Penal Code* definition, it also does not require that the defendant cause pain. Again, the practical implications of this broad definition were significant for Pursell. In his closing argument, prosecutor Connelly seized on this fact. "A torture under the law," he said, "occurs when there is an intent on the part of the defendant, the person committing the murder, to cause

great pain or suffering. The intent on the part of the defendant, *not necessarily that it is actually carried out*, but that he intends it." (Tr. 1/26/82, at 139–40) (emphasis added). But if pain is not needed for torture, then a host of cases not traditionally thought of as falling within the meaning of torture are suddenly swept into that category. The malicious defendant who repeatedly stabs an obviously drunk and unconscious man could be deemed a torturer. The careless defendant who intends to shoot his victim in the leg and watch him slowly bleed to death will be liable for torture after his bullet goes astray and kills his victim instantly. And the uneducated defendant who enters the hospital room of a comatose and heavily sedated man commits torture if he patiently and cruelly murders his victim. In each case, the defendant intends to cause pain and, in each case, the victim feels none or very little. All three cases, however, are torture under the instruction in Pursell's case. Much as I sympathize with the able trial judge's struggle to bring clarity to the issue, his instruction was too broad to aid the jury in distinguishing between those murders that are subject to the death penalty and those that are not. *Godfrey*, 446 U.S. at 428–29, 100 S.Ct. 1759.[64]

### (c) Meaning of Torture Was a Moving Target

■ There is a third problem with the instruction given in Pursell's case. Loosened from its common sense moorings, the definition of torture was a moving target. The jury could have decided that the word

---

**64.** Both definitions of torture given by the trial court were unconstitutional. Nonetheless, to vacate Pursell's death sentence only one need run afoul of the Constitution. "It has long been settled that when a case is submitted to the jury on alternative theories the unconstitutionality of any of the theories

requires that the conviction [or verdict] be set aside." *Shell*, 498 U.S. at 3, 111 S.Ct. 313 (Marshall J., concurring); *see also Sandstrom*, 442 U.S. at 526, 99 S.Ct. 2450; *Boyde v. California*, 494 U.S. at 370, 379–80, 110 S.Ct. 1190 (1990); *Mills*, 486 U.S. at 379, 108 S.Ct. 1860.

meant what the *Model Penal Code* said it did. Or the jury could have concluded that it meant what the *American Law Reports* said it did. Finally, the jury could have chosen neither definition and cast about for its own meaning of the word. In most cases, leaving jurors to apply their common sense understanding of a word is constitutionally acceptable. But when the trial court informs that same jury that the word in question is not susceptible to a common meaning and has no acceptable definition under the law, the jury has the kind of free rein that the Eighth Amendment forbids. *See Gregg,* 428 U.S. at 189, 96 S.Ct. 2909.

In the present case, nothing limited the absolute discretion of the jury. It, and it alone, had the power to decide what Pennsylvania law required. The oft-quoted exchange between Alice and Humpty Dumpty comes to mind:

> "When I use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean-neither more nor less."
>
> "The question is," said Alice, "whether you can make words mean so many different things."
>
> "The question is," said Humpty Dumpty, "which is to be master-that's all."

*United States v. Pacheco,* 225 F.3d 148, 149 (2d Cir.2000) (quoting Lewis Carroll, *Through the Looking Glass* ). In Pursell's case, the jury was the master of the meaning of torture. In permitting the jury such wide-ranging discretion, the trial judge abdicated his role: he failed to tell the jury what the law is. This is clearly a violation of Pennsylvania law. *Crawley,* 526 A.2d at 346–47 (holding that under Pennsylvania law, "[t]he responsibility for providing a legal definition of torture to be applied by the jury rests solely with the trial judge."). Under the unique facts of

the present case, it is a violation of the Eighth Amendment as well.

### (4) Is Relief Required Under AEDPA?

 But Pursell must do more than just prove a constitutional violation in order to obtain relief in this case. Under AEDPA, he must also show that the Pennsylvania Supreme Court's decision denying him relief was "contrary to" or "an unreasonable application of" "clearly established Federal law." 28 U.S.C. § 2254(d)(1). Before turning to the merits of that issue, I will briefly address the Pennsylvania Supreme Court's decision in this case.

### (a) The Pennsylvania Supreme Court's Decision

On appeal, Pursell challenged the torture aggravator on three grounds. First, he claimed that the statute making a murderer eligible for death if "[t]he offense was committed by means of torture," 42 Pa. Cons.Stat.Ann. § 9711(d)(8), was unconstitutionally vague. *Pursell–1,* 495 A.2d at 196. Second, he argued that the instructions given to the jury on the torture aggravator were insufficient. *Id.* Finally, he claimed that there was insufficient evidence of torture. *Id.* In less than two pages of text, the Pennsylvania Supreme Court rejected all three claims.

First, it held that the statute was not vague. *Id.* After explaining that any sentencing scheme had to be evaluated in light of *Furman v. Georgia, id.,* the Court rejected Pursell's challenge to the statute.

> The legislature's inclusion of the means of torture as an aggravating circumstance to be weighed by a jury considering whether the death penalty should be imposed is a sufficiently specific factor because we feel that the meaning of such term is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended.

Accordingly, the jury is channeled from a totally arbitrary and capricious imposition of the death penalty. It is our interpretation that torture is understood as the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious, or cruel manifesting exceptional depravity. . . .

When the means of torture are employed, we can believe, without a reasonable doubt, that the user of such means intended to torture his or her victim to death. What is intended to be included are those murders of the first degree where the actual commission of the offense included such concurrent acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily painful to the victim.

*Id.* at 196–97 (internal citations omitted). Not only did the Pennsylvania Supreme Court hold that torture was not vague, but it also went to great lengths to define that term. According to the Court, torture included the following elements: 1) that the defendant inflict a considerable amount of pain on the victim; 2) that the defendant intend to inflict such pain; and 3) that the pain inflicted is unnecessarily heinous, atrocious, or cruel manifesting exceptional depravity. At its bottom, however, torture required some conduct that "set the crime apart from the norm" of first degree murders. *Id.*

After defining torture, the Court turned to Pursell's challenge to the jury instructions actually given in his case. In two sentences, it disposed of them.

In comparing our interpretation of "torture" with that given to the jury by the trial court, we hold that it was correct and enabled the jury to understand the law on that issue. Therefore, we hold meritless [Pursell's] contention that the charge was insufficient.

*Id.* at 197. In a footnote, the Court cited the trial judge's first attempt to define torture. *Id.* n. 13 (quoting (Tr. 1/26/82, at 146)). It did not cite the trial court's later attempt to define the word. (Tr. 1/26/82, at 150–51). It did not mention that the jury twice asked for clarification of the judge's instructions. It did not acknowledge the trial judge's statement that there was no legal definition of torture in Pennsylvania. It did not compare in detail its definition with the one given by the trial court. And it cited no cases in rejecting Pursell's challenge.

Finally, after upholding the statute and affirming the instruction given at trial, the Pennsylvania Supreme Court rejected Pursell's claim based on insufficient evidence.

Our review of the record, giving all reasonable inferences to the Commonwealth, discloses sufficient evidence to support a finding of torture, and the intent to subject Christopher Brine to heinous, atrocious, or cruel suffering can reasonably be inferred from the circumstances of this case. . . . Accordingly, we conclude that sufficient evidence exists in this record to support a finding that Christopher Brine met his death by means of torture.

*Id.* at 197.

Pursell now argues that the Pennsylvania Supreme Court's rejection of his challenge to the trial court's jury instruction was "contrary to" and "an unreasonable application of" "clearly established Federal law." 28 U.S.C. § 2254(d)(1). That Court cited *Furman* for the right principle of law, and this is sufficient to pass muster under § 2254(d)(1)'s "contrary to" standard. *Williams*, 529 U.S. at 406, 120 S.Ct.

1495.[65] Therefore, the only issue before me is whether the Pennsylvania Supreme Court's decision was an "unreasonable application of" this clearly established law. I conclude that it was.

### (b) Unreasonable Application Prong

The Pennsylvania Supreme Court was objectively unreasonable when it equated the definition of torture that it had conjured up with the one actually heard by the jury. There were significant differences between the two, differences that the Court either failed to see or failed to address.

For one, the Pennsylvania Supreme Court's definition of torture was in the conjunctive, while the trial court's instruction was in the disjunctive. To find torture, the jury in Pursell's case needed to find either 1) that the murder was "especially heinous, atrocious, or cruel manifesting exceptional depravity," OR 2) that Pursell intended "to inflict pain, suffering, or both pain and suffering." (Tr. 1/26/82, at 146, 150–51). In contrast, to find torture under the Supreme Court's definition, a jury had to find three things: 1) that the defendant inflicted a considerable amount of pain on the victim; 2) that the defendant intended to inflict such pain; AND 3) that the pain inflicted was unnecessarily heinous, atrocious, or cruel manifesting exceptional depravity. *Pursell–1*, 495 A.2d at 196–97. As my earlier analysis demonstrates, the disjunctive nature of the trial court's instruction caused serious constitu-

tional problems. The instruction failed to adequately cabin the jury's discretion; and it allowed the jury to impose death either under a definition that was too vague or one that was too broad. The Pennsylvania Supreme Court's failure to recognize these crucial differences was objectively unreasonable.

Second, the Court's definition required that the defendant actually inflict pain on the victim, while the trial court's definition did not. *Compare id.* at 196 (stating that torture required "the infliction of a considerable amount of pain and suffering on a victim.") *with* (Tr. 1/26/82, at 150) (defining torture as either a murder that is "especially atrocious, heinous, or cruel manifesting exceptional depravity" or one that involves the "intention to inflict pain, suffering, or both pain and suffering."). As pain was the crux of Pursell's defense, the trial court's failure to instruct on this point had serious ramifications. *See supra* at 335–37, 394–95. Again, the Pennsylvania Supreme Court's failure to explore this difference was objectively unreasonable.

Finally, the Court's conclusion was devoid of reasoning. The Court dismissed Pursell's claim in two conclusive sentences. It never cited *Godfrey*, a case that clearly governed Pursell's claim. *See Stringer*, 503 U.S. at 227–29, 112 S.Ct. 1130 (holding that the unconstitutionality of the "especially heinous, atrocious, or cruel" instruction was compelled by *Godfrey* ). It never acknowledged that the "especially heinous,

---

65. Pursell argues that the Pennsylvania Supreme Court presumed that its statute was valid, a presumption that is not permitted under *Furman*. Dkt. no. 26, at 72. While the Court did state that such a presumption applied, it nonetheless accurately identified the legal standard required by *Furman* and its progeny. *Pursell–1*, 495 A.2d at 196. Further, it is not clear from the Court's opinion that it applied any presumption to the challenge to the trial court's instructions. *Id.* at 197. Un-

der the "contrary to" clause, a federal habeas court may grant the writ in only two instances: 1) if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or 2) if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 412–13, 120 S.Ct. 1495. While the question is a close one, I conclude that neither instance occurred here.

atrocious, or cruel" language used by the trial court was unconstitutional standing alone. *Godfrey,* 446 U.S. at 428, 100 S.Ct. 1759; *Maynard,* 486 U.S. at 363–64, 108 S.Ct. 1853; *Shell,* 498 U.S. at 1, 111 S.Ct. 313. And it never discussed how that clearly unconstitutional language applied to the trial court's instruction as a whole. Had the Pennsylvania Supreme Court undertaken such an inquiry, it would have come to one conclusion: the trial court's instruction was reversible error. Its failing was both wrong and unreasonable.

Nonetheless, this does not end my analysis. In a number of cases, the United States Supreme Court has held that state appellate courts can "cure" the kinds of constitutional error that occurred in Pursell's case. *Clemons v. Mississippi,* 494 U.S. 738, 741, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); *Richmond,* 506 U.S. at 42, 113 S.Ct. 528. First, the state court must adopt an adequate narrowing construction of the unconstitutional aggravating factor. *Richmond,* 506 U.S. at 42, 113 S.Ct. 528. Second, in a weighing state like Pennsylvania, the state court must actually reweigh the aggravating and mitigating circumstances in light of the narrowing construction. *Id.* at 48–49, 113 S.Ct. 528. Finally, if the state court does not reweigh, it can affirm the death sentence under a standard harmless-error review. *Clemons,* 494 U.S. at 741, 110 S.Ct. 1441. "Where the death sentence has been infected by a vague or otherwise constitutionally invalid aggravating factor, the state appellate court ... must actually perform a new sentence calculus, if the sentence is to stand." *Richmond,* 506 U.S. at 49, 113 S.Ct. 528. In the present case, the Pennsylvania Supreme Court performed no such calculus. It did not expressly adopt a narrowing construction of torture; it did not reweigh the aggravating and mitigating circumstances in the case; and it did not perform a harmless error analysis.

Under these circumstances, Pursell's death sentence cannot stand.

### (5) Harmless Error Analysis

■ Nor will I preserve Pursell's sentence through my own harmless error analysis. A writ of habeas corpus may issue only if the reviewing court finds that the constitutional error " 'had a substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. 1239). At the sentencing hearing, Pursell raised two issues: 1) that Brine did not feel pain because he was unconscious, (Tr. 1/26/82, at 121, 124–25); and 2) that Pursell did not have the intent to cause pain, *id.* at 22–23 (Rozwadowski testifying that the blows to Brine were not "applied just to cause pain. I think they were applied to cause—to ward off an attack or to silence somebody."). Unfortunately for Pursell, the trial court's instruction allowed the jury to impose death regardless of these issues. We do not know how the jury crafted its verdict. But we do know that the instructions themselves allowed the jury to impose death in a way that was inconsistent with the facts in this case, at odds with the definition of torture subsequently adopted by the Pennsylvania Supreme Court, and contrary to the United States Constitution. Had the trial court limited the jury's discretion in a way that the Eighth Amendment requires, there is a very real probability that the result of this proceeding would have been different. The error at issue was not harmless.

### (6) Conclusion to Torture Challenge

No one is more mindful of the deference due to our state courts than I am. Respect for the decisions of state courts is deeply rooted in our history, engrafted on our Constitution, and enshrined in the ha-

beas statute under which I grant relief today. Nonetheless, in certain cases, when our state courts are not merely wrong, but unreasonably so, federal courts have a role—indeed a duty—to step in and grant relief. 28 U.S.C. § 2254(d)(1). This is one of those cases. I will grant Pursell's claim for habeas relief because the trial court's instruction on the issue of torture was unconstitutional in violation of the Eighth Amendment.

## VII. CONCLUSION

For twenty years, Alan Pursell has sat on Pennsylvania's death row, awaiting execution. Over the course of that time, he has challenged his conviction and death sentence on appeal and in state post-conviction proceedings. Today, slightly more than twenty years after twelve jurors convicted Pursell of first-degree murder and sentenced him to death, I confirm the reliability of Pursell's conviction, but vacate his death sentence. As this lengthy opinion attests, this decision has not been reached lightly. I have considered all legal arguments raised, and I have read the entire trial transcript. My decision is not based on my view of the facts; nor is it grounded in some notion that twelve jurors got it right or wrong. Rather, my opinion is based on what I believe the Constitution requires. Pursell's lawyer failed to investigate, develop, and introduce overwhelming amounts of mitigating evidence, a clear violation of the Sixth Amendment. Furthermore, the trial judge did not adequately instruct the jury on the issue of torture, a clear violation of the Eighth Amendment. For these reasons, Pursell's death sentence cannot stand. Within 180 days of the entry of my Order in this case, the Commonwealth may conduct a new hearing on whether Alan Pursell should be sentenced to death. If the Commonwealth chooses not to conduct such a hearing, it shall sentence Pursell to life in prison in accordance with the laws of the Commonwealth.

An appropriate Order follows.

## ORDER

AND NOW this 1st day of February, 2002, upon consideration of petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, dkt. nos. 9 & 26, it is hereby ORDERED and DIRECTED that:

1. To the extent that petitioner seeks relief from his conviction for first-degree murder, his petition for habeas corpus relief is DENIED;

2. To the extent that petitioner seeks relief from his sentence of death, his petition for habeas corpus relief is GRANTED;

3. The execution of the writ of habeas corpus is STAYED for 180 days from the date of this Order, during which time the Commonwealth of Pennsylvania may conduct a new sentencing hearing in a manner consistent with this opinion;

4. After 180 days, should the Commonwealth of Pennsylvania not conduct a new sentencing hearing, the writ shall issue and the Commonwealth shall sentence petitioner to life imprisonment;

5. In accordance with 28 U.S.C. 2253(c)(2) and W.D. Pa. Local R. 9.4(L), a certificate of appealability is GRANTED to petitioner on those claims indicated in the foregoing Memorandum Opinion, *see* pp. 72 & 104;

6. If either party files an appeal to the United States Court of Appeals for the Third Circuit, this Order will be stayed pursuant to W.D. Pa. Local R. 9.4(L).

7. The Clerk of Court shall mark this CASE CLOSED.